# EXHIBIT A

C I T A T I O N

T H E   S T A T E   O F   T E X A S

## CAUSE NO. D-1-GN-17-002233

WC 3RD TRINITY LP

   vs.                                             , Plaintiff

STK REBEL AUSTIN LLC AND THE ONE GROUP HOSPITALITY,INC.,

                                                     , Defendant

TO:  STK REBEL AUSTIN, LLC.
      BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM
      1999 BRYAN ST STE 900
      DALLAS, TEXAS 75201-3136     **CERTIED MAIL :7014 3490 0000 6722 5646**

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

Attached is a copy of the ORIGINAL PETITION AND REQUEST FOR DISCLOSURE of the PLAINTIFF in the above styled and numbered cause, which was filed on MAY 22,2017 in the 200TH JUDICIAL DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, May 23, 2017.

REQUESTED BY:
BRIAN JOHN ELLIOTT
401 CONGRESS AVE  33RD FLOOR
AUSTIN, TX 78701
BUSINESS PHONE:(512)327-3300  FAX:(512)322-9238

Velva L. Price
Travis County District Clerk
Travis County Courthouse
1000 Guadalupe, P.O. Box 679003 (78767)
Austin, TX 78701

PREPARED BY: VICTORIA BENAVIDES

-- - -- - -- - -- - -- - -- **R E T U R N** -- - -- - -- - -- - -- - -- -

Came to hand on the _____ day of _____, _____ at _____ o'clock _____M., and

executed at _____ within the County of

_____ on the _____ day of _____, _____, at _____ o'clock _____M.,

by delivering to the within named _____, each

in person, a true copy of this citation together with the ORIGINAL PETITION AND REQUEST FOR

DISCLOSURE accompanying pleading, having first attached such copy of such citation to such copy of

pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

Sheriff / Constable / Authorized Person

By:_____

_____
Printed Name of Server

Notary Public, THE STATE OF TEXAS

_____ County, Texas

D-1-GN-17-002233               SERVICE BY DISTRICT CLERK       P01 - 000051832

☐ Original   ☐ Service Copy



5/22/2017 2:08:35 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-17-002233
victoria benavides

CAUSE NO. **D-1-GN-17-002233** _____

| | | |
|---|---|---|
| WC 3RD & TRINITY, LP, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| STK REBEL AUSTIN, LLC and THE ONE | § | |
| GROUP HOSPITALITY, INC., | § | |
| | § | **200th** |
| Defendants. | § | ___ JUDICIAL DISTRICT |

## ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiff WC 3rd & Trinity, LP ("WC" or "Landlord") files this Original Petition and Request for Disclosure against Defendants STK Rebel Austin, LLC ("STK" or "Tenant") and The One Group Hospitality, Inc. ("One Group" or "Guarantor") (together, "Defendants") and alleges as follows:

### I. DISCOVERY CONTROL PLAN

1.    Plaintiff WC intends to conduct discovery under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

### II. RULE 47(C) CLAIM FOR RELIEF

2.    Plaintiff WC seeks monetary relief over $200,000 but, at this time, not more than $1,000,000.00. Damages, however, continue to accrue.[1]

### III. PARTIES

3.    Plaintiff WC is a Texas limited partnership, authorized to conduct business in the State of Texas.

---

[1] Additionally, it should be noted that the Guaranty, addressed in detail further, ensures that three years of payment obligations as guaranteed.

**ORIGINAL PETITION AND REQUEST FOR DISCLOSURE**                                 **Page 1**

4.      Defendant STK is a Texas limited liability company, authorized to conduct business in the State of Texas. Defendant STK may be served with citation by serving its registered agent for service of process, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

5.      Defendant One Group is a Delaware corporation that, pursuant to the facts set forth below, transacts business in the State of Texas and has contracted with a Texas resident to perform a contract in whole or in part in this State. Defendant One Group may be served with citation by serving its registered agent for service of process, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 and, pursuant to Section 17.044 of the Texas Civil Practice and Remedies Code, by serving the Texas Secretary of State at Service of Process, Secretary of State, James E. Rudder Building, 1019 Brazos, Room 105, Austin, Texas 78701.

## IV. VENUE AND JURISDICTION

6.      Venue is mandatory in Travis County pursuant to Section 15.020 of the Texas Civil Practice and Remedies Code because this action arises from a "major transaction" as defined therein, and the parties' agreement made subject of this action mandates Travis County as the county of suit. Specifically, Section 28.9 of the Lease provides that venue for any action "shall be the county in which Rentals are due pursuant to Section 4.1 and Section 1.1 of this Lease unless venue is required to be in the county in which the Demised Premises is situated." Exhibit A, § 28.9. Section 4.1 of the Lease provides that Rentals are payable to Landlord at its address, which is set forth in Section 1.1 of the Lease as 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, which exists in Travis County, Texas.

## V. FACTS

### The Tenant

7.    Upon information and belief, Defendant STK is an operating subsidiary of Defendant One Group formed for the purpose of opening a restaurant in Austin, Texas.

8.    Defendant One Group is a publicly-traded global hospitality company that develops, owns and operates restaurants and lounges. One Group's primary restaurant brand is "STK" which is described as steakhouse concept that combines high energy social atmosphere of a chic lounge with the quality and fine dining experience of a traditional upscale steakhouse. According to One Group's, Form 10-Q, quarterly report filed with the Securities and Exchange Commission for the period ending March 31, 2017, One Group owned and operated or managed twenty-four (24) restaurants and lounges including fourteen (14) STK restaurants in major metropolitan cities in the United States, Canada and Europe including Atlanta, Chicago, Denver, Ibiza, Las Vegas, London, Los Angeles, Miami, Milan, New York, Orlando and Toronto.

9.    Defendant One Group's CEO, Jonathan Segal, is described on One Group's website as a pioneer in the restaurant industry and as having "over 36 years of experience in developing and operating, hotels, bars and hospitality projects."

10.    In its public filings with the Securities Exchange Commission including its annual reports and its quarterly reports (the "SEC filings") One Group represents to its shareholders and the public that it devotes significant time and resources to analyzing each prospective restaurant site. These public filings also state that Defendant One Group incurs substantial time and costs in the selection and build-out of its locations including confirming necessary modifications, and researching and obtaining necessary permits and required approvals.[2]

---

[2] Form 10-K Annual Report for period ending Dec. 31, 2016. **Site Selection and Development.** We believe that the locations of our restaurants are critical to our long-term success, and we devote significant time and resources

### The Lease

11.     Effective June 5, 2015, Plaintiff WC as Landlord and Defendant STK as Tenant entered into that certain Lease Agreement ("Lease") whereby Landlord leased to Tenant approximately 10,994 square feet of retail space located at 305 E. 3rd Street, Austin, Texas 78701, and as more particularly described in the Lease (the "Premises"). The Premises included square footage on both the ground floor and a rooftop area ("Rooftop Patio"). A true and correct copy of the Lease is attached hereto as Exhibit A.

12.     Pursuant to Article 1.1(i) of the Lease, the parties agreed that the Rent Commencement Date is March 1, 2016. The term of the Lease is for a period of one hundred and twenty (120) months after the Rent Commencement Date ("Lease Term").

13.     Also pursuant to the Article 2.2(ii) of the Lease, the Parties agreed that if the Premises was unable to be used for the Permitted Use, as evidenced by Tenant being unable to obtain the permits to construct, open and/or the operate the Premises for such use, after using its commercially reasonable best efforts to do so, Tenant would have the right to terminate the Lease, and Landlord would refund Tenant's Security Deposit and any prepaid Rental, less $2,500, as well as any Allowance for tenant improvements paid by Landlord to Tenant, and neither party would have any further rights or obligations under the Lease. The Lease provided that if Tenant did not terminate under these conditions on or before August 3, 2015, the expiration of the Initial

---

to analyzing each prospective site. We intend to continue our focus on (i) major metropolitan areas with demographic and discretionary spending profiles that favor our high-end concepts and (ii) partners with excellent track records and brand recognition. We also consider factors such as traffic patterns, proximity to high-end shopping areas and office buildings, hotels and convention centers, area restaurant competition, accessibility and visibility. Our ability to open new restaurants depends upon, among other things, finding quality locations, reaching acceptable agreements regarding the lease of locations, raising or having available adequate capital for construction and opening costs, timely hiring, training and retaining the skilled management and other employees necessary to meet staffing needs, obtaining, for an acceptable cost, required permits and approvals and efficiently managing the amount of time and expense to build out and open each new restaurant.

Contingency Period, then Tenant's right to terminate, would thereafter be void and of no further force and effect. This special concession allowing the Tenant to exit the Lease if there was a problem obtaining permits, was agreed upon after lengthy negotiations with Defendants, who according to their own disclosures, have decades of experience developing and opening restaurant spaces all over the globe.

14.     Further pursuant to the Lease, Defendant STK agreed to pay certain monthly Rental amounts, which consisted of Minimum Guaranteed Rentals, Percentage Rentals, and Defendant STK's proportionate share for Real Estate Charges, Insurance Expenses, Common Area Maintenance Charges, property management fees, and any other amounts due and payable by Defendant STK under the Lease (collectively, "Rent"), on or before the first (1st) day of each calendar month following the Rent Commencement Date during the Lease Term.

15.     The Premises, as detailed in Article III of the Lease, was being leased "AS IS" with Tenant accepting all defects, if any, and with the understanding that Landlord was making no warranty of any kind with respect to the Premises.  Tenant acknowledged that it had been given the opportunity to inspect the Premises itself, as well as the opportunity to have qualified experts inspect the Premises as well, prior to the execution of the Lease.

16.     Landlord had minimal requirements under the Lease for the delivery of the Premises: (1) broom clean/water tight condition, (2) free of hazardous substances, (3) in compliance with all local codes and regulations with respect to the Permitted Use (4) with existing HVAC in good working order and, (5) otherwise in accordance with the terms of the Lease. As previously noted, Article 1.1(o) of the Lease defines "Permitted Use" as a "Restaurant, Bar and/or Lounge operating as an STK Rebel." Notably, this agreed-upon definition does not mention, and is not tied to any general or specific requirements, regarding the Rooftop Patio. In contrast,

however, the remainder of Article 1.1(o) is the Landlord's negotiated acknowledgement of certain specific requirements of the Permitted Use for the STK restaurant lounge concept, including (a) playing of loud music (b) playing of pre-recorded ambient background music; (c) installing and operating one or more private dining rooms; and (d) using the Premises for private parties.

17.     In Article 3.1 of the Lease, Tenant accepted the Premises "AS IS, WHERE IS AND WITH ALL FAULTS" as was further iterated in Exhibit B of the Lease, which also acknowledged that Landlord was providing a generous monetary allowance for Tenant finish-out which would, in the event Tenant was not in default of the Lease, provide funding for Tenant's construction requirements for the Premises, including without limitation any permitted improvements to the Rooftop Patio. Each of these clauses was, in turn, subject to Tenant's right under the Lease to terminate the Lease should it be unable to obtain permits for its Permitted Use.

18.     As set forth in Article XXII of the Lease, the parties agreed that the following event, among other things, will be deemed to be an Event of Default under the Lease:

> 22.1     The following events of default shall be deemed to be events of default by Tenant under this Lease:
>
> (a)     Tenant shall fail to pay any installment of Rental or any other obligation under this Lease involving the payment of money and such failure shall continue for a period of five (5) days after written notice thereof to Tenant provided, however, that if during the immediately preceding twelve (12) month period Landlord has already given Tenant two written notices of the failure to pay installments of Rental, no further notice shall be required to Tenant for the next twelve (12) months (i.e., the event of default will automatically occur on the sixth (6th) day after the date upon which the Rental becomes due).

Lease, Exhibit A, § 22.1.

19.     As also set forth in Article 22 of the Lease, upon any such Event of Default, the parties agreed that Landlord may pursue any one or more of the following remedies against Tenant:

---

**ORIGINAL PETITION AND REQUEST FOR DISCLOSURE**                    **Page 6**

(i) seek reimbursement from Tenant for the damages suffered by Landlord as a result of the Event

of Default, plus interest; and/or (ii) terminate the Lease, upon which Tenant must surrender the

Premises or otherwise Landlord may enter upon and take possession of the Premises, and expel or

remove Tenant, in addition to other remedies provided for in the Lease and under all applicable

laws. Additionally, however, Landlord was induced to enter the Lease by the Guaranty provided

by Tenant's affiliate, the publically traded company, The One Group, Inc. Specifically, the

Guaranty states that "in consideration of, and in order to induce (Landlord) to execute (the

Lease)... (Guarantor) hereby guarantees unto Landlord the full and prompt payment and

performance of Tenant's obligations arising under the Lease...". *See* paragraphs 21-23 *infra.*

20.     The parties further agreed that if Landlord employs an attorney on account of any

breach or default by Tenant, Tenant shall reimburse Landlord its reasonable, out-of-pocket

attorney's fees incurred in connection therewith. Lease, § 22.6.

### The Guaranty

21.     To secure Tenant's performance of its obligations under the Lease, Defendant One

Group, as Guarantor, executed a Limited Lease Guaranty whereby it guaranteed the payment and

performance of all Guaranteed Obligations under the terms of the Lease (the "Guaranty"). A true

and correct copy of the Guaranty is attached to the Lease as Exhibit C thereto.

22.     Pursuant to the Guaranty, the parties agreed that if Tenant shall default in the

payment or performance of any of the Obligations, Guarantor shall pay the amount due to Landlord

as and when the same became due under the Lease. The parties further agreed that, on demand

Guarantor shall reimburse Landlord all reasonable, out-of-pocket costs and expenses that may arise

in enforcing the Guaranty, or damages resulting from any Tenant Event of Default, including

reasonable attorneys' fees. Lease, Ex. C thereto.

23.     The parties further agreed that the Guaranty is an absolute and unconditional guaranty of payment and performance of the Guaranteed Obligations, as defined therein, and that Guarantor's obligations are irrevocable and unconditional. Lease, Ex. C thereto. In addition, the parties agreed that the Guaranty is enforceable against the Guarantor without Landlord's exhaustion of remedies against the Tenant under the Lease. *Id.*

### Tenant's Failure to Exercise Right to Terminate During the Contingency Period

24.     Tenant's right to terminate the Lease during the Contingency Period, by its express terms, expired on August 3, 2015. Tenant did not exercise this right, which required written notice of termination of the Lease on or before August 3, 2015. Thus, this right has unequivocally expired. Tenant was, and is, able to obtain the permits required to develop the space; however Tenant has intentionally, and with bad faith, failed to do so given its own financial issues that prevent it from performing its payment and other obligations under the Lease.

### Tenant's Opening Date Default Under the Lease

25.     On or about May 26, 2016, Landlord notified Tenant in writing that as a result of Tenant's failure to timely pursue the Permits and Tenant's Work required to commence business operations, and failure to remit drawings for the Demised Premises to Landlord, Tenant was not using commercially reasonable best efforts to cause the Opening Date to occur on or before the March 1, 2016 Rent Commencement Date. A true and correct copy of Landlord's May 26, 2016 correspondence is attached hereto as Exhibit B. As set forth in the Lease, Landlord notified Tenant that pursuant to the Lease, Tenant was obligated to use such commercially reasonable best efforts pursuant to Section 9.1 therein. As of the date of this Petition, and as a result of Tenant's failure to use its commercially reasonable best efforts in breach of Section 22.1(b) of the Lease, the

Opening Date has not occurred, the Premises remains vacant, and the Landlord continue to incur significant monetary damages as a result.

26.     Defendants are presenting varying and conflicting interpretations of their obligations under the Lease. For example, recent public statements in Defendant One Group's Form 10-Q Quarterly Report dated Mary 15, 2017 indicate that Tenant presently intends to open an STK restaurant in Austin in 2018. This date, however, is contrary to the obligations under, the Lease since such an opening would be two years after the required opening date under the Lease. Finally, and most importantly, however, Defendants have represented to Landlord that they do not believe they can perform under the Lease – thus, no opening would occur.

### Tenant's Monetary Default Under the Lease and Landlord's Demand Under the Guaranty

27.     On or about October 10, 2016, Landlord first notified Tenant and Guarantor in writing that Tenant owed outstanding Rent and other charges in the amount of $353,888.51 (and as such amount continues to accrue, the "Delinquent Amount"). A true and correct copy of Landlord's October 10, 2016 correspondence is attached hereto as Exhibit C. As set forth in the Lease, Landlord notified Tenant and Guarantor that pursuant to Section 22.1(a) of the Lease, Tenant's failure to remit the Delinquent Amount within five (5) days constituted an Event of Default under the Lease. Landlord further notified Tenant and Guarantor that, pursuant to the Lease, should Landlord fail to receive the Delinquent Amount within five (5) days, Landlord would exercise all applicable remedies as provided in the Lease and/or applicable law. On or about December 15, 2016, Landlord further notified Tenant and Guarantor in writing that the Delinquent Amount as of that date was not less than $117, 965.34, which continued to accrue. A true and correct copy of Landlord's December 15, 2016 correspondence is attached hereto as Exhibit D.

To date, Tenant has failed and/or refused to remit the Delinquent Amount, which now totals $239,668.11, and which continues to accrue (the "Monetary Default").

28.     Tenant's motivation for knowingly defaulting, rather than performing, under the Lease is outlined by the recently announced change of direction in the business of The One Group. The One Group's press release dated April 21, 2017 states that in order to provide a better return for its investors - including its majority shareholder and CEO, Jonathan Segal - The One Group was pivoting its growth strategy from opening new capital intensive restaurant locations, like the planned opening under this Lease, to an asset-light business model focused instead on management and licensing opportunities. The delay in opening, as well as delaying or cancelling the opening certain of their other planned locations around the world (including Boston, Dallas, and Edinburgh, Scotland), aligns with the plan of The One Group to present to its investors a more attractive and less capital intensive growth plan.

29.     Given the Defendant's stressed financial position and change in business strategy, after the negotiated Initial Contingency Period had expired, rather than perform its lease obligations, Tenant instead fabricated a false narrative, feigning ignorance of the possibility that the Rooftop Patio would require repairs in order to function as a patio, and claiming that Landlord somehow mislead Defendants into assuming Lease obligations, despite Defendants status as sophisticated parties and written lease terms contemplating the required delivery condition and outlining Tenant's lease termination contingency option.

## VI. CAUSES OF ACTION

A.     **Count 1 – Breach of Lease (Against Defendant STK)**

30.     Plaintiff incorporates all preceding paragraphs as if set forth herein.

31.     The Lease is a valid and enforceable written contract executed by Plaintiff WC and Defendant STK.   Plaintiff WC performed, tendered performance of, or was excused from

performing its contractual obligations under the Lease, and is the proper party to sue for breach of the Lease. Defendant STK's failure to tender the Delinquent Amount as required by the Lease constitutes a material breach and Event of Default under the Lease, for which Plaintiff WC has suffered damages, in addition to amounts accruing, which are within the jurisdictional limits of this Court. Defendant STK received written notice of this Event of Default and failed to cure same.

**B.      Count 2 – Breach of Guaranty (Against Defendant One Group)**

32.      Plaintiff incorporates all preceding paragraphs as if set forth herein.

33.      The Guaranty is a valid and enforceable written contract executed by Plaintiff WC and Defendant One Group.  Plaintiff WC performed, tendered performance of, or was excused from performing its contractual obligations under the Guaranty, and is the proper party to sue for breach of the Guaranty. Defendant One Group's failure to fulfill its Guaranteed Obligations under the Guaranty by its failure to tender the Delinquent Amount as required by the Lease constitutes a material breach under the Guaranty, for which Plaintiff WC has suffered damages, in addition to amounts accruing, which are within the jurisdictional limits of this Court. Defendant One Group received written notice of this Event of Default and failed to cure same.

## VII. CONDITIONS PRECEDENT

34.      All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## VIII. JURY DEMAND

35.      Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## IX. ATTORNEYS' FEES

36.      Plaintiff is entitled to recover attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and pursuant to paragraph 22.6 of the Lease.  Plaintiff

incorporates the provisions of the above paragraphs and would show the Court that Plaintiff is entitled to judgment against STK and One Group, jointly and severally, for Plaintiff's reasonable and necessary attorneys' fees, as provided by the Lease and the Guaranty.

## X. REQUEST FOR DISCLOSURE

37.    Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

38.    For the above and foregoing reasons, Plaintiff requests that Defendants be cited to appear and answer herein, and, upon final trial of this matter, that judgment be entered against Defendants, jointly and severally, for the amount due under the Lease and Guaranty plus prejudgment interest, costs of court, reasonable and necessary attorneys' fees, post-judgment interest, and such other and further relief to which Plaintiff may show itself justly entitled.

Respectfully submitted,

By: _____

Brian Elliott
Texas Bar No. 24101036
Email: belliot@world-class.com
Maryann Norwood
Texas Bar No. 24026978
Email: mnorwood@wccapitalgroup.com
WC 3RD & TRINITY, LP
401 Congress Ave., 33rd Floor
Austin, Texas 78701
Telephone: (512) 327-3300
Facsimile: (512) 322-9238

ATTORNEYS FOR PLAINTIFF

# CIVIL CASE INFORMATION SHEET

**CAUSE NUMBER** *(FOR CLERK USE ONLY):* _____   **COURT** *(FOR CLERK USE ONLY):* _____

**STYLED** WC 3rd & Trinity, LP v. STK Rebel Austin, LLC, and The One Group Hospitality, Inc.

(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing. This sheet, approved by the Texas Judicial Council, is intended to collect information that will be used for statistical purposes only. It neither replaces nor supplements the filings or service of pleading or other documents as required by law or rule. The sheet does not constitute a discovery request, response, or supplementation, and it is not admissible at trial.

| 1. Contact information for person completing case information sheet: | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|
| Name: Brian Elliott  Email: belliott@world-class.com  Address: 401 Congress Ave 33rd Floor  City/State/Zip: Austin, Texas 78701  Telephone: 512-327-3300  Fax: 512-322-9238  Signature:  State Bar No: 24101038 | Plaintiff(s)/Petitioner(s): WC 3rd & Trinity, LP  Defendant(s)/Respondent(s): STK Rebel Austin, LLC, and The One Group Hospitality, Inc.  [Attach additional page as necessary to list all parties] | ☒ Attorney for Plaintiff/Petitioner  ☐ Pro Se Plaintiff/Petitioner  ☐ Title IV-D Agency  ☐ Other:  Additional Parties in Child Support Case:  Custodial Parent:  Non-Custodial Parent:  Presumed Father: |

## 2. Indicate case type, or identify the most important issue in the case (select only 1):

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract* ☐ Consumer/DTPA ☐ Debt/Contract ☐ Fraud/Misrepresentation ☐ Other Debt/Contract: | ☐ Assault/Battery ☐ Construction ☐ Defamation *Malpractice* ☐ Accounting ☐ Legal ☐ Medical ☐ Other Professional Liability: | ☐ Eminent Domain/Condemnation ☐ Partition ☐ Quiet Title ☐ Trespass to Try Title ☐ Other Property: | ☐ Annulment ☐ Declare Marriage Void *Divorce* ☐ With Children ☐ No Children | ☐ Enforcement ☐ Modification—Custody ☐ Modification—Other |
| *Foreclosure* ☐ Home Equity—Expedited ☐ Other Foreclosure ☐ Franchise ☐ Insurance ☒ Landlord/Tenant ☐ Non-Competition ☐ Partnership ☐ Other Contract: | ☐ Motor Vehicle Accident ☐ Premises *Product Liability* ☐ Asbestos/Silica ☐ Other Product Liability List Product: ___  ☐ Other Injury or Damage: | **Related to Criminal Matters** ☐ Expunction ☐ Judgment Nisi ☐ Non-Disclosure ☐ Seizure/Forfeiture ☐ Writ of Habeas Corpus— Pre-indictment ☐ Other: | **Title IV-D** ☐ Enforcement/Modification ☐ Paternity ☐ Reciprocals (UIFSA) ☐ Support Order | |
| | | | *Other Family Law* ☐ Enforce Foreign Judgment ☐ Habeas Corpus ☐ Name Change ☐ Protective Order ☐ Removal of Disabilities of Minority ☐ Other: | *Parent-Child Relationship* ☐ Adoption/Adoption with Termination ☐ Child Protection ☐ Child Support ☐ Custody or Visitation ☐ Gestational Parenting ☐ Grandparent Access ☐ Parentage/Paternity ☐ Termination of Parental Rights ☐ Other Parent-Child: |
| **Employment** | | **Other Civil** | | |
| ☐ Discrimination ☐ Retaliation ☐ Termination ☐ Workers' Compensation ☐ Other Employment: | ☐ Administrative Appeal ☐ Antitrust/Unfair Competition ☐ Code Violations ☐ Foreign Judgment ☐ Intellectual Property | ☐ Lawyer Discipline ☐ Perpetuate Testimony ☐ Securities/Stock ☐ Tortious Interference ☐ Other: | | |
| **Tax** | **Probate & Mental Health** | | | |
| ☐ Tax Appraisal ☐ Tax Delinquency ☐ Other Tax | *Probate/Wills/Intestate Administration* ☐ Dependent Administration ☐ Independent Administration ☐ Other Estate Proceedings | ☐ Guardianship—Adult ☐ Guardianship—Minor ☐ Mental Health ☐ Other: | | |

## 3. Indicate procedure or remedy, if applicable (may select more than 1):

| | | |
|---|---|---|
| ☐ Appeal from Municipal or Justice Court ☐ Arbitration-related ☐ Attachment ☐ Bill of Review ☐ Certiorari ☐ Class Action | ☐ Declaratory Judgment ☐ Garnishment ☐ Interpleader ☐ License ☐ Mandamus ☐ Post-judgment | ☐ Prejudgment Remedy ☐ Protective Order ☐ Receiver ☐ Sequestration ☐ Temporary Restraining Order/Injunction ☐ Turnover |

# Exhibit A

# LEASE AGREEMENT

Landlord: _____ WC 3rd and Trinity, LP _____

Tenant: _____ STK Rebel Austin, LLC _____

Effective Date: June 5, 2015

| ARTICLE | TITLE | PAGE |
|---|---|---|
| I. | Definitions and Certain Basic Provisions | 1 |
| II. | Granting Clause | 2 |
| III. | Delivery of Premises; Relocation of Premises | 2 |
| IV. | Minimum Guaranteed Rental and Percentage Rental | 3 |
| V. | Sales Reports, Records and Financial Statements | 4 |
| VI. | Tenant's Responsibility for Taxes, other Common Area Maintenance Charges, Real Estate Charges and Insurance Expense | 4 |
| VII. | Common Area | 5 |
| VIII. | Provisions Applicable to All Rentals | 6 |
| IX. | Use and Care of Demised Premises | 6 |
| X. | Maintenance and Repair of Demised Premises | 7 |
| XI. | Alterations | 8 |
| XII. | Landlord's Right of Access | 8 |
| XIII. | Signs; Store Fronts | 8 |
| XIV. | Utilities | 9 |
| XV. | Insurance Coverages | 9 |
| XVI. | Waiver of Liability; Indemnification; Mutual Waiver of Subrogation | 9 |
| XVII. | Damages by Casualty | 10 |
| XVIII. | Eminent Domain | 10 |
| XIX. | Assignment and Subletting | 10 |
| XX. | Subordination; Attornment; Estoppels | 11 |
| XXI. | Direction of Tenant's Energies | 12 |
| XXII. | Default by Tenant and Remedies | 12 |
| XXIII. | Landlord's Contractual Security Interest | 15 |
| XXIV. | Holding Over | 15 |
| XXV. | Notices | 15 |
| XXVI. | Commissions; Advice from Agent | 16 |
| XXVII. | Regulations | 16 |
| XXVIII. | Miscellaneous | 17 |

| EXHIBIT A: | DEMISED PREMISES |
|---|---|
| EXHIBIT B: | CONSTRUCTION: TENANT ACCEPTANCE OF SPACE AND TENANT'S WORK |
| EXHIBIT C: | LIMITED LEASE GUARANTY |
| EXHIBIT D: | RENEWAL OPTION |
| EXHIBIT E: | GROSS SALES EXCLUSIONS |
| EXHIBIT F: | TENANT SIGN PLAN |
| EXHIBIT G: | COMMON AREA MAINTENANCE EXCLUSIONS |

<u>LEASE AGREEMENT</u>

ARTICLE I
<u>DEFINITIONS AND CERTAIN BASIC PROVISIONS</u>

    1.1    The following list sets out certain defined terms and certain financial and other information pertaining to this Lease Agreement (the "Lease"):

    (a)    **"Landlord":**    WC 3rd and Trinity, LP

    (b)    **Landlord's address:**    401 Congress Avenue, 33rd Floor, Austin, Texas 78701

    (c)    **"Tenant":**    STK Rebel Austin, LLC

    (d)    **Tenant's address:**    411 West 14th Street, 2nd Floor, New York, New York 10014

    (e)    **Tenant's trade name:**    STK Rebel, subject to the provisions of Section 1.01(o) below.

    (f)    **Tenant's Guarantor:**    The One Group Hospitality, Inc.

    (g)    **"Demised Premises":** The building located at 305 E. 3rd Street, Austin, Texas 78701 which, contains approximately 6,960 square feet of rentable area on the ground floor, in addition to an approximately 4,034 square foot rooftop area ("**Rooftop Patio**") in an approximately 19,244 gross square foot building containing approximately 15,210 square feet of rentable area ("**Building**") on a portion of the tract of land as more particularly described in <u>Exhibit "A"</u>. Landlord shall have the right from time to time to re-measure the number of usable square feet within the Demised Premises and the Building (as applicable) utilizing Landlord's architect and in accordance with Building Owners and Managers Association (BOMA) Standards. In the event of any variance from the actual measured rentable area of the Building and the Demised Premises and the estimates thereof as of the date of execution of this Lease (the "**Effective Date**"), Landlord may adjust Tenant's obligations under this Lease to reflect such variance; <u>provided that</u>, no such adjustment shall increase the Minimum Guaranteed Rental payable by Tenant but may increase the Tenant's Proportionate Share by up to ten percent (10%) (the "**Cap**") and any related obligations of Tenant hereunder; <u>provided further that</u>, the Cap shall not apply to any variance caused by alterations to the Demised Premises made by Tenant after the Effective Date which modify the footprint of the Building.

    (h)    **Commencement Date:** The date Landlord delivers the Demised Premises to Tenant in accordance with the terms of this Lease, which is expected to be July 1, 2015 (the "**Scheduled Commencement Date**"); provided that, if Landlord fails to deliver the Demised Premises to Tenant within ninety (90) days of the Scheduled Commencement Date subject to any delay caused or contributed by Tenant, Tenant may terminate this Lease, without penalty, upon thirty (30) days' notice to Landlord (during which notice period Landlord shall be permitted to deliver possession of the Demised Premises to Tenant, in which case, Tenant shall not be permitted to terminate this Lease pursuant to this Section 1.1(h)).

    (i)    **Rent Commencement Date:** The earlier of (i) the date upon which Tenant commences business operations at the Demised Premises and opens to the general public (the "**Opening Date**"), and (ii) March 1, 2016, subject to extension as provided for in Section 28.18.

    (j)    **Lease Term:** Commencing on the Effective Date and continuing for one hundred twenty (120) months after the Rent Commencement Date subject to the Renewal Option described in Section 1.1(k); provided that if the Rent Commencement Date is a date other than the first day of a calendar month, the Lease Term shall include said number of months in addition to the remainder of the calendar month in which the Rent Commencement Date occurs.

    (k)    **Renewal Option:** Landlord hereby grants to Tenant the right and option to renew and extend the primary Term of this Lease for two (2) consecutive renewal terms of five (5) years each in accordance with Exhibit "D" attached hereto.

    (l)    **Minimum Guaranteed Rental:** Minimum Guaranteed Rental shall be as follows during the respective months of the Lease Term following the Rent Commencement Date:

| | |
|---|---|
| Before Rent Commencement Date | $0.00 per month ($0.00 annually) |
| Month 1* through 36 | $27,840.00 per month ($334,080.00 annually) |
| Month 37 through 60 | See First Rent Adjustment as specified in Section 4.3 |
| Month 61 through 120 | See Second Rent Adjustment as specified in Section 4.4 |
| First Renewal Period | Minimum Guaranteed Rental payable in Month 120 multiplied |
|     (Months 121 through 180) | by 1.1, per month |
| Second Renewal Period | Minimum Guaranteed Rental payable in Month 180 multiplied |
|     (Months 181 through 240) | by 1.1, per month |

    *Month 1 shall begin on the first day of the first full calendar month following the Rent Commencement Date unless the Rent Commencement Date starts on the first (1st) day of a calendar month, in which case, Month 1 shall begin on the Rent Commencement Date. All Rentals due for any partial month from the Rent Commencement Date to Month 1 shall be prorated (as described in Section 4.2 below) based on the Minimum Guaranteed Rental set forth in Section 1.1(l) for Month 1.

2

In addition to the Minimum Guaranteed Rental and Percentage Rental, Tenant shall pay to Landlord an additional sum of $1,546.66 per month during each of Month 1 through 36 (i.e., $55,680.00 in total) (the "**Supplemental Rent**"); provided that, if the Opening Date occurs before March 1, 2016, the Supplemental Rent shall be prorated and reduced based on the proportion by which (i) the number of days prior to March 1st the Opening Date occurs bears to (ii) 91 (i.e., the total number of days from December 1, 2015 through February 29, 2016). On or before the first (1st) day of each of Month 1 through 36, Supplemental Rent shall be payable to Landlord, together with the Minimum Guaranteed Rental, at Landlord's address, or to Landlord, via wire as instructed in writing by Landlord.

(m)  Percentage Rental Rate: 6.0% calculated in accordance with Section 4.5 below.

(n)  Security Deposit: $35,902.65, such Security Deposit being due and payable on the Commencement Date.

(o)  Permitted Use: Restaurant, Bar and/or Lounge operating as an STK Rebel. Landlord understands, acknowledges and agrees that (i) Demised Premises will operate in a manner substantially similar to the "STK Rebel" steakhouse restaurants operated by Tenant's affiliates, and (ii) such concept involves a number of elements uncharacteristic among traditional steakhouse restaurants, including without limitation, the following: (a) playing of loud pre-recorded music and using a "disc jockey" who may be accompanied by live instrument performances, subject to compliance with all local noise ordinances; (b) playing pre-recorded ambient background music; (c) installing and operating one or more private dining rooms in the Demised Premises; and (c) using the Demised Premises (or any portion thereof) for private parties (collectively, the "STK Concept"). Notwithstanding the foregoing or anything in this Lease to the contrary, Landlord acknowledges and agrees that Tenant and its affiliates operate "STK Rebel" restaurants in numerous locations worldwide and that in the event some or all these locations are rebranded, Tenant shall have the right, with Landlord's consent (such consent not to be unreasonably withheld) and the consent of Landlord's lender for the Building as applicable at the time (the "**Lender**"), to the extent such consent is required under Landlord's agreements with Lender, to rebrand the Demised Premises, including, without limitation, rebranding signs, posters, promotional materials, equipment, furnishings, décor and trade names, in order to maintain continuity between the restaurants. In addition, Tenant shall have the right, with Landlord's consent (such consent not to be unreasonably withheld) and Lender's consent, to the extent such consent is required under Landlord's agreements with Lender, to rebrand the Demised Premises in the event Tenant reasonably determines, in good faith, that such rebranding is in the best interests of Tenant. In the event of any such rebranding with the consent of Landlord and its Lender, the "STK Concept" shall (for the purposes of this Lease) be deemed amended to incorporate such rebranding.

Tenant acknowledges that the above specification of a "Permitted Use" means only that Landlord has no objection to the specified use and, except as otherwise expressly set forth in this Lease, does not include any representation or warranty by Landlord as to whether or not such specified use complies with applicable laws and/or requires special governmental permits.

(p)  Common Area Maintenance Charge: Estimated to be $2,997.70 per month, payable in advance, and subject to reconciliation and adjustment pursuant to Articles VI and VII below.

1.2  The following chart is provided as an estimate of Tenant's initial monthly payment broken down into its components. This chart, however, does not supersede the specific provisions contained elsewhere in this Lease and excludes Percentage Rental:

| | |
|---|---|
| Initial Minimum Guaranteed Rental (Sections 1.1 (l) and 4.2) | $27,840.00 |
| Supplemental Rent (Section 1.1(l)) | $1,546.66 |
| Initial Escrow Payment for Taxes, Common Area Maintenance and Other Real Estate Charges and Initial Escrow Payment for Insurance (Article VI) | $8,062.65 |
| Total Initial Monthly Payment* | $37,449.31 |

*For Month 1 following the Rent Commencement Date

## ARTICLE II
## GRANTING CLAUSE

2.1  Landlord leases the Demised Premises to Tenant upon the terms and conditions set forth in this Lease.

2.2  (i)  From and after the Effective Date, and notwithstanding anything in this Lease to the contrary, Tenant and its agents, employees and authorized representatives, at Tenant's sole cost and expense, may enter upon the Demised Premises at all reasonable times for the purpose of inspecting the Demised Premises, reviewing information concerning the Demised Premises and otherwise preparing for construction and alterations to be carried out therein by Tenant, including without limitation, the preparation of plans, designs and renderings which are required to be submitted by Tenant to Landlord and the appropriate governmental authorities, in each case, subject to the terms of this Lease but without the payment of any Rental and without the same being deemed the "Commencement Date". In addition, from and after the Effective Date, Landlord agrees to fully cooperate with Tenant in its effort to seek to obtain an alcohol permit and any other permits, licenses and sign-off (including with respect to parking) required to construct, open and /or operate the Demised Premises for the Permitted Purpose (collectively,

"Permits") and, within five (5) business days of Tenant's request, Landlord agrees to execute all documentation which is or may be necessary for Tenant to obtain such Permits.

(ii)     Notwithstanding anything in this Lease to the contrary, if the Demised Premises is unable to be used for the Permitted Use as evidenced by Tenant being unable to obtain the Permits to construct, open and/or the operate the Demised Premises for such use (despite using its commercially reasonable best efforts to obtain the same and provided that any such inability is not caused by the actions or inactions of Tenant [e.g., there is a city-wide moratorium on granting such Permits]), then Tenant may notify Landlord of the same by providing written notice to Landlord on or before August 3, 2015 (the "Initial Contingency Period"). In the event Tenant so notifies Landlord in writing it reasonably believes it cannot obtain the Permits, Tenant may terminate this Lease upon written notice to Landlord on or before the expiration of the Initial Contingency Period. In such event, Landlord shall refund Tenant's Security Deposit and any prepaid Rental, less $2,500 as well as any Allowance for tenant improvements paid by Landlord to Tenant, and neither party shall have any further rights or obligations hereunder. If Tenant does not terminate this Lease as provided herein on or before the expiration of the Initial Contingency Period, then Tenant's right to terminate as provided in this Section shall thereafter be void and of no further force and effect.

## ARTICLE III
## DELIVERY OF PREMISES

3.1     Except as expressly set forth in this Lease, (i) the Demised Premises is being leased "AS IS", with Tenant accepting all defects, if any, and (ii) Landlord makes no warranty of any kind, express or implied, with respect to the Demised Premises (without limitation, Landlord makes no warranty as to the habitability, fitness or suitability of the Demised Premises for a particular purpose). This Section 3.1 is subject to any contrary requirements under applicable law; however, in this regard Tenant acknowledges that it has been given the opportunity to inspect the Demised Premises and to have qualified experts inspect the Demised Premises prior to the execution of this Lease. Notwithstanding the foregoing, Landlord covenants, agrees, represents and warrants to deliver the Demised Premises to Tenant (a) in broom clean, watertight condition, free of Hazardous Substances (as defined below), (b) in compliance with all local codes and Regulations (as defined below) with respect to the Permitted Use, (c) with the existing HVAC (as defined below) serving the Demised Premises in good working order and (d) otherwise in accordance with the terms of this Lease ((a) and (d) collectively, the "Landlord's Work"). In the event that during the performance of Tenant's Work it is determined that remediation for asbestos or other Hazardous Substances existing at the Demised Premises as of the Commencement Date is required at the Demised Premises (the "Remediation Work"), then Landlord shall reimburse Tenant for the reasonable costs and expenses actually paid by Tenant for the Remediation Work.

3.2     Tenant hereby agrees and acknowledges that the Demised Premises may not contain sufficient parking for its Permitted Use. In such case, Landlord covenants and agrees, at the request of Tenant but at no cost to Landlord, to assist Tenant in identifying and locating offsite parking and valet parking service providers for the Demised Premises. Tenant shall be responsible, at its sole cost and expense, to contract with any valet service provider.

## ARTICLE IV
## MINIMUM GUARANTEED RENTAL AND PERCENTAGE RENTAL

4.1     Minimum Guaranteed Rental shall accrue from the Rent Commencement Date, and shall be payable to Landlord, at Landlord's address, or to Landlord, via wire as instructed in writing by Landlord.

4.2     Tenant shall pay to Landlord the Minimum Guaranteed Rental in monthly installments in the amount(s) specified in Section 1.1(l) of this Lease. The first (1st) such monthly installment shall be due and payable on or before the Rent Commencement Date. Subsequent installments shall be due and payable on or before the first (1st) day of each calendar month following the Rent Commencement Date during the Lease Term; provided that if the Rent Commencement Date is a date other than the first (1st) day of a calendar month, there shall be due and payable on or before such date, as Minimum Guaranteed Rental for the balance of such calendar month, a sum equal to a portion of the Minimum Guaranteed Rental specified for the first full calendar month, which portion is based on the number of days from the Rent Commencement Date to the end of the calendar month in which the Rent Commencement Date falls as compared to the total number of days in such month.

4.3     In Month 37 as specified in Section 1.1(l), the same being the thirty-seventh month following the Rent Commencement Date, the annual Minimum Guaranteed Rental shall be adjusted to an amount equal to (a) the average of (i) the annual Minimum Guaranteed Rental and (ii) the annual Percentage Rental, in each case, paid during Months 1-36 as indicated in Section 1.1(l), multiplied by (b) 65%. Notwithstanding the foregoing, such adjusted annual Minimum Guaranteed Rental shall not exceed $390,000 per year, nor shall it ever be less than the annual Minimum Guaranteed Rental paid during months 25-36. The increase of Minimum Guaranteed Rental, if any, as set forth in this Section shall be referred to herein as the "First Rent Adjustment". For the avoidance of doubt, the First Rent Adjustment shall apply to months 37 through 60 of the Lease Term and shall not take into account any Supplemental Rent paid by Tenant during months 1-36.

4.4     If following the First Rent Adjustment the monthly Minimum Guaranteed Rental is less than $30,624.00, then in Month 61 as specified in Section 1.1(l), the same being the sixty-first month following the Rent Commencement Date, the monthly Minimum Guaranteed Rental shall be increased to $30,624.00. If following the First Rent Adjustment the monthly Minimum Guaranteed Rental is greater than $30,624.00, then the monthly Minimum Guaranteed Rental shall remain the same as during month 60. The increase of Minimum Guaranteed Rental, if any, as set forth in this Section shall be referred to herein as the "Second Rent Adjustment". For the avoidance of doubt, the Second Rent Adjustment shall apply to months 61 through 120 of the Lease Term.

4

4.5     In addition to the Minimum Guaranteed Rental, Tenant shall also pay to Landlord each year Percentage Rental determined by (i) multiplying the total Gross Sales made in or from the Demised Premises during the particular calendar year by the Percentage Rental Rate specified in Section 1.1(m) of this Lease and then (ii) subtracting from the product thus obtained the annual Minimum Guaranteed Rental paid or payable by Tenant to Landlord for such calendar year. Once the product of Gross Sales for an applicable calendar year multiplied by the Percentage Rental Rate exceeds the annual Minimum Guaranteed Rental paid or payable by Tenant for such year, the Percentage Rental shall thereafter be paid in monthly installments on or before the 15th day of each calendar month during such year (each monthly installment shall be determined after deducting therefrom the Percentage Rental previously paid by Tenant for such year). In the event that the total of the monthly payments of Percentage Rental for any calendar year is not equal to the actual annual Percentage Rental computed on the amount of Gross Sales for such calendar year in accordance with the specified rate, then Tenant shall pay to Landlord any deficiency or Landlord shall refund or credit to Tenant any overpayment, as the case may be, within sixty (60) days after the end of such calendar year. In no event shall the Rental to be paid by Tenant to Landlord for any calendar year be less than the annual Minimum Guaranteed Rental specified in this Lease.

4.6     If this Lease should commence on a date other than the first day of a calendar year or terminate on a date other than the last day of a calendar year, the annual Minimum Guaranteed Rental used to calculate Percentage Rental for such fractional part of the calendar year following the Rent Commencement Date or preceding the termination date, as the case may be, shall be prorated to account for the partial year. Upon the termination of this Lease, Tenant shall make a payment of Percentage Rental for the final month or partial calendar month of the term of this Lease determined in accordance with (and subject to) the provisions of the third sentence of Section 4.5 above.

4.7     The term "Gross Sales", as used in Section 4.5 and elsewhere in this Lease, shall be construed to include the total amount of gross receipts, whether for cash or otherwise, generated from all sales of merchandise, food, beverages and services provided by Tenant, and all other receipts whatsoever, from all business conducted in or from the entire Demised Premises by Tenant (including the ground floor of the Building and the rooftop), including, by way of illustration (but in no way limited to), mail orders, telephone orders or electronic orders (e.g., internet, computer, etc.) received or filled at the Demised Premises, "layaways" and other deposits (offset by such sums refunded to purchasers) taken from the Demised Premises, orders taken from the Demised Premises (although such orders may be filled elsewhere), and sales by any sublessee, concessionaire or licensee of Tenant (as well as license fees, franchise fees and similar fees), including without limitation any of the foregoing with respect to special events and rentals of the Demised Premises to the extent permitted hereunder. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which the sale was made, irrespective of the time when Tenant receives payment from its customer. Gross sales shall not include, however, (i) any sums collected and paid out for any sales, excise or similar tax imposed by any duly constituted governmental authority, (ii) nor the amount of returns to shippers or manufacturers, (iii) nor the amount of any cash or credit refund made upon any sale, (iv) nor sales of Tenant's fixtures, nor (v) any of the Gross Sales Exclusions set forth on Exhibit "E" attached hereto.

## ARTICLE V
## SALES REPORTS, RECORDS AND FINANCIAL STATEMENTS

5.1     On or before the fifteen (15th) day of each calendar month during the term of this Lease from and after the Rent Commencement Date, Tenant shall prepare and deliver to Landlord at the place where Rental (as defined in Section 8.1 below) is then payable (or via electronic mail) a statement of Gross Sales made from the Demised Premises during the preceding calendar month, certified by an officer of Tenant. In addition, from and after the Rent Commencement Date, within thirty (30) days after the expiration of each calendar year and within thirty (30) days after the termination of this Lease if this Lease should not terminate at the end of a calendar year, Tenant shall prepare and deliver to Landlord at the place where Rental is then payable (or via electronic mail) a statement of Gross Sales made from the Demised Premises during the preceding year (or partial calendar year), certified to be correct by an officer of Tenant. Tenant shall furnish similar statements for its licensees, concessionaires, and subtenants, if any. All such statements shall be in a form which is mutually agreed to by the parties; and, if requested by Landlord, Tenant shall also provide to Landlord copies of sales reports, if any, submitted by Tenant to the Comptroller of the State of Texas. Tenant acknowledges Landlord's concern for prompt, accurate sales records. Tenant also acknowledges that its failure to submit statements of Gross Sales as required above shall result in additional (although not readily ascertainable) expense to Landlord. Tenant therefore agrees that if it does not deliver to Landlord a statement of Gross Sales within ten (10) days following its due date hereunder, then notwithstanding anything to the contrary contained elsewhere in this Lease, the Minimum Guaranteed Rental for the particular month during which the statement was due and for each month thereafter (until the statement is delivered) shall automatically be increased by ten percent (10%) of the Minimum Guaranteed Rental for such month; provided that, Landlord agrees to promptly give Tenant written notice of any such failure and so long as Tenant furnishes the applicable statement of Gross Sales within ten (10) days of its receipt of such notice from Landlord, any increases in the Minimum Guaranteed Rental payable by Tenant shall be credited against Tenant's next payment(s) of Percentage Rental hereunder (for the avoidance of doubt, if Tenant fails to furnish the applicable statement of Gross Sales within ten (10) days of its receipt of Landlord's notice, then any increases in the Minimum Guaranteed Rental payable by Tenant shall not be considered as a deduction from Percentage Rental); provided further that, if during the immediately preceding twelve (12) month period Landlord has already given Tenant two written notices of such failure to timely furnish the applicable statement of Gross Sales, no further notice shall be required to be given to Tenant for the next twelve (12) months and any increase in Minimum Guaranteed Rental thereafter payable by Tenant during the next 12 months shall not be considered as a deduction from Percentage Rental. The rights of Landlord under the immediately preceding sentences are cumulative with the rights prescribed in Section 5.3, Article XXII, Article XXIII and elsewhere in this Lease or at law.

5.2     Tenant shall keep in the Demised Premises or at some other location in the city where the Demised Premises is located a permanent, accurate set of books and records of all sales of merchandise and revenue derived from business conducted in the Demised Premises, and all supporting records such as tax reports and banking records. All such books and records shall be retained and preserved for at least twenty-four (24) months after the end of the

calendar year to which they relate, and shall be subject to inspection and audit by Landlord and its agents at all reasonable times.

5.3    Upon reasonable advance notice to Tenant (but in no event less than five (5) business days' notice), Landlord may, at its sole cost and expense, have its manager(s), auditor(s) or other agent(s) make a special audit of all books and records, wherever located, pertaining to sales made in or from the Demised Premises, provided that, such parties execute a confidentiality agreement reasonably acceptable to Tenant. Landlord shall be entitled to one audit per calendar year at Landlord's sole cost and expense. With respect to any audit in a calendar year, if Tenant's statements of Percentage Rental are found to be underreported by more than two and one-half percent (2.5%) over the figures submitted by Tenant, or if Tenant has failed to timely deliver statements as required hereunder (after ten (10) days of Tenant's receipt of notice from Landlord of such failure), Tenant shall pay for the reasonable, out-of-pocket costs incurred by Landlord in performing such audit. In addition, Tenant shall promptly pay to Landlord any deficiency which is established by such audit. In the event Tenant disputes such audit prepared by Landlord, Tenant shall give Landlord notice of such fact within fifteen (15) days after Tenant's receipt of the result of Landlord's review and/or audit (a "Tenant Dispute Notice"). In the event Tenant delivers a timely Tenant Dispute Notice to Landlord and Landlord and Tenant cannot agree on the outcome of the dispute within fifteen (15) days of Landlord's receipt of a Tenant Dispute Notice, then Landlord and Tenant shall jointly appoint an independent certified public accountant to audit and review Tenant's books and records within thirty (30) days of the date of Landlord's receipt of Tenant's Dispute Notice (such audit, the "Tenant Dispute Audit"). Tenant shall have no payment obligation with respect to the disputed amount until it receives the determination of such certified public accountant; the determination thereof shall be binding on Landlord and Tenant. Payment of any disputed amount shall be due from Tenant within five (5) days of the determination. The parties shall share equally the cost of the Tenant Dispute Audit unless the Tenant is required to pay a deficiency to Landlord established by the Tenant Dispute Audit, in which case Tenant shall pay the cost of the Tenant Dispute Audit.

5.4    In addition to the statements and reports prescribed above, Tenant shall, within fifteen (15) days after a request from Landlord, deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of Tenant and any guarantor of Tenant's obligations under this Lease. Moreover, Tenant further agrees to cooperate with any request by Landlord for Tenant's written permission or other cooperation in connection with Landlord's obtaining a credit report or similar information regarding Tenant and/or Tenant's guarantor from third-party sources; and in this regard, Tenant, to the maximum extent permitted by applicable law, hereby waives any obligations to Tenant which Landlord may otherwise have with regard to Landlord's seeking and/or obtaining any such third-party reports or information. Landlord request for the additional information prescribed in this Section 5.4 will be limited either to a potential sale or financing of the Building. The foregoing requirements shall not apply to Tenant or Guarantor so long as Tenant's guarantor is a publicly traded company and such records are publicly available for Landlord to independently review (Landlord acknowledging that the named Guarantor in this Lease is, as of the date hereof, a publicly traded company).

5.5    Landlord shall use good faith efforts to keep confidential all sales reports, records and financial statements supplied by Tenant; however, Landlord shall have the right to reveal such information to mortgagees, prospective purchasers and prospective mortgagees (and their respective agents) and to Landlord's managers, development and administrative officers and personnel, and consultants; provided that such managers, development an administrative officers and personnel and consultants are informed by Landlord of the confidential nature of the such reports.

5.6    Notwithstanding the foregoing or anything to the contrary contained in this Lease, Landlord shall only have the right to request, audit and/or inspect Tenant's books and records for a period of twenty four (24) months following the calendar year which they reference.

**ARTICLE VI**
**TENANT'S RESPONSIBILITY FOR TAXES,**
**COMMON AREA MAINTENANCE CHARGES,**
**REAL ESTATE CHARGES AND INSURANCE EXPENSES**

6.1    Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Demised Premises. If any such taxes are levied against Landlord or the Building and if Landlord elects to pay the same or if the assessed value of the Building is increased by inclusion of personal property and trade fixtures placed by Tenant in the Demised Premises and Landlord elects to pay the taxes based on such increase, Landlord shall provide Tenant with reasonable documentation evidencing such taxes (and the payment thereof) and showing that the same are attributable to Tenant's personal property and trade fixtures, in which case, Tenant shall pay to Landlord upon demand such taxes.

6.2    This Lease is a "Triple Net" Lease, which means that, subject to the terms and conditions of this Lease, commencing on the Rent Commencement Date, Tenant shall also be obligated to pay for "Tenant's Proportionate Share" (as defined below) of all "Real Estate Charges" (as defined below), "Insurance Expenses" (as defined below), "Common Area Maintenance Charge" (as defined in Article VII), all repairs, maintenance and replacements to the Demised Premises (as described in Article X), all utilities to the Demised Premises (as described in Article XIV) and all other costs and expenses related to the use or operation of the Demised Premises as expressly provided for in this Lease to be considered for all purposes to be additional Rentals under this Lease, including any property management fees actually incurred by Landlord for the Demised Premises. Tenant's obligations under this Section 6.2 shall be prorated during any partial year (i.e., the first year and the last year of the Lease Term). "Tenant's Proportionate Share" shall be computed on the ratio that the total floor area (all of which is deemed "rentable") of the Demised Premises (excluding the Rooftop Patio) bears to the total rentable floor area of the Building (excluding the Rooftop Patio and any other rooftop area). Tenant's Proportionate Share shall equal approximately 45.8%, subject to any adjustment in accordance with Section 1.1(g) following Landlord's re-measurement of the Demised Premises

and/or Building. "**Real Estate Charges**" shall include ad valorem taxes, general and special assessments, parking surcharges, any tax or excise on rents, any tax or charge for governmental services (such as street maintenance or fire protection), in each case, related to the Building or the Demised Premises, and any tax or charge which replaces either wholly or in part in substitution, or in lieu of, any of such above-described Real Estate Charges; including, without limitation, any margin tax pursuant to Chapter 171 of the Texas Tax Code (as same may be amended, renewed or replaced from time to time) imposed on Landlord and computed with respect to rents payable under this Lease; provided, however, that Real Estate Charges shall not be deemed to include any (i) estate or inheritance tax, (ii) income or transfer taxes imposed upon Landlord and (iii) any fines, penalties or interest resulting from Landlord's failure to timely pay any taxes to the appropriate authority. Additionally, Real Estate Charges shall include any reasonable, out-of-pocket fees paid by Landlord to consultants, attorneys and other professionals who monitor, negotiate and/or contest any or all such charges. "**Insurance Expenses**" shall include all premiums and other expenses reasonably incurred by Landlord in accordance with Section 15.1 or otherwise approved by Tenant for property coverage (sometimes referred to as "all risk" coverage) and commercial general liability insurance related to, and property insurance for, the Demised Premises; *provided that*, unless approved by Tenant, Insurance Expenses shall not be deemed to include, and Tenant shall not be responsible for, any premiums or other expenses related to insurance carried by Landlord which is duplicative of insurance Tenant is required to carry and maintain pursuant to Article XV hereof.

6.3     Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Demised Premises (other than taxes levied directly against Tenant's personal property within the Demised Premises). Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Demised Premises (including, without limitation, any rights set forth in §41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time); *provided that*, Landlord represents and warrants to Tenant that, as of the date hereof, Landlord has received no notices regarding the appraisal or reappraisal, for tax purposes, of all or a portion of the Demised Premises. Additionally, Tenant, to the maximum extent permitted by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Demised Premises (including, without limitation, any rights set forth in §41.413 and §42.015 of the Texas Property Tax Code, as such sections may be amended and/or supplemented from time to time). To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

6.4     Tenant agrees to pay Landlord, as Rental each month, 1/12 of anticipated annual Real Estate Charges, Insurance Expenses and Common Area Maintenance Charges for the Demised Premises in advance as reasonably estimated by Landlord (based on the Real Estate Charges, Insurance Expense and Common Area Maintenance Charges for the prior fiscal year), such payments to be made on the first day of each calendar month, beginning on the Rent Commencement Date. In the event Landlord determines that the total of the monthly payments pursuant to this Section 6.4 for any appropriate fiscal period year is not equal to the total of payments required from Tenant for Real Estate Charges, Insurance Expenses or Common Area Maintenance Charges, or all of them, pursuant to previous sections in this Article VI, then Tenant shall pay to Landlord any deficiency or Landlord shall refund or credit to Tenant any overpayment, as the case may be, within thirty (30) days after the date upon which the exact amount has been determined by Landlord and communicated in writing to Tenant. In the event that Tenant sends notice within thirty (30) days after Tenant's receipt of such amounts, Tenant shall have the right to audit Landlord's books and records relating to Common Area Maintenance Charges, Real Estate Charges and Insurance Expenses for the previous calendar year or hire a third party reasonably acceptable to Landlord provided that Landlord will approve any auditor that is from a nationally recognized accounting firm to conduct such audit. Landlord shall make available to Tenant any supporting documentation related to Common Area Maintenance Charges, Real Estate Charges and Insurance Expenses in Landlord's possession. Tenant shall be solely responsible for all costs and expenses of such audit, unless the audit determines the amount in question to be in error and overcharged by more than two and one-half percent (2.5%), in which case Landlord shall pay the cost of the audit or inspection.

6.5     Landlord covenants and agrees to provide Tenant within thirty (30) days of Tenant's written request proof reasonably satisfactory to Tenant that all Real Estate Charges and Insurance Expenses then due and owing with respect to the immediately preceding fiscal year have been paid, in full, by Landlord.

## ARTICLE VII
## COMMON AREA

7.1     Tenant and its customers, employees and invitees are hereby granted during the term of this Lease (including any extensions thereof) the non-exclusive right and easement, in common with Landlord and other tenants and occupants of the Building, to use all exterior walkways, driveways, alleys and access areas (including curb cuts), sidewalks, service areas and rear doors for deliveries, dumpsters, compactors, grease traps and vats, and other areas and facilities situated within the tract described on **Exhibit "A"** ("Tract") designated by Landlord or otherwise available or intended to be available for the common use of the tenants and occupants of the Building (the "Common Area(s)") for the normal or intended purposes of such areas; provided, however, that Landlord shall retain the right to control and utilize the Common Areas as all other portions of the Building not constituting the Demised Premises in any manner that does not violate any of the terms of this Lease or otherwise adversely interfere with Tenant's business operations in the Demised Premises. Landlord further grants to Tenant during the term of this Lease, subject to the rights and privileges of other tenants and occupants of the Building, a non-exclusive right and easement over that portion of the Tract as may be reasonably required by Tenant to improve, renovate, maintain and conduct its operations at the Demised Premises; provided, however any improvement or renovation of such portion of the Tract shall be subject to the prior written approval of Landlord.

7.2     Tenant and its employees and customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the nonexclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants in the Building and other persons permitted by the Landlord to use the same, and subject to such reasonable rules and regulations governing use as Landlord may from time to time prescribe and notify Tenant thereof in advance; provided that, such reasonable rules and regulations do not unreasonably interfere with Tenant's use of the Demised Premises for its business. For example, and without limiting the generality of Landlord's ability to establish rules and regulations governing all aspects of the Common Area, Tenant agrees as follows:

(a)     Tenant shall not solicit business within the Common Area nor take any action which would interfere with the rights of other persons to use the Common Area.

(b)     Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights and shall have no liability to Tenant for such closure; provided that, Landlord shall use commercially reasonable efforts not to unreasonably interfere with Tenant's business operations.

(c)     Except as expressly provided herein, with regard to the roof(s) (other than the Rooftop Patio) of the Building, use of the roof(s) is reserved to Landlord or, with regard to any tenant demonstrating to Landlord's satisfaction a need to use same, to such tenant after receiving prior written consent from Landlord.

7.3     Landlord shall be responsible for the operation, management and maintenance of the Common Area, the manner of maintenance and the expenditures therefore to be in the sole discretion of Landlord; provided that, Landlord covenants and agrees to maintain the Common Area in a clean manner, free of rubbish and debris and in keeping with similar Buildings within the same geographical area as the Building. Without limiting the generality of the immediately preceding sentence, Tenant acknowledges that LANDLORD MAKES NO REPRESENTATION OR WARRANTY REGARDING WHETHER OR NOT LANDLORD WILL PROVIDE SECURITY SERVICES OR, IF SO, WHAT FORM OF SECURITY SERVICES WILL BE PROVIDED.

7.4     In addition to the Rentals and other charges prescribed in this Lease, Tenant shall pay to Landlord Tenant's Proportionate Share of the actual cost of Landlord's management, operation and maintenance of the Common Area, as well as other commonly shared costs, which may be actually incurred by Landlord in its reasonable discretion, including, among other costs, all costs of the following as they related to the Common Areas ("Common Area Maintenance Charge(s)"): lighting, painting, cleaning, policing, inspecting, repairing and replacing Common Area elements; trash removal; insect and pest treatments and eradication; security (if and to the extent Landlord provides security); environmental protection improvements or devices and health and safety improvements and devices which may be required by applicable laws (including the maintenance, repair and replacement of same); seasonal decorations, seasonal lighting and/or other promotional activities (if any); charges and assessments paid by Landlord pursuant to any reciprocal easement or comparable document affecting the Common Area; property management fee, a reasonable allowance for Landlord's actual overhead costs and the cost of any insurance for the Common Area which Landlord is not reimbursed pursuant to Section 6.2, but specifically excluding all expenses paid or reimbursed pursuant to Article VI and all Common Area Maintenance Exclusions set forth Exhibit "G" attached hereto. With regard to capital expenditures, capital improvements and replacements, to the extent capitalized on Landlord's records, shall be included only to the extent of a reasonable depreciation or amortization (including interest accruals commensurate with Landlord's interest costs) beginning with the date on which payment for the improvement was made and continuing through the reasonable useful life of the improvement. If this Lease should commence on a date other than the first day of a calendar year or terminate on a date other than the last day of a calendar year, Tenant's reimbursement obligations under this Section 7.4 shall be prorated based upon Landlord's expenses for the entire calendar year. Landlord shall provide Tenant a written estimate of Tenant's proportionate share of the annual Common Area Expenses for each calendar year (along with reasonably detailed documentation evidencing how Landlord arrived at such estimate) and Tenant shall pay to Landlord, during each month of the term of this Lease on the same day that rent is due hereunder, an amount equal to one twelfth (1/12ᵗʰ) of such estimated annual amount, but subject to adjustment and reconciliation in accordance with Section 6.4 after the end of the year on the basis of the actual cost for such year. Tenant shall have the right to audit Landlord's books and records relating to Common Area Maintenance Charges in accordance with Section 6.4 above.

7.5     Landlord and Tenant acknowledge that both Landlord and Tenant are experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts and additional rent payable for Tenant (including, without limitation, payments under Section 6.2 and Section 7.4 hereinabove) are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. Accordingly, Tenant voluntarily and knowingly waives all rights and benefits of Tenant under Section 93.012 of the Texas Property Code as such section now exists or as may be hereafter amended or succeeded.

## ARTICLE VIII
### PROVISIONS APPLICABLE TO ALL RENTALS

8.1     For purposes of this Lease, the term "Rental" or "Rentals" shall be deemed to include Minimum Guaranteed Rentals, Percentage Rentals, Tenant's required payments for Common Area Maintenance Charges, Real Estate Charges and Insurance Expenses, and any other amounts due and payable by Tenant under this Lease. Landlord and Tenant agree that each provision of this Lease for determining Rentals adequately and sufficiently describes to Tenant and Landlord the method by which such Rental is to be computed.

8.2     All Rentals, including, without limitation, Minimum Guaranteed Rental, Percentage Rentals, Real Estate Charges, Common Area Maintenance Charges, and Insurance Expenses shall accrue from the Rent Commencement Date.  All Rentals shall be payable to Landlord at Landlord's address specified in Section 1.1(b) of

this Lease or via wire in accordance with written instructions of Landlord, or at any other address or account which Landlord may subsequently designate in a written notice to Tenant.

8.3    The parties agree that each monthly installment of Minimum Guaranteed Rental and Tenant's monthly payments for Real Estate Charges, Common Area Maintenance Charges and Insurance Expenses, are payable on or before the first (1st) day of each calendar month. Any such payment of Rental which is not received on or before the first (1st) day of a particular calendar month shall be deemed past-due. The parties further agree that each monthly installment of Percentage Rental, if any is due pursuant to this Lease, is payable on or before the 15th day of each calendar month and, except for amounts specifically disputed by Tenant if Tenant issues a timely dispute notice in accordance with Section 6.4, each annual adjustment payment from Tenant is payable within thirty (30) days after Landlord's written statement requesting such payment from Tenant or, with respect to any specifically disputed amounts, within five (5) days of the final determination of the disputed amount as provided in Section 6.4; and any such prescribed payment which is not so received shall be deemed past-due.  All Rentals shall be due and payable without notice, offset or deduction of any nature.  In the event any Rental which is payable pursuant to this Lease is not actually received by Landlord within five (5) days after its due date for any reason whatsoever (including, but not limited to, a failure in the United States mails), or if any Rental payment is by check which is returned for insufficient funds (provided that Landlord has deposited the check within thirty (30) days of its receipt thereof), then in addition to the past due amount, Tenant shall pay to Landlord one of the following (the choice to be at the sole option of Landlord unless one of the choices is improper under applicable law, in which event the other alternative will automatically be deemed to have been selected):  (a) a late charge in an amount equal to five percent (5%) of the Rental then due, in order to compensate Landlord for its administrative and other overhead expenses; or (b) interest on the Rental then past-due at the maximum contractual rate which could legally be charged in the event of a loan of such Rental to Tenant (but in no event to exceed 15% per annum), such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the Rental due date and terminating with the date on which Tenant makes full payment of all amounts owing to Landlord at the time of said payment.  Any such late charge or interest payment shall be payable as additional Rental under this Lease, shall not be considered as a deduction from Percentage Rental, and shall be payable immediately on demand.  If any Rental is paid by check which is returned for insufficient funds (or, if Tenant has authorized Landlord to draft Tenant's bank account for the Rental and there are insufficient funds available to pay such draft), Tenant shall immediately make the required payment to Landlord in the form of a cashier's check or money order; moreover, unless the check was not cashed by Landlord within thirty (30) days of its receipt thereof, Tenant shall also pay Landlord the amounts specified above in this Section 8.3, plus an additional fee of $500.00 to compensate Landlord for its expense and effort in connection with the dishonored check or bank draft.

8.4    If Tenant fails in two (2) consecutive months to make any required payment of Rental(s) within ten (10) days after such payment is due, then Landlord, in order to reduce its administrative costs may require, by giving written notice to Tenant (and in addition to any late charge or interest accruing pursuant to Section 8.3 above, as well as any other rights and remedies accruing pursuant to Article XXII or Article XXIII below, or any other provision of this Lease or at law), that the Rentals for the next three (3) months are to be paid in advance in one lump sum (instead of monthly) and that such Rental payment is to be made on or before the due date by cashier's check or money order; provided, however, if during any twelve (12) month period, Tenant fails to make three (3) required payments of Rental within ten (10) days after such payment is due, upon Landlord's written notice, Tenant shall pay Rental quarterly, in advance (instead of monthly), for the two (2) years from and after the date such third late payment was otherwise due and payable, and such payment(s) shall be made on or before the due date by cashier's check or money order.  Any acceptance of a monthly Rental payment or of a personal or corporate check thereafter by Landlord shall not be construed as a subsequent waiver of said rights.

## ARTICLE IX
## USE AND CARE OF DEMISED PREMISES

9.1    Tenant shall use its commercially reasonable best efforts to cause the Opening Date to occur on or before the Rent Commencement Date and, once open, shall thereafter operate its business continuously in an efficient, high class and reputable manner.  Except during reasonable periods for repairing, cleaning and decorating or in the event of casualty or condemnation, Tenant shall not at any time leave the Demised Premises vacant, but shall in good faith continuously throughout the term of this Lease conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises is leased. Tenant shall, except during reasonable periods for repairing, cleaning and decorating or in the event of casualty or condemnation, keep the Demised Premises open to the public for business with adequate personnel in attendance on all days (excluding certain days and holidays reasonably designated by Tenant) and during hours as reasonably established by Tenant as consistent with STK Rebel brand standards, except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation.

9.2    The Demised Premises may be used only for the purpose or purposes specified in Section 1.1(o) above, and only under the trade name specified or permitted by Section 1.1(e) and Section 1.1(o) above, and for no other purpose and under no other trade name.

9.3    Tenant shall not, without Landlord's prior written consent, keep anything within the Demised Premises, or use the Demised Premises for any purpose which creates a risk of, toxic or otherwise hazardous substances or which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises (collectively, "Hazardous Substances"); provided that, the foregoing shall not prohibit Tenant from keeping cleaning solutions and like substances used in day-to-day operations at the Demised Premises (so long they are kept in compliance with Environmental Laws). Tenant's operations in the Demised Premises as well as all property, substances and other materials kept, stored, allowed to be brought within, or disposed from the Demised Premises shall comply in all respects with all federal, state, and municipal laws, ordinances, codes and regulations relating to the protection of the environment and natural resources, now existing or hereafter enacted (collectively, the

"Environmental Laws"), including without limitation the following: (i) the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (often referred to as "CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, as same may have been further amended or may be further amended from time to time, (ii) the federal Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendments of 1980, and the Hazardous and Solid Waste Amendments of 1984, as same may have been further amended or may be further amended from time to time, (iii) the federal Water Pollution Control Act of 1972 (often referred to as the "Clean Water Act"), as same may have been amended or may be amended from time to time, (iv) the federal Spill Compensation and Control Act of 1976, as same may have been amended or may be amended from time to time, and (v) any and all other federal, state, county, and municipal laws, ordinances, codes and regulations which relate in any way to the matters regulated by CERCLA and/or any other above-mentioned federal legislation. All property kept, stored or allowed to be brought within the Demised Premises by or on behalf of Tenant, its affiliates, owners, officers, directors, agents, employees, contractors, subcontractors, guests or invitees shall be at Tenant's sole risk. Tenant shall immediately notify Landlord in the event Tenant becomes aware of any actual or potential environmental hazard or any actual or alleged violation by Tenant, its affiliates, owners, officers, directors, agents, employees, contractors, subcontractors, guests or invitees of one or more Environmental Laws. Tenant shall indemnify Landlord and hold Landlord harmless from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action (including without limitation all attorneys' fees and expenses) arising out of or relating to, directly or indirectly, any violation or alleged violation by Tenant or any party accessing the Demised Premises by or through Tenant of any one or more of the Environmental Laws, except for any violations of Environmental Laws which may be caused solely by Landlord, any prior owner of the Demised Premises or any of their agents. This indemnification shall survive the expiration or termination of this Lease.

9.4     Tenant shall not permit any objectionable noises or odors to emanate from the Demised Premises nor take any action which would result in a violation of any applicable laws or ordinances; constitute a nuisance, nor permit any unlawful practice to be carried on or committed on the Demised Premises. Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant is designing a restaurant and intends to implement the STK Concept and, in connection therewith, noises, pulsating sounds, vibrations, odors, etc. may emanate from the Demised Premises as a result thereof, however, the same shall not be deemed a default under this Lease so long as Tenant takes commercially reasonable efforts to mitigate the same and all such noises, pulsating sounds, vibrations, odors, etc. are in compliance with all applicable legal requirements including any and all noise ordinances.

9.5     Tenant shall take good care of the Demised Premises; shall not commit or suffer waste in or about the Demised Premises, nor to any facility or equipment for which Tenant is responsible pursuant to Section 10.2 of this Lease; shall not cause damage to any other portion of the Building (and, if any such damage should occur, shall immediately repair same or, if Landlord so elects, reimburse Landlord for Landlord's reasonable, out-of-pocket cost in repairing same); shall keep the Demised Premises free of insects, rodents, vermin and other pests (including regular exterminator treatments at least quarter-annually, and additional spot treatments if and as needed, with copies of all exterminator paid invoices and reports to be delivered to Landlord promptly after Landlord's request for the same), and shall keep the Demised Premises secure, i.e., Tenant hereby acknowledging that security for the Demised Premises is Tenant's responsibility and that Tenant is not relying on any representation or warranty by Landlord in this regard. Tenant shall not overload the floors in the Demised Premises, nor deface or injure the Demised Premises. Excepting Landlord's repair and maintenance obligations set forth in Section 10.1 or elsewhere in this Lease, Tenant shall keep the Demised Premises and sidewalks, service-ways and loading areas adjacent to the Demised Premises (and, for restaurant operations, the grease traps servicing the Demised Premises) neat, clean and free from dirt, rubbish, ice or snow at all times. Tenant must maintain all kitchen exhaust systems and grease traps exclusively serving the Demised Premises in a clean, working condition and must provide to Landlord, when requested by Landlord, Tenant's records and manifests regarding the maintenance of same. Tenant shall comply with all applicable governmental requirements with respect to the frequency of cleaning of such grease trap. Tenant shall store all trash and garbage within the Demised Premises, or in a trash dumpster or similar container reasonably approved by Landlord as to type, location and screening; and Tenant shall arrange for the regular pick-up of such trash and garbage at Tenant's expense. Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas reasonably prescribed by Landlord. Tenant shall not operate an incinerator or burn trash or garbage within the Demised Premises.

9.6     Tenant shall maintain display windows, if any, in a neat, attractive condition, and shall keep all display windows, exterior electric signs and exterior lighting under any canopy in front of the Demised Premises lighted from dusk until 11:00 p.m. (or such later time as determined by Tenant), everyday, including Sundays and holidays.

9.7     Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned, in each case, except to the extent Tenant is prohibited from doing so pursuant to certain third-party agreements entered into by Tenant or its affiliates.

9.8     Tenant shall procure at its sole expense any permits and licenses required for the transaction of business in the Demised Premises and, except to the extent such compliance is Landlord's responsibility as expressly set forth in this Lease, otherwise comply with all applicable laws, ordinances and governmental regulations. In addition, if the nature of Tenant's business makes it advisable for Tenant to take any extra precautions (for example, in the case of a business which is affected by so-called "dramshop" laws, Tenant's compliance with all "dramshop" educational programs and procedures), Tenant shall take commercially reasonable extra precautions. At Landlord's request, but not more than once per calendar year, Tenant shall deliver to Landlord copies of all such permits and licenses and proof of Tenant's compliance with all such laws, ordinances, governmental regulations and extra precautions.

9.9     Subject to Section 3.1(b) above, Tenant shall be responsible for compliance with the Americans with Disabilities Act of 1990 (ADA), as amended from time to time, and related state and municipal laws and regulations, in all matters regarding the configuration of the Demised Premises (the interior as well as all public and/or employee door entrances) and Tenant's business operations at the Demised Premises.

## ARTICLE X
## MAINTENANCE AND REPAIR OF DEMISED PREMISES

10.1    Landlord shall keep the foundation, the structural elements of all exterior and structural walls (except plate glass; windows, doors and other exterior openings; window and door frames, molding, closure devices, locks and hardware; special store fronts; signs, placards, decorations or other advertising media of any type; and interior painting or other treatment of interior walls, all lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installation equipment and fixtures), and the roof (specifically excluding the Rooftop Patio) of the Demised Premises and all other parts of the Building (other than the Common Areas) not included within the envelop of the Demised Premises, including the sewer and water lines and fire-protection systems and devices servicing the Building and exterior surfaces of the Building, in good repair, at Landlord's sole cost and expense, and without reimbursement of such costs by Tenant to Landlord in accordance with Section 6.2, Article VII or otherwise. Without limiting the generality of the immediately preceding sentence, Landlord shall, also at its sole cost and expense, repair any damage to the Demised Premises occasioned by the act or negligence of Landlord, its agents, employees and contractors, however, Landlord shall not be required to make any repairs occasioned by the act or negligence of Tenant, its agents, employees, guests, invitees, subtenants, licensees and concessionaires (including, but not limited to, roof leaks resulting from Tenant's installation, replacement or maintenance of air conditioning equipment or any other roof penetration or placement, failure to maintain the heating, ventilation and air conditioning systems (sometimes referred to as "HVAC") or other operational systems required to be maintained by Tenant or operation of the Rooftop Patio); and the provisions of the previous sentence are expressly recognized to be subject to the provisions of Article XVII and Article XVIII of this Lease. In the event that the Demised Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give prompt written notice thereof to Landlord and Landlord shall have a reasonable time after receipt by Landlord of such written notice, in which to make such repairs. If any repairs required to be made by Landlord hereunder are not made within ten (10) days after written notice to Landlord, Tenant shall send Landlord a second notice and Landlord shall have an additional five (5) days to make such repairs, provided that, if Landlord fails to make such repairs within the 5-day period, Tenant may (at its option) and subject to the preapproval of Landlord, not to be unreasonably withheld, conditioned or delayed, make such repairs and offset the reasonable, out-of-pocket costs thereof against the Rental payable hereunder (for the avoidance of doubt, pursuit of the foregoing remedy by Tenant shall in no way prejudice Tenant's right at any time to pursue any other remedies provided under this Lease for Landlord's failure to timely make such repairs). In the event that the Demised Premises should become in need of repairs required to be made by Tenant hereunder, Tenant shall obtain the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed, for such repairs, ensure all such repairs are performed in a good and workmanlike manner and in accordance with all local and building rules of construction and codes and shall not limit or void any warranty (except any roof warranty); provided that, Landlord's approval shall not be required for repairs which are less than $25,000 (individually or with respect to a series of related repairs performed at the same time) and that do not affect the Building envelope, life safety, ADA or that would not be visible from the exterior. Notwithstanding the foregoing, if the nature of the repairs is such that they cannot be fully completed within the time period set forth in the preceding sentence, Landlord shall be deemed to have complied with the foregoing requirement so long as it has commenced such repairs within the time period and thereafter diligently prosecuted the same to completion.

10.2    Tenant shall keep the Demised Premises in good, clean and habitable condition and shall at its sole cost and expense make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord under the provisions of Section 10.1, Article XVII and Article XVIII. Without limiting the coverage of the previous sentence, it is understood that Tenant's responsibilities therein include all items which are expressly excluded from Landlord's responsibility in Section 10.1 above, as well as the maintenance, repair and replacement of all of the following facilities and equipment, located within the Demised Premises or on the exterior of the Building and servicing the Demised Premises: lighting, heating, air-conditioning, fire-protection sprinkler systems, landscaping, irrigation, plumbing, kitchen exhaust systems, grease traps and roof grease protection systems, and other electrical, mechanical and electromotive installation, equipment and fixtures. In addition, Tenant's responsibilities shall also include all repairs in ducts, conduits, pipes, and wiring, and any sewer stoppage located in, under and above or servicing the Demised Premises. If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice delivered to Tenant by Landlord (or less than ten (10) days, in the case of a situation which by its nature requires an immediate response or a response within less than ten (10) days), Landlord may at its option make such repairs using commercially reasonable care not to disrupt Tenant's business or damage stock; and Tenant shall pay to Landlord upon demand, as additional Rental hereunder, the reasonable, out-of-pocket cost of such repairs plus interest at the maximum contractual rate which could legally be charged in the event of a loan of such payment to Tenant (but in no event to exceed 1½% per month), such interest to accrue continuously from the date of payment by Landlord until repayment by Tenant. Notwithstanding the foregoing, if the nature of the repairs to be made by Tenant is such that they cannot be fully completed within the time period set forth in the preceding sentence, Tenant shall be deemed to have complied with the foregoing requirement so long as it has commenced such repairs within the time period and thereafter diligently prosecuted the same to completion. At the expiration of this Lease, Tenant shall surrender the Demised Premises in good condition, excepting reasonable wear and tear, and losses required to be restored by Landlord in Section 10.1, Article XVII and Article XVIII of this Lease (such condition, the "Required Surrender Condition"). In the event that the Demised Premises should become in need of repairs in excess of $25,000 (individually or with respect to a series of related repairs performed at the same time) which are required to be made by Tenant hereunder or repairs that would affect the Building envelope, life safety, ADA or that would be visible from the exterior, Tenant shall give immediate written notice thereof to Landlord and Landlord shall have approval rights over all such proposed repairs before performed, such approval, however, not to be unreasonably withheld, conditioned or delayed. In the event that the Demised Premises should become in need

11

of repairs required to be made by Tenant hereunder, Tenant shall ensure all such repairs shall be performed in accordance with all local and building rules of construction and codes and shall not limit or void any warranty (except, as it relates to limiting or voiding warranties, roof repairs).

10.3    Subject to Landlord's obligation to leave the existing HVAC serving the Demised Premises in good working order, Tenant shall be solely responsible for maintenance, repair and (if necessary) replacement of, and insurance for, the HVAC system. Without limiting the generality of the immediately preceding sentence: (a) Tenant shall replace all filters in the HVAC systems as recommended by the manufacturer's specifications; and (b) Tenant shall have the entire heating, ventilation and air conditioning equipment inspected by a qualified or licensed HVAC contractor at least once a year. The inspection specified in item (b) immediately above shall be completed between March 1st and May 31st of each year. Upon Landlord's request, Tenant shall provide Landlord with a copy of the invoice or report from the inspecting company, giving evidence that the system has been inspected. If after Landlord's request, Landlord has not received from Tenant a copy of the inspection report within ten (10) days, then Landlord shall, upon notice to Tenant, have the right to have the heating, ventilation and air conditioning equipment inspected by a company to be selected by Landlord. Landlord shall bill Tenant for the cost of this inspection, which shall be paid within 10 days of receipt of Landlord's invoice.

## ARTICLE XI
## ALTERATIONS

11.1    Tenant shall not make any alterations, additions or improvements to the Demised Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided that, Landlord's consent shall not be required for (i) the installation of unattached, movable trade fixtures which may be installed without drilling, cutting, or otherwise defacing the Demised Premises or (ii) Permitted Alterations (as defined below). Without limiting the generality of the immediately preceding sentence, any installation or replacement of Tenant's heating or air conditioning equipment must be effected strictly in accordance with Landlord's reasonable instructions. All alterations, additions, improvements and fixtures (including, without limitation, all floor coverings and all heating and air conditioning equipment but excluding Tenant's unattached or readily movable furniture, office equipment and trade fixtures and Tenant's inventory) which may be made or installed by either party upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become the property of Landlord at the termination of this Lease, provided that, at the expiration of the Lease Term, Landlord may request the removal of Specialty Alterations in which event Tenant shall remove the same and restore the Demised Premises to its original condition at Tenant's expense.

11.2    All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner, lien-free and in compliance with all governmental requirements, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Demised Premises. Tenant agrees to indemnify Landlord and hold Landlord harmless against any loss, liability or damage resulting from such work, including without limitation, any work done to the rooftop or with respect to the Rooftop Patio. Except with respect to any construction work performed within the first 36 months of the Lease Term, including without limitation, Tenant's Work, Tenant shall, if requested by Landlord with respect to any construction work in excess of $25,000 (individually or with respect to a series of related repairs performed at the same time), furnish a bond or other mutually agreed upon security against any such loss, liability or damage.

11.3    Except with respect to any construction work performed within the first 36 months of the Lease Term, including without limitation, Tenant's Work, in the event Tenant uses a general contractor to perform construction work within the Demised Premises, Tenant shall, prior to the commencement of such work, require said general contractor to execute and record a Bond to Pay Claims (the "Bond") in accordance with Chapter 53, Subchapter I of the Texas Property Code, as such may be amended, superseded or replaced from time to time, and shall deliver a copy of the recorded bond to Landlord. Except with respect to any construction work performed within the first 36 months of the Lease Term, including without limitation, Tenant's Work, the delivery of the waiver and release of lien by the general contractor and the Bond within the time period set forth above shall be a condition precedent to Tenant's ability to begin the applicable construction work at the Demised Premises.

11.4    The term "Permitted Alterations", as used in Section 11.1 and elsewhere in this Lease, shall mean any nonstructural alteration, addition or improvement of the Demised Premises, or any alteration, addition or improvement not affecting any HVAC or other base building mechanical, electrical or plumbing systems, provided that such alteration, addition or improvement does not require a building permit and the same does not cost in excess of $25,000 individually.

11.5    The term "Specialty Alterations", as used in Section 11.1 and elsewhere in this Lease, shall mean alterations, additions or improvements made by Tenant upon the Demised Premises which (i) are atypical of then restaurant installations and (ii) would cause Landlord to incur other than ordinary and typical demolition costs if such items were to be demolished by Landlord. Landlord shall notify Tenant as to whether any Specialty Alterations shall need to be removed on or before the end of the Lease Term prior to its installation of the same by Tenant.

## ARTICLE XII
## LANDLORD'S RIGHT OF ACCESS

12.1    Upon reasonable advance notice to Tenant (but in no event less than two (2) days' notice) except in the event of an emergency, Landlord shall have the right to enter upon the Demised Premises at any time for the purpose of inspecting the same, or of making repairs to the Demised Premises (as and to the extent permitted under this Lease), or for making repairs, alterations or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, tenants or lenders.

12

12.2     Tenant will permit Landlord to place and maintain "For Rent" or "For Lease" signs on the Demised Premises during earlier of (i) the last ninety (90) days of the Lease Term and (ii) the date the Tenant finally vacates the Demised Premises, it being understood that such signs shall in no way affect Tenant's obligations pursuant to Section 9.1, Section 13.1 or any other provision of this Lease.

12.3     Notwithstanding the foregoing or anything in this Lease to the contrary, upon any entry into the Demised Premises by Landlord agrees to use commercially reasonable efforts to not interfere with Tenant's business operations and to otherwise endeavor to schedule such entry outside of Tenant's normal operating hours.

### ARTICLE XIII
### SIGNS; STORE FRONTS

13.1     Tenant shall not, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, (a) make any material changes to the store front, (b) install any exterior lighting, decorations, paintings, awnings, canopies, or the like, (c) erect or install any signs, window or door lettering, placards, decorations, banners, portable signs or advertising media of any type which can be viewed from the exterior of the Demised Premises, excepting only dignified displays of customary type, for its display windows, or (d) install any bars, drapes, blinds, shades or other window or door covering or treatment which can be viewed from the exterior of the Demised Premises, or tint any windows or plate glass, in each case, except to the extent set forth in the sign plan outlined **Exhibit "E"** (which sign plan is hereby approved by Landlord subject to all applicable laws and ordinances). All signs, lettering, placards, decorations and advertising media (including, without limitation, the sign required by Section 13.2 below) shall be subject to all applicable legal requirements as required by the authorities having jurisdiction, as well as Landlord's requirements as to construction, method of attachment, size, shape, height, lighting, color, and general appearance. All signs of Tenant shall be kept in good condition, in proper operating order and comply with all applicable laws at all times.

13.2     At the conclusion of the Lease Term, unless otherwise directed by Landlord, Tenant will remove its sign, will close off with a water tight seal ("cap") the electrical outlet(s) servicing such sign, will repair any damage to the Building which have resulted from the installation or removal of the sign and will seal and clean or paint the front of the Building in the manner directed by Landlord, in and immediately around the area where the sign had been located.

### ARTICLE XIV
### UTILITIES

14.1     Tenant shall contract directly for telephone, cable, internet, electricity, gas and any other special services required for Tenant's operations.

14.2     Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewerage service and other utilities furnished to the Demised Premises. Landlord may, if it so elects, furnish one or more utility services to Tenant, and in such event Tenant shall purchase the use of such services as are tendered by Landlord, and shall pay on demand as additional Rental the rates established therefor by Landlord which shall not exceed the rates which would be charged for the same services furnished directly by the local public utility companies. Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Demised Premises to the public utility, if any, furnishing such service.

14.3     Landlord shall not be liable for any interruption whatsoever in utility services not furnished by Landlord, nor for interruptions in utility services furnished by Landlord which are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or which are necessary or useful in connection with making any alterations, repairs or improvements.

### ARTICLE XV
### INSURANCE COVERAGES

15.1     Landlord shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense (but subject to Article VI above), causing the Demised Premises to be insured under special form property coverage (sometimes referred to as "all-risk" coverage), including the cost of all Tenant's finish-out improvements as set forth in Exhibit "B" ("Tenant's Work") and commercial general liability insurance (plus whatever endorsements or special coverages Landlord, in its sole discretion, may consider appropriate), to the extent necessary to comply with Landlord's obligations pursuant to other provisions of this Lease, and such other insurance (if any) that Landlord deems appropriate for the Demised Premises.

15.2     Tenant, at its own expense, shall maintain during the term of this Lease a policy or policies of workers' compensation and comprehensive general liability insurance, including personal injury and property damage, with contractual liability endorsement, without any exclusion for abuse and molestation, in the amount of Two Million Dollars ($2,000,000.00) for property damage, Two Million Dollars ($2,000,000.00) for assault and battery and Two Million Dollars ($2,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate for personal injuries or deaths of persons occurring in or about the Demised Premises.  Tenant, at its own expense, shall also maintain during the term of this Lease liquor liability coverage in the amount of One Million Dollars ($1,000,000.00). Tenant, at its own expense, shall also maintain during the term of this Lease fire and extended coverage (with additional coverages for sprinkler damage, vandalism and malicious mischief) insurance covering 100% of the replacement cost of  (i) all alterations, additions, partitions, and improvements installed or placed on the Demised Premises by Tenant, excluding Tenant's Work (i.e., only those Tenant's finish-out improvements as set forth in **Exhibit "B"**); and (ii) all of Tenant's personal property, including but not limited to, furniture and equipment contained within the Demised Premises. Said policies shall (i) name Landlord, its mortgagee (if any) and World Class

Capital Group, LLC as additional insureds and insure Landlord's contingent liability under or in connection with this Lease (except for the workers' compensation policy); (ii) include a waiver of subrogation endorsement in favor of Landlord (except to the extent such waiver invalidates Tenant's insurance coverage); (iii) be issued by an insurance company which is reasonably acceptable to Landlord and which are licensed to do business in the state in which the Demised Premises is located with a general policyholder's rating of not less than A and a financial rating of not less than Class VIII, as rated in the most current edition of Best's Key Rating Guide; (iv) have deductibles reasonably acceptable to Landlord; and (v) provide that said insurance shall not be canceled unless thirty (30) days prior written notice has been given to Landlord. Said policy or policies or certificates thereof shall be delivered to Landlord by Tenant on or before the Commencement Date and otherwise upon Landlord's reasonable request. In addition, Tenant shall carry comprehensive boiler and machinery coverage on all heating, ventilating and air conditioning equipment, electrical, mechanical and other such systems serving the Demised Premises in commercially reasonable amounts. Tenant shall maintain throughout the term of this Lease business income and extra expense insurance in a reasonable amount sufficient to cover the Minimum Guaranteed Rent payments payable hereunder for a minimum period of twelve (12) months. Such policies or duly executed certificates of insurance shall be promptly delivered to Landlord on or before the Commencement Date and otherwise upon Landlord's reasonable request (but not more than once per calendar year). If Tenant should fail to comply with the foregoing requirements relating to insurance, Landlord may, upon ten (10) days' notice to Tenant (during which time Tenant may comply with the foregoing), obtain such insurance and Tenant shall pay to Landlord on demand as additional Rental hereunder the premium cost thereof plus interest at the maximum contractual rate (but in no event to exceed 1½% per month) from the date of payment by Landlord until repaid by Tenant.

15.3    Tenant may obtain the general liability insurance required by this Section 15.2 as part of a total package or blanket policy insuring properties other than the Demised Premises, provided that such insurance gives Landlord no less protection than that which would be given by separate policies. The above insurance requirements shall not preclude Tenant from having reasonable deductibles in insurance coverage provided Tenant shall indemnify Landlord against any loss resulting from such deductibles.

**ARTICLE XVI**
**WAIVER OF LIABILITY; INDEMNIFICATION; MUTUAL WAIVER OF SUBROGATION**

16.1    Landlord and Landlord's agents and employees shall not be liable to Tenant nor to Tenant's employees, agents or visitors, nor to any other person whomsoever, for any injury to person or damage to property caused by the Demised Premises becoming out of repair or by defect or failure of any structural element of the Demised Premises or of any equipment, pipes or wiring, or broken glass, or by the backing up of drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Demised Premises (in each case, except (i) to the extent due to Landlord's willful or grossly negligent failure to make repairs required to be made hereunder, after the expiration of a reasonable time after written notice to Landlord of the need for such repairs, or (ii) to the extent due to Landlord's material breach of any obligation, covenant, representation or warranty made in this Lease ((i) and (ii) collectively, **"Landlord Caused Damages"**), nor shall Landlord be liable to Tenant, nor to Tenant's employees, agents or visitors, nor to any other person whomsoever, for any loss or damage that may be occasioned by or through the acts or omissions of any other persons whomsoever, excepting only duly authorized employees and agents of Landlord. Landlord shall not be held responsible in any way on account of any construction, repair or reconstruction (including widening) of any private or public roadways, walkways or utility lines which is not performed by Landlord or its authorized employees or agents or which is performed by a governmental authority or utility company.

16.2    Landlord shall not be liable to Tenant or to Tenant's employees, agents, or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Demised Premises to the extent caused by the negligence or misconduct of Tenant, its employees, subtenants, licensees or concessionaires, or of any other person entering the Demised Premises under express or implied invitation of Tenant, or to the extent arising out of the use of the Demised Premises by Tenant, or to the extent arising out of any breach or default by Tenant in the performance of its obligations under this Lease; and Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from any loss, expense or claims arising out of such damage or injury.

16.3    Indemnification. SUBJECT TO SECTION 29.3(ii).

(i)    TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LANDLORD, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS AND SHAREHOLDERS ("LANDLORD'S RELATED PARTIES") FROM AND AGAINST ANY AND ALL LIABILITIES, JUDGMENTS, DEMANDS, CAUSES OF ACTION, CLAIMS, LOSSES, DAMAGES, COSTS AND EXPENSES (COLLECTIVELY, "LOSSES"), INCLUDING REASONABLE ATTORNEYS FEES AND COSTS, ARISING OUT OF THE USE, OCCUPANCY, CONDUCT, OPERATION, OR MANAGEMENT OF THE DEMISED PREMISES BY, OR THE WILLFUL MISCONDUCT OR NEGLIGENCE OF, TENANT, ITS OFFICERS, CONTRACTORS, LICENSEES, AGENTS, SERVANTS, EMPLOYEES, GUESTS, INVITEES, OR VISITORS IN OR ABOUT THE DEMISED PREMISES OR ARISING FROM ANY BREACH OR DEFAULT UNDER THIS LEASE BY TENANT, OR ARISING FROM ANY ACCIDENT, INJURY, OR DAMAGE, HOWSOEVER AND BY WHOMSOEVER CAUSED, TO ANY PERSON OR PROPERTY, OCCURRING IN OR ABOUT THE DEMISED PREMISES DURING THE LEASE TERM; PROVIDED THAT, THE FOREGOING INDEMNITY SHALL NOT APPLY TO ANY LOSSES ARISING OUT OF ANY LANDLORD CAUSED DAMAGES.  THE INDEMNITY CONTAINED IN THIS SECTION 16.3(I) IS (a) INDEPENDENT OF TENANT'S INSURANCE, (b) WILL NOT BE LIMITED BY COMPARATIVE NEGLIGENCE STATUTES OR DAMAGES PAID UNDER WORKERS' COMPENSATION OR SIMILAR EMPLOYEE BENEFIT ACTS, AND (c) WILL SURVIVE THE END OF THE TERM.

(II)    LANDLORD SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS TENANT, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, AND SHAREHOLDERS

("TENANT'S RELATED PARTIES") FROM AND AGAINST ANY AND ALL LOSSES ARISING FROM ANY ACCIDENT, INJURY, OR DAMAGE TO ANY PERSON OR PROPERTY, OCCURRING IN OR ABOUT THE DEMISED PREMISES OR THE BUILDING DURING THE LEASE TERM AS THE RESULT OF LANDLORD'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR TO THE EXTENT OF ANY LANDLORD CAUSED DAMAGES. THE INDEMNITY CONTAINED IN THIS <u>SECTION 16.3(II)</u> IS (a) INDEPENDENT OF LANDLORD'S INSURANCE, (b) WILL NOT BE LIMITED BY COMPARATIVE NEGLIGENCE STATUTES OR DAMAGES PAID UNDER WORKERS' COMPENSATION OR SIMILAR EMPLOYEE BENEFIT ACTS, AND (c) WILL SURVIVE THE END OF THE TERM.

16.4     LANDLORD AND TENANT RELEASE EACH OTHER FROM ALL CLAIMS OR LIABILITIES FOR DAMAGE TO THE DEMISED PREMISES, DAMAGE TO OR LOSS OF PERSONAL PROPERTY WITHIN THE DEMISED PREMISES, AND LOSS OF BUSINESS OR REVENUES THAT ARE COVERED BY THE RELEASING PARTY'S PROPERTY INSURANCE. LANDLORD AND TENANT WILL NOTIFY THE ISSUING PROPERTY INSURANCE COMPANIES OF THE RELEASE SET FORTH IN THIS PARAGRAPH AND WILL HAVE THE PROPERTY INSURANCE POLICIES ENDORSED, IF NECESSARY. TO PREVENT INVALIDATION OF COVERAGE. THIS RELEASE WILL NOT APPLY IF IT INVALIDATES THE PROPERTY INSURANCE COVERAGE OF THE RELEASING PARTY.   THE RELEASE IN THIS PARAGRAPH WILL APPLY EVEN IF THE DAMAGE OR LOSS IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR STRICT LIABILITY OF THE RELEASED PARTY, BUT WILL NOT APPLY TO THE EXTENT THE DAMAGE OR LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE RELEASED PARTY.

## ARTICLE XVII
## DAMAGES BY CASUALTY

17.1     Tenant shall give immediate written notice to Landlord of any damage caused to the Demised Premises by fire or other casualty.

17.2     In the event that the Demised Premises shall be damaged or destroyed by fire or other casualty insurable under special form (sometimes referred to as "all-risk") property insurance and Landlord or Tenant, as the case may be, does not elect to terminate this Lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense (without reimbursement of such costs by Tenant to Landlord in accordance with Section 6.2 or otherwise) to rebuild and repair the Demised Premises. In the event (a) the Building in which the Demised Premises are located is destroyed or substantially damaged by a casualty not covered by Landlord's insurance; or (b) such Building is destroyed or rendered untenantable to an extent in excess of fifty percent (50%) of the Demised Premises by a casualty, then either Landlord or Tenant may elect to terminate this Lease. In addition, notwithstanding anything herein to the contrary, in the event the holder of a mortgage, deed of trust or other lien on such Building at the time of the casualty elects, pursuant to such mortgage, deed of trust or other lien, to require the use of all or part of Landlord's insurance proceeds in satisfaction of all or part of the indebtedness secured by the mortgage, deed of trust or other lien, then Landlord may elect to terminate this Lease. Landlord or Tenant, as the case may be, shall give written notice of such election within sixty (60) days after the occurrence of such casualty and, if neither party elects to terminate this Lease, Landlord shall rebuild and repair the Demised Premises with reasonable diligence and at its sole cost and expense.

17.3     Landlord's obligation to rebuild and repair under this Article XVII shall in any event be limited to restoring the Demised Premises to substantially the condition in which the same existed prior to such casualty, exclusive of any alterations, additions, improvements, fixtures and/or equipment installed by Tenant and shall be further subject to Landlord's actual receipt of adequate insurance proceeds to perform such restoration work. Tenant agrees that promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence and at Tenant's sole cost and expense to restore, repair and replace all alterations, additions, improvements, fixtures, signs and equipment installed by Tenant, subject to, with respect to Tenant's Work, the receipt of that portion of the property insurance allocable to the cost of Tenant's Work. Tenant shall be responsible for any deficiency between the cost of Tenant's Work and the amount actually paid by the insurance company allocated to Tenant's Work.

17.4     Tenant agrees that during any period of reconstruction or repair of the Demised Premises, it will continue the operation of its business within the Demised Premises to the extent practicable (economically and otherwise). In the event more than fifteen percent (15%) of the floor area of the entire Building is damaged or destroyed (or otherwise rendered unusable), the Minimum Guaranteed Rental only shall be abated during such period of reconstruction or repair of the Demised Premises based on the proportion by which the usable square footage of the Demised Premises bears to the total square footage of the Demised Premises.

17.5     Without limiting the generality of Tenant's termination rights set forth in Section 17.2, if (i) more than twenty five percent (25%) of the floor area of the entire Building shall be damaged or destroyed by a casualty (or otherwise rendered unusable), or (ii) Landlord does not commence the reconstruction of the Demised Premises within six (6) months of the occurrence of such damage or destruction and thereafter diligently prosecute the reconstruction to completion, then Tenant may terminate this Lease, without penalty, by giving notice to Landlord.

## ARTICLE XVIII
## EMINENT DOMAIN

18.1     If more than thirty percent (30%) of the floor area of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof or if a less portion of such floor area should be so taken but such taking renders the Demised Premises unsuitable (economically or otherwise) for Tenant's continued operations, this Lease shall

terminate as of the date physical possession is taken by the condemning authority and no rental obligations shall accrue hereunder from and after such termination of the Lease.

18.2    If less than thirty percent (30%) of the floor area of the Demised Premises should be taken as aforesaid and this Lease does not terminate in accordance with Section 18.1, then this Lease shall remain in full force and effect; however, the Minimum Guaranteed Rental (but not Percentage Rental) payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority. Following such partial taking, Landlord shall make all necessary repairs or alterations to the remaining premises and all necessary repairs within the scope of Landlord's Work as described in this Lease, at its sole cost and expense (and without reimbursement of such costs by Tenant to Landlord in accordance with Section 6.2 or otherwise), required to make the remaining portions of the Demised Premises to be an architectural whole.

18.3    All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises shall be the property of Landlord, and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for Tenant's moving and relocation expenses or for the loss of Tenant's fixtures and other tangible personal property if a separate award for such items is made to Tenant as long as such separate award does not reduce the amount of the award that would otherwise be awarded to Landlord.

### ARTICLE XIX
### ASSIGNMENT AND SUBLETTING

19.1    Except as expressly set forth in this Lease to the contrary and except to the extent reasonably necessary for the use of valet services in accordance with Section 3.2, Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein, or sublet the Demised Premises or any part thereof or grant any license, concession or other right of occupancy of any portion of the Demised Premises without the prior written consent of Landlord. Landlord agrees that it will not withhold consent in an unreasonable and arbitrary manner (as further explained in Section 28.4 of this Lease); however, in determining whether or not to grant its consent, Landlord shall be entitled to take into consideration, without limitation, the reputation and net worth of the proposed transferee. In addition, Landlord shall also be entitled to charge Tenant a reasonable fee for processing Tenant's request (including without limitation for reasonable legal expenses), which processing fee is meant to reimburse Landlord for the reasonable, out-of-pocket cost incurred by Landlord in connection with the request. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings.

19.2    If Tenant is a corporation, partnership or other entity and if at any time during the term of this Lease the person or persons who directly own a majority of either the outstanding voting rights or the outstanding ownership interests of Tenant at the time of the execution of this Lease cease to own a majority of such voting rights or ownership interests (except as a result of transfers by devise or descent), the loss of a majority of such voting rights or ownership interests shall be deemed an assignment of this Lease by Tenant and, therefore, subject in all respects to the provisions of Section 19.1 above. The previous sentence shall not apply, however, if at the time of the execution of this Lease, Tenant or Tenant's parent company is a corporation and the outstanding voting shares of capital stock of Tenant or Tenant's parent company are listed on a recognized security exchange or over-the-counter market. For the avoidance of doubt, any sale of stock of Tenant or Tenant's parent company on a recognized security exchange or over-the-counter market shall not be deemed an assignment for the purposes of this Lease.

19.3    Any assignee or sublessee of an interest in and to this Lease shall be deemed, by acceptance of such assignment or sublease or by taking actual or constructive possession of the Demised Premises, to have assumed all of the obligations set forth in or arising under this Lease to the extent they arise after the date of such assignment, sublease or taking of possession; provided that, if there is a non-monetary default which originated prior to such assignment, subletting or taking possession and which continues thereafter (a "continuing default"), the assignee or sublessee shall be responsible for the cure thereof (such obligations to be expressly assumed in the form of assignment between Tenant and the applicable assignee or sublessee); provided further that, a sublessee shall only be deemed to have assumed obligations related to the portion of the Demised Premises related to the sublease. Such assumption shall be effective as of the earlier of the date of such assignment or sublease or the date on which the assignee or sublessee obtains possession of the Demised Premises.

19.4    Notwithstanding any assignment or subletting, except as otherwise expressly provided in this Lease to the contrary or unless Landlord determines in its sole discretion that the net worth of the proposed transferee is sufficient to meet the obligations under this Lease and Landlord otherwise expressly agrees, in writing, at the time of Landlord's consent to an assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the Rentals herein specified and for compliance with all of its other obligations under this Lease and any guarantor of this Lease shall at all times remain fully responsible and liable for the payment of the Rentals and other obligations under this Lease to extent provided for in its guaranty (even if future assignments and sublettings occur subsequent to the assignment or subletting by Tenant, and regardless of whether or not Landlord's approval has been obtained for such future assignments and sublettings). Moreover, in the event that the rental due and payable by a sublessee exceeds the Rental payable under this Lease, or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration payable on a per square foot basis to Tenant by the assignee, licensee or other transferee for such assignment, license or transfer exceeds the Rental payable under this Lease ("Excess Rental"), then Tenant shall be bound and obligated to pay Landlord all of such Excess Rental within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case may be. For purposes hereof, "Excess Rental" shall be calculated after deducting from any consideration payable to Tenant all of its reasonable, documented out-of-pocket leasing or subletting costs and commissions,

including without limitation, free rent periods, tenant allowances and other inducements offered to a transferee and the cost of renovations performed by Tenant on behalf of such transferee. Finally, in the event of an assignment or subletting, it is understood and agreed that the portion of the Excess Rental to be paid to Landlord in accordance with the preceding sentence shall if received by Tenant be held in trust for Landlord, to be forwarded immediately to Landlord without offset or reduction of any kind; and upon election by Landlord such rentals shall be paid directly to Landlord as specified in Article IV of this Lease.

19.5    Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Demised Premises except in connection with Tenant or its parent company's receipt of financing or credit from an institutional lender.

19.6    In the event of the transfer and assignment by Landlord of its interest in this Lease and in the Building to a person expressly assuming all of Landlord's obligations under this Lease (i.e., including obligations arising prior to the effective date of the assignment), in writing, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest and Landlord shall thereby be discharged of any further obligation relating thereto so long as such successor in interest expressly acknowledges receipt of such security in writing.

19.7    Notwithstanding the foregoing or anything to the contrary contained in this Lease, no Landlord consent will be required for an assignment to any of the following transferees or with respect to the following transfers: (a) any person or entity which directly or indirectly controls, is controlled by or is under common control with Tenant; or (b) a transferee which is the result of a merger or consolidation with Tenant or its parent company, or which acquires all or substantially all of Tenant's or its parent company's corporate stock or assets (each, a "Permitted Assignment"). For purposes hereof, no Excess Rental shall be due and payable to Landlord in connection with a Permitted Assignment or in connection with the use of any valet service.

## ARTICLE XX
## SUBORDINATION; ATTORNMENT; ESTOPPELS

20.1    Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter placed upon the Demised Premises, and to any renewals and extensions thereof. Tenant agrees that any mortgage shall have the right at any time to subordinate its mortgage, deed of trust or other lien to this Lease; provided, however, notwithstanding that this Lease may be (or may become) superior to a mortgage, deed of trust or other lien, the mortgagee shall not be liable for prepaid rentals, security deposits and claims accruing during Landlord's ownership; and further provided that the provisions of a mortgage, deed of trust or other lien relative to the rights of the mortgagee (vis-à-vis Landlord) with respect to proceeds arising from an eminent domain taking (including a voluntary conveyance by Landlord) and provisions relative to proceeds arising from insurance payable by reason of damage to or destruction of the Demised Premises shall be prior and superior to any contrary provisions contained in this Lease (vis-à-vis Landlord) with respect to the payment or usage thereof. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien hereafter placed upon the Demised Premises, and Tenant agrees upon demand to execute such further instruments subordinating this Lease as Landlord may reasonably request, including without limitation a subordination and non-disturbance agreement in a form provided by mortgagee and reasonably acceptable to Tenant (each, an "SNDA"), within fifteen (15) days of Landlord's written request. Notwithstanding the foregoing, Landlord shall obtain from any such present or future mortgagee (and any other superior interest holder), a written agreement that after a foreclosure (or a deed in lieu of foreclosure) the rights of Tenant shall remain in full force and effect during the term of this Lease so long as Tenant shall continue to recognize and perform all of the covenants and conditions of this Lease.

20.2    At any time when the holder of an outstanding mortgage, deed of trust or other lien covering Landlord's interest in the Demised Premises has given Tenant written notice of its interest in this Lease, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or other lien shall have received written notice of such default and the applicable cure period provided in this Lease or other time period specified in the SNDA, if any (measured from the date of such holder's receipt of written notice) has elapsed without the default having been cured.

20.3    Tenant agrees that it will from time to time upon reasonable request by Landlord execute and deliver to Landlord a written statement addressed to Landlord (or to party designated by Landlord), which statement shall identify Tenant and this Lease, shall certify that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), shall confirm that, to Tenant's knowledge, Landlord is not in default as to any obligations of Landlord under this Lease (or if Landlord is in default, specifying any default), shall confirm Tenant's agreements contained above in this Article XX, and shall contain such other information or confirmations as Landlord may reasonably require. Landlord is hereby irrevocably appointed and authorized as the agent and attorney-in-fact of Tenant to execute and deliver any such written statement on Tenant's behalf if Tenant fails to do so within fifteen (15) days after the delivery of a written request from Landlord to Tenant.

## ARTICLE XXI
## DIRECTION OF TENANT'S ENERGIES

21.1    Tenant acknowledges that Tenant's monetary contribution to Landlord (in the form of Rentals) will be substantially reduced if during the term of this Lease, either Tenant or any person, corporation, or other entity, directly or indirectly controlling, controlled by or under common control with Tenant shall directly or indirectly operate, manage, conduct or have any interest in an "STK", "STK Rebel" or other steakhouse restaurant (the "Competing Concept") within a straight line radius of two (2) miles of the Demised Premises (the "Restricted Area"), which Tenant acknowledges is a reasonable area for the purpose of this provision. Accordingly, Tenant agrees

that if during the term of this Lease, either Tenant or any person, corporation, or other entity, directly or indirectly controlling, controlled by or under common control with Tenant (and also, any chief executive officer or chief financial officer of Tenant or Tenant's parent company) either directly or indirectly commences operation of another Competing Concept within the Restricted Area the Demised Premises, the Rental payable by Tenant hereunder shall, upon notice from Landlord, be adjusted as follows from and after such notice:

       (a)    the Minimum Guaranteed Rental shall be one hundred ten percent (110%) of the amount stipulated in Section 1.1(l) of this Lease; and

       (b)    the Percentage Rental shall be computed so as to include fifty (50%) percent (increased to seventy-five percent (75%), if the other store is within a one-mile radius) of all "Gross Sales" (as defined in Section 4.7 of this Lease) from the business engaged in the Competing Concept within the Restricted Area.

     21.2    The above adjustment in Rental reflects the estimate of the parties as to the damages which Landlord would be likely to incur by reason of the diversion of business and customer traffic from the Demised Premises to such other business engaged in the Competing Concept within the Restricted Area, as the proximate result of the establishment of such other store. This provision shall not apply to (i) any existing store presently being operated by Tenant as of the date hereof, provided there is no increase in the size, change in merchandise mix or trade name of such commercial establishment or (ii) any officer, director or shareholder of Tenant or Tenant's parent company unless any such party is chief executive officer or chief financial officer of Tenant or Tenant's parent company (Landlord acknowledging and agreeing that Tenant's parent company is a publicly traded company and Tenant has no control over the actions of its public shareholders or its officers or directors) or (iii) with respect to any chief executive officer or chief financial officer of Tenant or Tenant's parent company, (a) any passive investment of not more than five percent (5%) of the outstanding publicly traded securities of a business engaged in a Competing Concept, (b) any pre-existing business owned by such person prior to becoming chief executive officer or chief financial officer of Tenant or Tenant's parent company, and (c) any activities of such person after leaving the position of chief executive officer or chief financial officer of Tenant or Tenant's parent company. Finally, Tenant agrees that Landlord may waive, for any reason whatsoever, all rights granted to Landlord pursuant to this Section 21.1 and may sever this section from the remainder of this Lease (thereby keeping the remainder of the Lease unmodified and in full force and effect).

## ARTICLE XXII
## DEFAULT BY TENANT AND REMEDIES

     22.1    The following events shall be deemed to be events of default by Tenant under this Lease:

       (a)    Tenant shall fail to pay any installment of Rental or any other obligation under this Lease involving the payment of money and such failure shall continue for a period of five (5) days after written notice thereof to Tenant provided, however, that if during the immediately preceding twelve (12) month period Landlord has already given Tenant two written notices of the failure to pay installments of Rental, no further notice shall be required to Tenant for the next twelve (12) months (i.e., the event of default will automatically occur on the sixth (6th) day after the date upon which the Rental becomes due).

       (b)    Tenant shall fail to comply with any provision of this Lease, other than as described in sub-section (a) above, and either shall not cure such failure within thirty (30) days after written notice thereof to Tenant or if the default cannot be cured within said 30 day period and Tenant fails promptly to commence with due diligence and dispatch the curing of such default or, having so commenced, thereafter fails to prosecute or complete with due diligence and dispatch the curing of such default; provided, however, in no event more than ninety (90) days from the date of such written notice to Tenant.

       (c)    Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

       (d)    Tenant or any guarantor of Tenant's obligations under this Lease shall file a petition under any section or chapter of the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof; or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease thereunder.

       (e)    A receiver or Trustee shall be appointed for the Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligation under this Lease.

       (f)    Except during reasonable periods for repairing, cleaning and decorating or in the event of casualty or condemnation Tenant shall fail to continuously operate after opening for business to the public, desert or vacate or shall commence to desert or vacate the Demised Premises or any substantial portion of the Demised Premises or at any time prior to the three last three months of the Lease Term shall remove or attempt to remove, without the prior written consent of Landlord, all or a substantial amount of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property (other than in the ordinary course of business).

       (g)    From and after the opening of the Demised Premises to the public, Tenant shall fail to maintain any license, permit or other authorization (collectively, "Liquor License") required by any applicable governmental authority, or quasi-governmental authority (including, but not limited to, the Texas Alcoholic Beverage Commission or the Bureau of Alcohol, Tobacco, Firearms and Explosives), required for sale of alcoholic beverages on the Demised Premises, which failure continues for more than thirty (30) days,

or the failure by Tenant to pay any taxes to the Texas Comptroller, related to the sale of alcoholic beverages on the Demised Premises, which failure continues for more than thirty (30) days after Tenant's receipt of notice of such unpaid taxes.

(h)     Tenant shall do or permit to be done anything which creates a lien upon the Demised Premises, which lien is not removed, discharged or bonded by Tenant within thirty (30) days of its receipt of written notice of the filing of such lien.

22.2    Upon the occurrence of any such "events of default" (and after the expiration of all applicable notice and cure periods), then in addition to the remedies available to Landlord under the other provisions of this Lease and all applicable laws, Landlord shall also have the option to pursue any one or more of the following remedies:

(a)     Without any further notice or demand whatsoever, Tenant shall be obligated to reimburse Landlord for the damages suffered by Landlord as a result of the event of default, plus interest on such amount at the maximum contractual rate which could legally be charged in the event of a loan of such amount to Tenant (but in no event to exceed 1½ % per month); and Landlord may pursue a monetary recovery from Tenant.

(b)     Without any further notice or demand whatsoever, Landlord may take any one or more of the actions permissible at law to ensure performance by Tenant of Tenant's covenants and obligations under this Lease. In this regard, and without limiting the generality of the immediately preceding sentence, it is agreed that if Tenant fails to open for business as required in this Lease, or having opened for business, deserts or vacates the Demised Premises, Landlord may enter upon and take possession of such premises in order to protect them from deterioration and continue to demand from Tenant the monthly Rentals and other charges provided in this Lease, without any obligation to relet; however, if Landlord does, at its sole discretion, elect to relet the Demised Premises, such action by Landlord shall not be deemed as an acceptance of Tenant's surrender of the Demised Premises unless Landlord expressly notifies Tenant of such acceptance in writing pursuant to this subsection (b), Tenant hereby acknowledging that Landlord shall otherwise be reletting as Tenant's agent and Tenant furthermore hereby agreeing to pay to Landlord on demand any deficiency that may arise between the monthly Rentals and other charges provided in this Lease and that are actually collected by Landlord. It is further agreed in this regard that in the event of any default described in subsection (b) of Section 22.1 of this Lease, Landlord shall have the right to enter upon the Demised Premises by force if necessary without being liable for prosecution or any claim for damages therefore, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any reasonable, out-of-pocket expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action. Finally, it is agreed that in the event of any default described in subsection (h) of Section 22.1 of this Lease, Landlord may pay or bond around such lien, whether or not contested by Tenant; and in such event Tenant agrees to reimburse Landlord on demand for all reasonable, out-of-pocket costs and expenses incurred in connection with any such action such action, with Tenant further agreeing that Landlord shall in no event be liable for any damages or claims resulting from such action.

(c)     Landlord may terminate this Lease by written notice to Tenant, in which event Landlord shall have the right to enter upon the Demised Premises, and Tenant shall immediately surrender, the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rent, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary without being liable for prosecution or any claim for damages therefor. Tenant hereby waives any statutory requirement of prior written notice for filing eviction or damage suits for nonpayment of rent. In addition, Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of any termination effected pursuant to this subsection (c), said loss and damage to be determined by either of the following alternative measures of damages:

(i)     Until Landlord is able, through reasonable efforts, the nature of which efforts shall be at the reasonable discretion of Landlord, to relet the Demised Premises under terms satisfactory to Landlord, in its reasonable discretion, Tenant shall pay to Landlord on or before the first day of each calendar month, the monthly Rentals and other charges provided in this Lease. If and after the Demised Premises have been relet by Landlord, Tenant shall pay to Landlord on the 20th day of each calendar month the difference between the monthly Rentals and other charges provided in this Lease for such calendar month and that actually collected by Landlord for such month. If it is necessary for Landlord to bring suit in order to collect any deficiency, Landlord shall have a right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time. Any such suit shall not prejudice in anyway the right of Landlord to bring a similar action for any subsequent deficiency or deficiencies. Any amount collected by Landlord from subsequent tenants for any calendar month in excess of the monthly Rentals and other charges provided in this Lease, shall be credited to Tenant in reduction of Tenant's liability for any calendar month for which the amount collected by Landlord will be less than the monthly Rentals and other charges provided in this Lease; but Tenant shall have no right to such excess other than the above-described credit.

(ii)     When Landlord desires, Landlord may demand a final settlement. Upon demand for a final settlement, Landlord shall have a right to, and Tenant hereby agrees to pay, the difference between the total of all monthly Rentals and other charges provided in this Lease for the remainder of the term and the reasonable rental value of the Demised Premises for such period, such difference

to be discounted to present value at a rate equal to the rate of interest which is allowed by law in the State of Texas when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of six percent per annum).

(d)     If Landlord elects to exercise the remedy prescribed in subsection 22.2(b) above, this election shall in no way prejudice Landlord's right at any time thereafter to cancel said election in favor of the remedy prescribed in subsection 22.2 (c) above, provided that at the time of such cancellation Tenant is still in default. Similarly, if Landlord elects to compute damages in the manner prescribed by subsection 22.2(c)(i) above, this election shall in no way prejudice Landlord's right at any time thereafter to demand a final settlement in accordance with subsection 22.2(c)(ii) above. Pursuit of any of the above remedies shall in no way prejudice Landlord's right at any time to pursue any other remedies provided by law. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default, except to the extent such forbearance by Landlord materially prejudices the rights of Tenant.

(e)     Following any event of default, Tenant shall, at the written request of Landlord and to the extent permitted by applicable law, immediately surrender any Liquor License related to the Demised Premises. Tenant acknowledges and agrees that money damages may be inadequate to protect Landlord against failure by Tenant to surrender its Liquor License in accordance with this Lease, and, accordingly, Tenant agrees that Landlord will be entitled to seek to obtain specific performance and injunctive relief in its favor without proof of immediate, irreparable, and/or actual damages for any such failure. Tenant further agrees to waive any requirement for securing or posting any bond in connection with the pursuit of any such remedy.

22.3     It is expressly agreed that in determining "the monthly Rentals and other charges provided in this Lease," as that term is used throughout subsections 22.2(c)(i) and 22.2(c)(ii) above, there shall be added to the Minimum Guaranteed Rental (as specified in Sections 1.1(l) of this Lease) a sum equal to the charges for the payments for taxes, charges and insurance (as specified in Article VI of this Lease) plus one twenty-fourth of the total of all Percentage Rentals required to be paid by Tenant (pursuant to Section 4.3 of this Lease) because of Gross Sales during the two full calendar years immediately preceding the date Landlord initiated action pursuant to said subsections (or, if two full calendar years have not then elapsed, to the corresponding fraction of all Percentage Rentals required to be paid because of Gross Sales during the period commencing with the Rent Commencement Date of this Lease and concluding with the date on which Landlord initiated such action).

22.4     It is further agreed that, in addition to payments required pursuant to subsections 22.2(b) and 22.2(c) above, Tenant shall compensate Landlord for all reasonable, out-of-pocket expenses incurred by Landlord in repossession (including, among other expenses, any increase in insurance premiums caused by the vacancy of the Demised Premises), all reasonable, out-of-pocket expenses incurred by Landlord in reletting (including, among other expenses, repairs, remodeling, replacements, advertisements and brokerage fees), all commercially reasonable concessions granted to a new tenant upon reletting (including, among other concessions, renewal options), all losses incurred by Landlord as a result of Tenant's default and a reasonable allowance for Landlord's administrative efforts, salaries and overhead attributable directly to Tenant's default and Landlord's pursuing the rights and remedies provided herein and under applicable law.

22.5     Landlord may seek to restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder shall be deemed cumulative and not exclusive of each other.

22.6     If on account of any breach or default by Tenant in its obligations hereunder, Landlord shall employ an attorney to represent, enforce or defend any of Landlord's rights or remedies hereunder. Tenant agrees to pay any reasonable, out-of-pocket attorney's fees incurred by Landlord in connection therewith.

22.7     In the event of a default under subsection 22.1(a) above or in the event that any one or more provisions of this Article XXII authorizes Landlord to enter the Demised Premises, Landlord is entitled and is hereby authorized, without any notice to Tenant, to enter upon the Demised Premises by use of a duplicate key, a master key, a locksmith's entry procedures or any other means not involving personal confrontation, and to alter or change the door locks on all entry doors of the Demised Premises, thereby permanently excluding Tenant. In such event Landlord shall not be obligated to place any written notice on the Demised Premises explaining Landlord's action; moreover, if a reason for Landlord's action is the failure of Tenant to pay any one or more Rentals when due pursuant to this Lease, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all Rental defaults of Tenant have been fully cured.

22.8     Tenant acknowledges its obligation to deposit with Landlord the sum stated in Section 1.1(n) above, to be held by Landlord without interest as security for the performance by Tenant of Tenant's covenants and obligations under this Lease. Tenant agrees that such deposit may be commingled with Landlord's other funds and is not an advance payment of Rental or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use such fund to the extent necessary to make good any arrears of Rental and any other damage, injury, expense or liability caused to Landlord by such event of default, and Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not then in default thereunder, any remaining balance of such deposit shall be returned by Landlord to Tenant upon termination of this Lease (subject to the provisions of Section 19.6 above).

22.9     In the event of any default described in subsection (d) of Section 22.1 of this Lease, any assumption and assignment must conform with the requirements of the Bankruptcy Code which provides, in part, that Landlord

20

must be provided with adequate assurances (i) of the source of rent and other consideration due under this Lease, (ii) that the financial condition and operating performance of any proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the date of execution of this Lease; (iii) that any Percentage Rental due under this Lease will not decline substantially; and (iv) that any assumption or assignment is subject to all of the provisions of this Lease (including, but not limited to, restrictions as to use) and will not breach any such provision contained in any financing agreement or other agreement relating to the Demised Premises.

        (a)    In order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Tenant must fulfill the following obligations, in addition to any other reasonable obligations that Landlord may require, before any assumption of this Lease is effective: (i) all defaults under subsection (a) of Section 22.1 of this Lease must be cured within ten (10) days after the date of assumption; (ii) all other defaults under Section 22.1 of this Lease other than under subsections (c), (d) and (e) of Section 22.1 must be cured within fifteen (15) days after the date of assumption; (iii) all actual monetary losses incurred by Landlord (including, but not limited to, reasonable attorneys fees) must be paid to Landlord within ten (10) days after the date of assumption; and (iv) Landlord must receive within ten (10) days after the date of assumption a security deposit in the amount of six (6) months Minimum Guaranteed Rental (using the Minimum Guaranteed Rental in effect for the first full month immediately following the assumption) and an advance prepayment of Minimum Guaranteed Rental in the amount of three (3) months minimum guaranteed rent (using the minimum guaranteed rent in effect for the first full month immediately following the assumption), both sums to be held by Landlord in accordance with Section 22.8 above and deemed to be Rental under this Lease for the purposes of the Bankruptcy Code as amended and from time to time in effect.

        (b)    In the event this Lease is assumed in accordance with the requirements of the Bankruptcy Code and this Lease, and is subsequently assigned, then, in addition to any other reasonable obligations that Landlord may require and in order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Landlord shall be provided with (i) a financial statement of the proposed assignee prepared in accordance with generally accepted accounting principles consistently applied, though on a cash basis, which reveals a net worth in an amount sufficient, in Landlord's reasonable judgment, to assure the future performance by the proposed assignee of Tenant's obligations under this Lease; or (ii) a written guaranty by one or more guarantors with financial ability sufficient to assure the future performance of Tenant's obligations under this Lease, such guaranty to be in form and content satisfactory to Landlord and to cover the performance of all of Tenant's obligations under this Lease.

    22.10    No agreement except a surrender of the Demised Premises and no act or omission by Landlord or Landlord's agent during the term shall constitute an acceptance or surrender of the Demised Premises unless made in writing and signed by Landlord. No reentry or taking possession of the Demised Premises by Landlord shall constitute an election by Landlord to terminate this Lease unless a written notice of such intention is given to Tenant.

    22.11    Landlord covenants and agrees to use commercially reasonable efforts to mitigate all damages, losses, costs and expenses incurred by Landlord following the termination of the Lease by Landlord. Landlord and Tenant agree that Landlord's duty to mitigate shall be satisfied and Landlord shall be deemed to have used objectively reasonable efforts to fill the Demised Premises by doing the following: (a) posting a "For Lease" sign on the Demised Premises; (b) advising Landlord's leasing agent of the availability of the Demised Premises; and (c) advising at least three (3) outside commercial brokerage entities of the availability of the Demised Premises; provided, however, that Landlord shall not be obligated to relet the Demised Premises before leasing any other unoccupied portions of any other property under the ownership or control of Landlord. If Landlord receives any payments from the reletting of the Demised Premises, any such payment shall first be applied to any costs or expenses incurred by Landlord as a result of a default by Tenant under this Lease.

## ARTICLE XXIII
## LANDLORD'S CONTRACTUAL SECURITY INTEREST

    23.1    In addition to the statutory landlord's lien, Landlord shall have at all times a valid security interest to secure payment of all Rentals and other sums of money becoming due hereunder from Tenant, and to secure payment of any damages or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein, upon all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant presently, or which may hereafter be, situated on the Demised Premises, and all proceeds therefrom, and, other than in the ordinary course of business, such property (excluding inventory) shall not be removed without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord shall first have been paid and discharged. Upon the occurrence of an event of default by Tenant, Landlord may upon thirty (30) days' notice to Tenant, in addition to any other remedies provided herein, enter upon the Demised Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Demised Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant additional reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale Landlord or its assigns may purchase unless otherwise prohibited by law. Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice shall be met if such notice is given in the manner prescribed in this Lease at least ten (10) days before the time of sale. Any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held in the above described Demised Premises or where the property is located after the time, place and method of sale and a general description of the types of property to be sold have been advertised in a daily newspaper published in the county in which the property is located, for seven consecutive days before the date of the sale. The proceeds from any such disposition, less any and all

reasonable, out-of-pocket expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and legal expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this paragraph. Any surplus shall be paid to Tenant or as otherwise required by law; Tenant shall pay any deficiencies forthwith. Tenant hereby agrees that a carbon, photographic or other reproduction of this Lease shall be sufficient to constitute a financing statement. Tenant nevertheless agrees that upon request by Landlord, Tenant agrees that it will execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provision of the Uniform Commercial Code (or corresponding state statute or statutes) in force in the state in which the property is located, as well as any other state the laws of which Landlord may at any time consider to be applicable; moreover Landlord is hereby irrevocably vested with a power of attorney from Tenant to execute any and all such financing statements on behalf of Tenant.

23.2    Notwithstanding Section 23.1, so long as Tenant is not currently in default under this Lease, Landlord agrees that it will subordinate its security interest and landlord's lien to the security interest of Tenant's supplier or institutional financing source, provided that the subordination must be limited to a specified transaction and specified items of the fixtures, equipment or inventory involved in the transaction.

### ARTICLE XXIV
### HOLDING OVER

24.1    In the event Tenant remains in possession of the Demised Premises after the expiration of this Lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month at a Rental equal to the Rental (including any Percentage Rental) herein provided plus fifty percent (50%) of such amount otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a tenancy at will. Notwithstanding the preceding sentence, however, if prior to the end of the Lease Term Landlord has delivered a written notice to Tenant informing Tenant of Landlord's need to use the Demised Premises immediately after the conclusion of the Lease Term, or if during the hold-over period Landlord delivers such notice to Tenant, then in either such event Tenant's occupancy shall be characterized as a tenancy at sufferance; and in either such event, in addition to the payments prescribed above in this Article XXIV, Tenant shall indemnify Landlord (a) against claims for damages by any other tenant or prospective tenant to whom Landlord may have leased all or part of the Demised Premises, and (b) for all other losses, costs and expenses, including reasonable attorneys' fees, incurred by reason of such holding over by Tenant. Tenant further agrees that during any period when Tenant's status is as a tenant at sufferance pursuant to this Section 24.1, Landlord may utilize any of the remedies available at law and under this Lease; and in this regard Tenant agrees that one of Landlord's rights shall be to enter upon the Demised Premises, without any notice to Tenant, by use of a duplicate key, a master key, a locksmith's entry procedures or any other means not involving personal confrontation, and to alter or change the door locks and/or other security devices on all entry doors of the Demised Premises, thereby depriving Tenant access to the Demised Premises.

### ARTICLE XXV
### NOTICES

25.1    Wherever any notice, claim or demand is required or permitted under this Lease, such notice, claim or demand shall be in writing. Any notice, claim or demand required or permitted to be delivered under this Lease shall be deemed to be delivered when actually received by the designated addressee or, if earlier and regardless of whether actually received or not, when it is either (i) three (3) business days after being deposited in the United States mail, postage prepaid, certified mail, return receipt requested, or (ii) one (1) business day after delivered to the custody of a reputable messenger service or courier service for overnight delivery, addressed to the applicable party to whom it is being delivered at the respective addresses set out in Section 1.1 above, or at such other addresses as they have theretofore specified by written notice; provided that, a copy of any notice sent to Tenant shall be provided to The Giannuzzi Group, LLP, 411 West 14th Street, 4th Floor, New York, New York 10014, Attn: Nicholas L. Giannuzzi, Esq.

25.2    If and when included within the term "Landlord" as used in this instrument there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant" as used in this instrument there are more than one person, firm, or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payment to Tenant. All parties included within the terms "Landlord" and "Tenant," respectively, shall be bound by notices and payments given in accordance with the provisions of this Article to the same effect as if each had received such notice or payment. In addition, Landlord and Tenant each agree that notices to Landlord and Tenant may be given by the other party's attorney or other authorized agent.

### ARTICLE XXVI
### COMMISSIONS; ADVICE FROM AGENT

26.1    Landlord shall pay to UCR and Sierra Midwest, LLC (collectively, "Agent"), a commission for negotiating this Lease, in accordance with a separate agreement between Landlord and Agent.

26.2    Landlord and Tenant warrant and represent to each other that they have not consulted or negotiated with any broker or finder with regard to the Demised Premises or this Lease other than the aforementioned Agent. If either party shall be in breach of the foregoing warranty, such party shall indemnify the other against any loss, liability and expense (including reasonable attorneys' fees and court costs) arising out of claims for fees or commissions from anyone having dealt with such party in breach.

## ARTICLE XXVII
## REGULATIONS

27.1     Landlord and Tenant each represent and warrant to the other that the representing party is not, and shall not become during the Lease Term, a person or entity with whom the other party is restricted from doing business under applicable laws relating to national security (such as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, commonly known as the "USA Patriot Act") and executive orders and regulations relating to such applicable laws. Each party agrees to take all reasonable measures throughout the Lease Term in order to assure the continued validity of its representation and warranty in this Section 27.1; moreover, each party will provide further assurances and information to the other party if and to the extent required by such applicable laws.

27.2     Landlord and Tenant acknowledge that there are in effect federal, state, county and municipal laws, orders, rules directives and regulations (collectively referred to hereinafter as the "**Regulations**") and that additional Regulations may hereafter be enacted or go into effect. relating to or affecting the Demised Premises, and concerning the impact on the environment of construction. land use. maintenance and operation of structures, toxic or otherwise hazardous substances, and conduct of business. Subject to the express rights granted to Tenant under the terms of this Lease, Tenant will not cause, or permit to be caused, any act or practice, by negligence, omission or otherwise, that would violate any Regulations. Moreover, Tenant shall have no claim against Landlord by reason of any changes Landlord is required to make in the Demised Premises pursuant to said Regulations or any charges imposed upon Tenant, Tenant's customers or other invitees pursuant to same.

27.3     If, by reason of any Regulations, the payment to, or collection by, Landlord of any Rental or other charge (collectively referred to hereinafter as "**Lease Payments**") payable by Tenant to Landlord pursuant to the provisions of this Lease is in excess of the amount (the "**Maximum Charge**") permitted thereof by the Regulations, then Tenant, during the period (the "**Freeze Period**") when the Regulations shall be in force and effect shall not be required to pay, nor shall Landlord be permitted to collect, any sum in excess of the Maximum Charge. Upon the earlier of (i) the expiration of the Freeze Period, or (ii) the issuance of a final order or judgment of a court of competent jurisdiction declaring the Regulations to be invalid or not applicable to the provisions of this Lease, Tenant, to the extent not then prescribed by law, and commencing with the first day of the month immediately following, shall pay to Landlord as additional Rental in equal monthly installments during the balance of the term of this Lease, a sum equal to the cumulative difference between the Maximum Charges and the Lease Payments during the Freeze Period. If any provisions of this section, or the application thereof, shall to any extent be declared to be invalid and unenforceable, the same shall not be deemed to affect any of the other provisions of this section or of this Lease, all of which shall be deemed valid and enforceable to the fullest extent permitted by law.


## ARTICLE XXVIII
## MISCELLANEOUS

28.1     Nothing in this Lease shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant.

28.2     Except as expressly permitted under this Lease, Tenant shall not for any reason withhold or reduce Tenant's required payments of Rentals and other charges provided in this Lease; it being agreed (i) that the obligations of Landlord under this Lease are independent of Tenant's obligations except as may be otherwise expressly provided in this Lease and (ii) that to the maximum extent permitted under applicable law, Tenant hereby waives all rights which it might otherwise have to withhold Rentals. The immediately preceding sentence shall not be deemed to deny Tenant the ability of pursuing all rights granted it under this Lease or at law (with the exception of any right of Tenant to offset or withhold the payment of Rentals, which right is hereby waived to the maximum extent permitted by applicable law); however, as contemplated in Texas Rule of Civil Procedure 174(b), as amended from time to time, at the direction of Landlord, Tenant's claims in this regard (except as expressly provided under this Lease) shall be litigated in proceedings different from any litigation involving Rental claims or other claims by Landlord against Tenant (i.e., each party may proceed to a separate judgment without consolidation, counterclaim or offset as to the claims asserted by the other party).

28.3     (i)     The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to its interest in the Demised Premises and the proceeds of sale on execution of the interest of Landlord in the Demised Premises; and Landlord shall not be personally liable for any deficiency, except that Landlord shall, subject to the provisions of Section 19.6 hereof, remain personally liable to account to Tenant for any Security Deposit under this Lease. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord.

(ii)     NOTWITHSTANDING ANYTHING CONTAINED IN THIS LEASE TO THE CONTRARY, IN NO EVENT WILL LANDLORD BE LIABLE TO TENANT OR ANY PERSON OR ENTITY CLAIMING RIGHTS BY, THROUGH OR UNDER TENANT AS A RESULT OF ANY BREACH HEREOF OR FAILURE TO PERFORM HEREUNDER OR INDEMNITY IN CONNECTION HEREWITH FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL OR OTHER DAMAGES, OTHER THAN ACTUAL DAMAGES ARISING FROM SUCH BREACH OR FAILURE TO PERFORM OR INDEMNITY, AND IN ALL SUCH CASES LANDLORD'S LIABILITY HEREUNDER IS LIMITED TO LANDLORD'S INTEREST IN THE DEMISED PREMISES AS DESCRIBED IN SECTION 28.3 ABOVE.

28.4    In all circumstances under this Lease where the prior consent of one party (the "consenting party"), whether it be Landlord or Tenant, is required before the other party (the "requesting party") is authorized to take any particular type of action, such consent shall not be withheld, conditioned or delayed in a wholly unreasonable and arbitrary manner; however, the requesting party agrees that its exclusive remedy if it believes that consent has been withheld improperly (including, but not limited to, consent required from Landlord pursuant to Section 9.2 or Section 19.1) shall be to institute litigation either for a declaratory judgment or for a mandatory injunction requiring that such consent be given (with the requesting party hereby waiving any claim for damages except that the prevailing party shall be entitled to reasonable attorneys' fees). In addition, the foregoing limitation on liability and remedies shall not apply if it is found that the consenting party has withheld consent intentionally and in bad faith or if the consenting party refuses to comply with a court order or judgment requiring it to grant its consent.

28.5    One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act. Neither Landlord's acceptance of rent or any other sums payable by Tenant hereunder (or any portion thereof), nor failure by Landlord to complain of any action, non-action or default of the other shall constitute a waiver as to any breach of any covenant or condition contained herein nor a waiver of any of Landlord's rights hereunder. Waiver by Landlord of any right shall not constitute a waiver of any other right or for any prior or subsequent default of the same obligation. No right or remedy of Landlord hereunder or covenant, duty or obligations hereunder shall be deemed waived unless such waiver is in writing and signed by the party waiving such right.

28.6    Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant. Landlord or Tenant, as the case may be, shall not be liable or responsible for (except for the payment of any amounts due under this Lease, provided that, the Rent Commencement Date may be extended in accordance with Section 28.18), and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots. acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party (each, a "Force Majeure Event").

28.7    If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby.

28.8    Intentionally omitted.

28.9    The laws of the State of Texas shall govern the interpretation, validity, performance and enforcement of this Lease, without regard to any conflict of law principles. Venue for any action under this Lease shall be the county in which Rentals are due pursuant to Section 4.1 and Section 1.1 of this Lease unless venue is required to be in the county in which the Demised Premises is situated.

28.10    The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

28.11    Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

28.12    The terms, provisions and covenants contained in this Lease shall apply to, inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

28.13    This Lease contains the entire agreement between the parties. and no rights are created in favor of either party other than as specified or expressly contemplated in this Lease. No brochure, rendering, information or correspondence shall be deemed to be a part of this agreement unless specifically incorporated herein by reference. In addition, no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.

28.14    LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION OR PROMISE OF THE OTHER, OR OF THE AGENT OR COOPERATING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THIS LEASE.

28.15    This Lease consists of twenty-eight articles and Exhibits "A" through "G". In the event any provision of an exhibit or other attached page shall be inconsistent with a provision in the body of this Lease, the provision as set forth in the exhibit or other attached page shall be deemed to control.

28.16    The terms and provisions of this Lease are expressly conditioned upon Landlord obtaining approval from its Lender of all of the terms of this Lease on or before ten (10) days of the Effective Date (the "Lender Approval Deadline"). If the foregoing condition precedent has not been satisfied on or before the Lender Approval Deadline, then Landlord may terminate this Lease be delivering written notice thereof to Tenant within three (3) days after the Lender Approval Deadline, and in such event this Lease shall terminate, and thereafter no longer be of any force or effect, and neither party shall have any further rights or obligations hereunder, except that any amounts paid by Tenant to Landlord upon execution of this Lease shall be immediately repaid to Tenant. If Landlord fails to deliver a termination notice within the time period provided above, then such termination right shall be deemed to be waived and the foregoing contingency shall be deemed to be satisfied.

28.17   In the event cable television is not available at the Demised Premises, Landlord hereby grants to Tenant and its agents and contractors, at Tenant's sole cost and expense, the right to install, maintain and operate at least two (2) mast mounted satellite dish antenna (the Dish) (which may be three (3) feet in diameter) and related equipment, including cables from the exterior of the Demised Premises to equipment inside the Demised Premises, necessary to the operation of the Dish, as part of Tenant's integrated satellite business network.  Tenant may locate the Dish at, or relocate the Dish to, some other location on or about the Demised Premises for purposes of adequate reception, subject to appropriate law, codes and regulations and Landlord's approval. Tenant shall ensure that the Dish, and each part of it, shall be installed in a good and workmanlike manner and in accordance with all local and building rules of construction and codes.  Tenant shall obtain all FCC and other licenses or approvals required to install and operate the Dish. The Dish is and shall remain the property of Tenant or Tenant's assignee, transferee or sublessee, and Landlord and Tenant agree that the Dish is not, and installation of the Dish at the Demised Premises shall not cause the Dish to become a fixture pursuant to this Lease or by operation of law.  Tenant shall be responsible for the repair and maintenance of the Dish during the Term of this Lease, at its sole cost and expense, and upon the termination of this Lease shall remove said Dish and repair any and all damage to the Demised Premises (including, but not limited to, the roof of the Demised Premises) caused as a result of such removal.

28.18   Notwithstanding anything to the contrary contained in this Lease, in the event (i) any Force Majeure Event or (ii) any Remediation Work, in any such case, causes, the Tenant's Work not to be completed or cause Tenant to not open for business to the public on or before the Rent Commencement Date, then the Rent Commencement Date shall be extended by one day for each such day of delay.

28.19   Concurrently with the execution of this Lease by Tenant, The One Group Hospitality, Inc., a Delaware limited liability company ("Guarantor"), shall execute a Limited Guaranty of Lease Agreement (the "Guaranty") in favor of Landlord, in the form of the Guaranty attached hereto as Exhibit "C".  Guarantor shall have no liability, obligation or financial responsibility under, relating to or arising out of the Lease whatsoever except as expressly set forth in the Guaranty.

28.20   Landlord understands, acknowledges, covenants and agrees that (i) Tenant and/or its affiliates are the sole owners of and have the exclusive right, title and interest in and to the "STK Rebel" trade name and any other trademarks now or hereafter owned by Tenant and/or its affiliates, singly or in any combination (collectively, "Trademarks"), and (ii) Landlord has no right, title or interest in or to any of the Trademarks.  Landlord recognizes that the Trademarks possess substantial goodwill and economic value to Tenant and its affiliates, and expressly agrees not to use such Trademarks without the prior written consent of Tenant.  Landlord shall comply with all instructions received from Tenant in connection with its use of the Trademarks.

*[Remainder of Page Intentionally Left Blank*
*Signature Page Follows]*

EXECUTED as of the latest date accompanying a signature by Landlord or Tenant below.

**LANDLORD:**

WC 3RD AND TRINITY, LP

By:    WC 3rd and Trinity GP, LLC,
       its General Partner

By:    World Class Real Estate, LLC,
       its Manager

By:    World Class Capital Group, LLC,
       its Manager

By:
Name:  Natin Paul
Title:   President

Date of Signature: 6/5/2015

**TENANT:**

STK REBEL AUSTIN, LLC

By:
Name:
Title:

Date of Signature:

Taxpayer ID / Soc. Sec. No

26

EXECUTED as of the latest date accompanying a signature by Landlord or Tenant below.

LANDLORD:

WC 3RD AND TRINITY, LP

By:     WC 3rd and Trinity GP, LLC,
        its General Partner

By:     World Class Real Estate, LLC,
        its Manager

By:     World Class Capital Group, LLC,
        its Manager

By:     _____
Name:   Natin Paul
Title:  President

Date of Signature: _____

TENANT:

STK REBEL AUSTIN, LLC

By:     _____
Name:   SAMUEL GOLDENBERG
Title:  CFO

Date of Signature:  June 5, 2015

Taxpayer ID / Soc. Sec. No. _____

26

EXHIBIT "A"

**DEMISED PREMISES**



EXHIBIT "B"

CONSTRUCTION: TENANT ACCEPTANCE OF SPACE AND TENANT'S WORK
(WITH ALLOWANCE TO TENANT FOR FINISH-OUT)

ARTICLE I

TENANT'S OBLIGATIONS

Tenant hereby and acknowledges that it is has had the opportunity to conduct its own independent investigation and inspection of all aspects of the Demised Premises. Except as expressly provided in the attached Lease to the contrary and except for Landlord's Work, on the Commencement Date, Tenant shall accept the Demised Premises in its "AS IS, WHERE IS AND WITH ALL FAULTS", and turned over to Tenant for finish out. Prior to the commencement of any construction, Tenant shall adhere to the following:

A. PRE-CONSTRUCTION OBLIGATIONS

(1)     Plans, specifications, shop drawings, diagrams, schedules and other data relating to work to be performed by Tenant must be furnished by Tenant to Landlord substantially complete, sufficient to comply with all applicable laws and to obtain a building permit, and ready for Landlord's consideration and final approval, within ninety (90) days after the Commencement Date or Scheduled Commencement Date, whichever is later. Without limiting the generality of the immediately preceding sentence, Tenant's submissions must include but is not limited to a site plan, demolition plans, floor plans, reflected ceiling plans, structural plans, plumbing plans, electrical plans and mechanical plans, interior and exterior elevations of all walls, a furniture plan and an equipment plan. All drawings shall be at scale of either 1/8" or 1/4".

(2)     Prior to commencement of Tenant's Work, Landlord must provide prior written approval of Tenant's general contractor, subcontractors, plans, specifications, shop drawings and diagrams, which approval shall not be unreasonably withheld, conditioned or delayed; provided that, Landlord hereby approves Tenant's use of Duprat Construction as general contractor for Tenant's Work.

(3)     Tenant shall secure Landlord's written approval of all designs, plans, specifications, materials and contractors for work to be performed by Tenant before beginning the work, such approval not to be unreasonably withheld, conditioned or delayed, and shall secure all necessary licenses and permits to be used in performing the work. Tenant's finished work shall be in accordance with all such approved items, as well as any other specifications provided by Landlord (and approved by Tenant), and shall be subject to Landlord's approval and acceptance.

(4)     The insurance requirements under Article XV of this Lease and the waiver requirements under Article XVI of this Lease shall apply during the construction contemplated in this exhibit, and Tenant shall provide evidence of appropriate insurance coverage (including, unless waived by Landlord, what is commonly referred to as "builder's all-risk" insurance) prior to beginning any of Tenant's Work. Tenant shall also provide Landlord with evidence of insurance covering both Tenant and Tenant's contractor against damage to their personal property, as well as against third-party liability and worker's compensation claims arising out of all construction and associated activities. All policies of insurance shall be subject to Landlord's prior approval, not to be unreasonably withheld, conditioned or delayed, and shall be endorsed showing Landlord, Landlord's representatives, and Landlord's property manager as additional named insureds.

B. DESCRIPTION OF TENANT'S WORK

(1)     Signs: Tenant shall pay for all signs and the installation thereof, including the electrical hook-up, subject to the provisions of Section 13.1 of this Lease.

(2)     Utilities: All meters or other measuring devices in connection with utility services shall be provided by Tenant. All service deposits shall be made by Tenant at Tenant's expense.

(3)     All work undertaken by Tenant (i) shall be at Tenant's expense (except for the Allowance), and (ii) shall not damage the Building or any part thereof. Any roof penetration shall be performed by Landlord's roofer, or, at Landlord's option, by a bonded roofer approved in advance by Landlord, such approval not to be unreasonably withheld, conditioned or delayed. The work shall be begun only after Landlord has given consent and, except with respect to work done on the roof, must be completed in accordance with the specifications required to maintain any existing warranties. Such consent shall in part be conditioned upon Tenant's plans to include materials acceptable to Landlord in order to prevent damage to the roof. Tenant shall provide documentation generated by a structural engineer licensed in the State of Texas as deemed necessary by Landlord and as may be required by the authority having jurisdiction to ensure the adequate weight distribution of any new equipment being installed. Tenant shall be responsible for obtaining, and paying for, professional inspections of any structural work (including, without limitation, any roof work or concrete work).

(4)     Upon completion of Tenant's Work, Tenant shall (i) notify Landlord that the work is complete and ready for Landlord's review, (ii) deliver to Landlord a true copy of Tenant's certificate of occupancy (or similar governmental permit), and (iii) provide unconditional lien waivers from Tenant's general contractor indicating that all bills have been paid to Tenant's contractors, subcontractors and professionals.

C. ALLOWANCE TO TENANT FOR FINISH-OUT

(1)  Subject to the documentation requirements as set forth in the this Section C.(1), and provided that Tenant is not in default of this Lease, Landlord will pay to Tenant an allowance of, but in no event exceeding, $1,346,550.00 ("Allowance"), as a reimbursement for Tenant's bona fide (and verified) construction expenses (the "Tenant Improvements"), which Allowance shall be processed and paid in three installments as follows:

   1.  33.33% of the Allowance (i.e., $448,850.00) delivered upon 50% completion of Tenant's Work;
   2.  33.33% of the Allowance (i.e., $448,850.00) delivered upon 75% completion of Tenant's Work;
   3.  the remainder of the Allowance less a 10% retainage (i.e., $404,000.00) (the "Third Allowance Advance") delivered upon substantial completion of Tenant's Work; and
   4.  the 10% retainage (i.e., $44,850.00) delivered upon Evidence of Completion being provided to Landlord (as hereinafter defined).

For the avoidance of doubt, in the event Tenant is in default of this Lease (beyond the expiration of all applicable notice and cure periods), Tenant shall nonetheless be entitled to the applicable portion of the Allowance once the default has been cured by Tenant (assuming Tenant has satisfied any other payment conditions expressly set forth in this Section C.(1).

With respect to each Allowance advance, Tenant shall accompany its payment request to Landlord with the following documentation:

   1)  Application and Certificate for Payment and Schedule of Values from Tenant's general contractor;
   2)  Copies of all paid invoices and canceled checks (or wire confirmations) for expenses paid directly by Tenant; and
   3)  Mechanics and Materialmen Unconditional Lien Waivers in form and substance acceptable to Landlord, executed by the general contractor as it relates to the portion of the work performed to-date and paid for.
   4)  With respect the Third Allowance Advance, AIA Form Document G704-2000 Certificate of Substantial Completion signed by Tenant's Architect and delivered to Landlord confirming substantial completion of the Tenant Improvements consistent with the Tenant Plans drafted by Tenant's Architect and approved by Landlord for construction.

Furthermore, Tenant will, upon final completion of the Tenant Improvements, provide Landlord with the following "Evidence of Completion" in form and content reasonably satisfactory to Landlord:

   1)  Certificates of Occupancy or Temporary Certificate of Occupancy, or equivalent, for the Tenant Improvements as issued by the authority having jurisdiction;
   2)  Executed Affidavit and Certificate of Completion by Tenant and general contractor;
   3)  Two (2) copies of final "as-built" Tenant Plans of the Tenant Improvements;
   4)  Notification and signed confirmation issued by Tenant's Architect to Landlord confirming final completion of the Tenant Improvements consistent with the Tenant Plans drafted by Tenant's Architect and approved by Landlord for construction;
   5)  Final affidavits of bills paid, unconditional Final Lien Waivers, or other evidence reasonably satisfactory to Landlord executed by Tenant and the general contractor relating to the Demised Premises that all work has been completed lien-free and that the costs of all materials and labor furnished in connection with said work have been paid in full;
   6)  To the extent required by applicable law, the Tenant Improvements have been inspected by Texas Department of Licensing and Regulation ("TDLR") and found to be in compliance with the Disability Acts;
   7)  Evidence that Tenant has paid any portion of the cost of the Tenant's Work not covered by the Allowance;
   8)  Tenant's delivery to Landlord of all insurance documentation prescribed in Article XV of this Lease; and
   9)  Tenant's commencement of business in the Demised Premises.

In addition to any rights and remedies Tenant may have under this Lease (or at law or in equity), in the event Landlord fails to disburse the Allowance as and when due under this Lease (i.e., following Tenant's provision of all documentation as required hereunder) and fails to disburse such Allowance within 60 days of Tenant's written notice and demand therefor, Tenant may, at its election, offset the amount of such Allowance against any Rental payable to Landlord under this Lease.

(2)  Notwithstanding the Allowance prescribed in Section C.(1) immediately above, the parties agree (a) that Tenant is not and may not be a contractor, but instead will employ one or more third-party contractors to perform all Tenant's Work, and (b) that Landlord shall not be a party to any construction contracts relating to Tenant's Work. All construction contracts for Tenant's Work shall be executed solely by Tenant, and only Tenant shall (vis-à-vis such contractors) be responsible for making payments to contractors, regardless of whether or not the above-prescribed allowance from Landlord is sufficient to make all such payments.

## EXHIBIT "C"
## LIMITED LEASE GUARANTY

FOR VALUE RECEIVED, and in consideration of, and in order to induce WC 3rd and Trinity, LP ("Landlord") to execute a certain Lease Agreement (the "Lease") dated of even date herewith between Landlord and STK Rebel Austin, LLC ("Tenant") covering certain premises more fully described in the Lease, The One Group Hospitality, Inc. ("Guarantor") hereby guarantees unto Landlord the full and prompt payment and performance of Tenant's obligations arising under the Lease (other than any acceleration of rent beyond Month 36 of the Lease Term) solely with respect to the period commencing as of the Effective Date and continuing through and including the earlier of (i) the last day of Month 36 of the Lease Term (i.e., the last day of the 36th full calendar month following the Rent Commencement Date) and (ii) the date Tenant vacates and surrenders the Demised Premises to Landlord in the Required Surrender Condition (such date, the "Primary Obligations Expiration Date"; such obligations, the "Primary Obligations"). In addition, if the date Tenant vacates and surrenders the Demised Premises to Landlord in the Required Surrender Condition occurs prior to the last day of Month 36 of the Lease Term, then Tenant shall continue to guarantee the payment of the Minimum Guaranteed Rental through and including Month 36 of the Lease Term (the "Secondary Obligations"; together with the Primary Guaranteed Obligations, the "Obligations"). Guarantor hereby covenants that if Tenant shall default in the payment or performance of any of the Obligations, Guarantor shall pay the amount due to Landlord as and when the same become due under the Lease. Guarantor further covenants to pay to Landlord on demand by Landlord all reasonable, out-of-pocket costs and expenses that may arise in enforcing this Limited Lease Guaranty (this "Guaranty") or damages in consequent of any default by Tenant of the Obligations (other than any acceleration of rent beyond Month 36 of the Lease Term), including without limitation, reasonable attorneys' fees (the "Enforcement Costs"; together with the "Obligations", the "Guaranteed Obligations"). All capitalized terms used herein and not otherwise defined shall have the respective meanings as set forth in the Lease.

This Guaranty is an absolute and unconditional guaranty of payment and performance of the Guaranteed Obligations. It shall be enforceable against Guarantor without the necessity of (i) any suit instigated by Landlord against Tenant, (ii) the exhaustion of Landlord's remedies with respect to Tenant under the Lease, or (iii) the enforcement of Landlord's rights with respect to any security which has ever been given to secure the payment and performance of the Guaranteed Obligations. Except as otherwise provided in this Guaranty, this Guaranty shall also be enforceable without the necessity of any notice of Tenant's nonpayment or nonperformance, notice of acceptance of this Guaranty or any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives.

The obligations of Guarantor hereunder shall be irrevocable and unconditional, irrespective of the genuineness, validity, regularity or enforceability of the Lease or any security given for the Guaranteed Obligations or any circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor, and Guarantor waives the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty, and agrees that the obligations of Guarantor hereunder shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or guarantor. Specifically, Guarantor waives the benefits of any right of discharge under Texas law and any other rights of sureties and guarantors thereunder. Without limiting the generality of the foregoing, Guarantor agrees that the occurrence of the following events (or any thereof), whether they occur with or without notice or consent by Guarantor, will in no way release or impair any liability or obligation of Guarantor hereunder: (i) Landlord, in its discretion, waives compliance by Tenant with any of its Guaranteed Obligations or covenants under the Lease or waives any default thereunder, or grants any indulgence with respect to the Lease, (ii) Landlord modifies, amends or changes any provision of the Lease, (iii) Landlord grants extensions or renewals of the Lease or the Guaranteed Obligations, (iv) Landlord transfers its interest in the Demised Premises covered by the Lease or its rights under this Guaranty, (v) Landlord consents to the assignment by Tenant of its rights under the Lease, (vi) Landlord deals in any respect with Tenant and the Guaranteed Obligations as if this Guaranty were not in effect, (vii) Tenant is released from its Guaranteed Obligations by benefit of an exculpation clause in the Lease, (viii) the release or discharge of Tenant in a creditor's proceedings, receivership, bankruptcy or other proceeding, (ix) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the federal Bankruptcy Act or other statute or from the decision in any court, and (x) the rejection or disaffirmance of the Lease in any such proceedings. If, as a result of such proceedings, Landlord is forced to refund any payment made by Tenant to Landlord on account of the Guaranteed Obligations because it is found to be a preference or for any other reason, Guarantor hereby covenants to pay such amount to Landlord upon demand.

All of Landlord's rights and remedies under the Lease or under this Guaranty are intended to be distinct, separate and cumulative, and no such right or remedy therein mentioned is intended to be in exclusion of or a waiver of any of the others. Specifically, the obligation of Guarantor hereunder shall not be released by Landlord's receipt, application or release of security given for performance and observance of covenants and conditions required to be performed and observed by Tenant under the Lease.

Until the Guaranteed Obligations have been paid in full, Guarantor shall not have any right of subrogation unless such right is expressly granted in writing by Landlord. Any indebtedness of Tenant held by Guarantor is hereby subordinated to this Guaranty; and such indebtedness of Tenant to Guarantor, if Landlord so requests, shall be collected, enforced and received by Guarantor as trustee for Landlord and shall be paid over to Landlord in order to satisfy the Guaranteed Obligations guaranteed hereunder.

Landlord in its sole discretion may apply all payments received by it from Tenant, Guarantor or any other guarantor under any other instrument, or realized by it from any security in such manner and order or priority as Landlord sees fit, to any of the Guaranteed Obligations of Tenant.

Whether signed by only one person or more than one person, this Guaranty and all other obligations hereunder shall be binding on each of the undersigned and their respective heirs, executors, administrators, successors and assigns (except as otherwise provided herein). The word "person" as used herein includes natural persons and entities of all kinds. Suit may be brought and maintained against Guarantor without the joinder of Tenant or any other person.

Guarantor agrees that if Landlord shall employ counsel to present, enforce or defend any or all of Landlord's rights or remedies hereunder, or defend any action brought by Guarantor, then, in any event in which Guarantor is not the prevailing party, Guarantor shall pay all reasonable attorneys' fees and expenses incurred by Landlord in connection with any such action.

This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Landlord.

As used herein, the term "Tenant" shall include any successor or assignee of Tenant, the term "Landlord" shall include any successor or assignee of Landlord, and the term "Lease" shall include any amendment, extension or renewal of the Lease.

Notwithstanding the foregoing or anything contained in this Guaranty or the Lease to the contrary, except for the Obligations, Guarantor shall have no liability, obligation or financial responsibility under, relating to or arising out of the Lease whatsoever. Without limiting the generality of the foregoing, Guarantor shall have no liability, obligation, or financial responsibility under, relating to or arising out of the Lease to the extent arising after Month 36 of the Lease Term, except for Obligations which predate the expiration of Month 36 of the Lease Term. Notwithstanding anything herein to the contrary, this Guaranty shall survive with respect to any Primary Obligations arising from any act or omission by Tenant prior to the Primary Obligations Expiration Date and any Secondary Obligations arising from any act or omission by Tenant prior to Month 36 of the Lease Term.

**THIS GUARANTY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS IN THE STATE OF TEXAS. GUARANTOR HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT WITH RESPECT TO THIS GUARANTY MAY BE MAINTAINED IN THE COURTS OF DALLAS COUNTY, TEXAS, OR IN THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS AND GUARANTOR HEREBY CONSENTS TO THE JURISDICTION AND VENUE OF SUCH COURTS.**

EXECUTED the __5th__ day of June, 2015.

The One Group Hospitality, Inc.
Name (Printed or Typed)

411 West 14th Street, 2nd Floor, New York, New York 10014
Address (Printed or Typed)

14-1961545
SSN/EIN

By: _____
(Signature)

**EXHIBIT "D"**

**RENEWAL OPTION**

Landlord hereby grants to Tenant, but not any assignee or subtenant of Tenant (other than an assignee who assumes this Lease pursuant to a Permitted Assignment contemplated by Section 19.7 of this Lease), the right and option to renew and extend the primary Term of this Lease for two (2) consecutive renewal terms of five (5) years each (hereinafter collectively referred to as the "Renewal Terms" and individually referred to as a "Renewal Term"), with the first Renewal Term to begin upon the expiration of the Primary Term and subsequent Renewal Terms to begin upon the expiration of the immediately preceding Renewal Term provided that such option shall be exercisable if, and only if, on the date Tenant delivers such notice to Landlord, (i) Tenant is not currently in default under this Lease (after notice and the expiration of all applicable cure periods), and (ii) this Lease is in full force and effect; provided that, if Tenant is then-currently in default under this Lease, Tenant shall be required to cure such default prior to the expiration of the Primary Term or then-current Renewal Term, as the case may be, in which case Tenant shall be then, and only then, be entitled to renew this Lease.

Except as otherwise set forth herein to the contrary (including, without limitation, the sums constituting Minimum Guaranteed Rental during the Renewal Terms), all of the other terms, provisions and covenants of this Lease shall apply to each Renewal Term. The Minimum Guaranteed Rental during the Renewal Term shall be as specified in Section 1.1(i) of the Agreement. If Tenant fails to timely give Landlord the Renewal Notice, all of Tenant's rights with respect to such renewal option, and any future renewal options, shall expire.

**EXHIBIT "E"**

**GROSS SALES EXCLUSIONS**

Notwithstanding anything in this Lease to the contrary, Gross Sales shall not include (and Percentage Rental) shall not be paid on the following amounts:

(a) complimentary and discounted meals;

(b) insurance proceeds;

(c) bulk sales;

(d) financing proceeds;

(e) receipts from public telephones, stamp machines, or vending machines installed for the benefit of Tenant's employees;

(f) delivery charges or any service rendered at cost or approximately at cost for the convenience of customers;

(g) sums and credits received in the settlement of claims for loss of or damage to the merchandise;

(h) service charges payable to Tenant on accounts receivable;

(i) all gratuities and/or service charges given by customers and paid to Tenant's employees;

(j) amounts received by Tenant as direct reimbursement for out-of-pocket costs paid to third-party providers of goods and services (other than food and beverages), such as florists, musicians, disk jockeys, renters of furniture, photographers and valets retained in connection with private functions held in the Demised Premises;

(k) sums paid for the sale of any gift certificate, unless and until such certificate is redeemed in the Demised Premises;

(l) deposits from its customers and subtenants, if any, until such time as such deposits are applied against amount due and payable by such customers;

(m) sums paid to any provider of valet services and any gratuities paid to such service providers employees; and/or

(n) any basic monthly rent, percentage rent or additional rent collected from any subtenant, assignee or other party operating a business on the Demised Premises.

EXHIBIT "F"

TENANT SIGN PLAN

(TO BE ATTACHED)

SUBJECT TO LANDORD'S FINAL REVIEW AND APPROVAL

## EXHIBIT "G"

### COMMON AREA MAINTENANCE EXCLUSIONS

Notwithstanding the definition of Common Area Maintenance Charges set forth in this Lease, such charges shall not include the following (the **"Common Area Maintenance Exclusions"**):

(i)     Costs incurred by Landlord for management, operation and maintenance of the Common Areas, to the extent that Landlord is reimbursed by insurance proceeds;

(ii)    Overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in or to the Building or Common Areas to the extent the same exceeds the costs of such goods and/or services rendered by unaffiliated third parties on a competitive basis;

(iii)   Notwithstanding any contrary provision of this Lease, including, without limitation, any provision relating to capital expenditures, any and all costs arising from the presence of Hazardous Substances in or about the Building or the Common Areas, except to the extent introduced to the Building or the Common Areas by Tenant or any party accessing the Building or the Common Areas by or through Tenant;

(iv)    Costs arising from the negligence or fault in the construction or repair of the Building or Common Areas by Landlord, its agents, contractors or providers of materials or services to extent any such items are the responsibility of Landlord under this Lease;

(v)     Costs (including in connection therewith all attorneys' fees and costs of settlement and/or judgments and payments in lieu thereof) arising from claims, disputes or potential disputes in connection with potential or actual claims, litigation or arbitrations pertaining to Landlord and/or the Building and not related to the maintenance of the Common Areas;

(vi)    "in house" legal fees;

(vii)   Reserves for bad debts or for future improvements, repairs, additions, etc.;

(viii)  Depreciation payments;

(ix)    Any ground lease rental and/or any interest, principal, points and fees on debts or amortization on any mortgage or mortgages or any other debt instrument encumbering the Building;

(x)     Costs, including permit, license and inspection costs, incurred with respect to the installation of tenant or other occupants' improvements in the Building or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Building; and

(xi)    Leasing commissions, attorneys' fees in connection with the negotiation and preparation of letters, deal memos, letters of intent, leases, subleases and/or assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations and transactions with Tenant or present or prospective tenants or other occupants of the Building.

It is understood that Common Area Maintenance Charges shall be reduced by all cash discounts, trade discounts, quantity discounts, rebates or other amounts received by Landlord in the purchase of any goods, utilities, or services in connection with the management, operation and maintenance of the Common Area.

Exhibit B

# WC 3ᴿᴰ AND TRINITY, LP

481 Congress Avenue | 33ᵗʰ Floor | Austin, Texas 78701 | 512 327 3300

May 26, 2016

*via Certified Mail Return Receipt Requested and overnight delivery*

STK Rebel Austin, LLC
411 West 14ᵗʰ Street, 2ⁿᵈ Floor
New York, NY 10014

The One Group Hospitality, Inc.
411 West 14th Street, 2nd Floor
New York, NY 10014

With a copy to:
The Giannuzzi Group, LLP
411 West 14ᵗʰ Street, 4ᵗʰ Floor
New York, NY 10014
Attn: Nicholas L. Giannuzzi, Esq.

RE:     Lease Agreement dated June 5, 2015 (the "Lease") by and between WC 3ʳᵈ & Trinity, LP ("Landlord") and STK Rebel Austin, LLC ("Tenant") regarding the certain building known as 3ʳᵈ & Trinity (the "Demised Premises") and associated Guaranty dated June 5, 2015

Dear Tenant and Guarantor,

Any capitalized term not defined herein shall have the meaning ascribed thereto in the Lease.

This notice is to address concerns regarding Tenants ongoing efforts to complete improvements and open for business in accordance with the provisions outlined in the Lease.  As you are aware, Section 9.1 of the lease agreement states "Tenant shall use its commercially reasonable best efforts to cause the Opening Date to occur on or before the Rent Commencement Date."

We have made many attempts to obtain clarification as to the status of your efforts to achieve an Opening Date, and still lack visibility and clarity.

No later than Tuesday, June 08, 2016, please provide Landlord with a detailed action plan outlining strategies to secure all necessary permits required to proceed with construction. In addition, please provide a schedule identifying the critical path dates that you and your staff will need to maintain in order to complete the planned improvements as quickly as possible and open for business.  In addition, in order to ensure compliance with the Lease, Landlord will require weekly updates on the progress of the required Tenant Improvements; this process will be required until the Premises is officially opened.

# WC 3ᴿᴰ AND TRINITY, LP

401 CONGRESS AVENUE | 33ᵗʰ FLOOR | AUSTIN, TEXAS 78701 | 512.327.3300

     If you have any additional questions, please contact me directly at aalbright@wccapitalgroup.com. I appreciate your prompt response to this request.

Sincerely,

Aaron Albright
Asset Manager

cc: Sonia Low (*via e-mail*: sonialow@togrp.com)

# Exhibit C



October 10, 2016

STK Rebel Austin, LLC                                      *via Certified Mail, R.R.R. and U.S. 1st Class Mail*
411 West 14th Street, 2nd Floor
New York, NY 10014

The One Group Hospitality, Inc.                           *via Certified Mail, R.R.R. and U.S. 1st Class Mail*
411 West 14th Street, 2nd Floor
New York, NY 10014

The Giannuzzi Group, LLP                                  *via Certified Mail, R.R.R. and U.S. 1st Class Mail*
411 West 14th Street, 4th Floor
New York, NY 10014
Attn: Nicholas L. Giannuzzi, Esq.

**RE:**   **Lease Agreement dated June 5, 2015 (the "Lease") by and between WC 3rd & Trinity,
       LP ("Landlord") and STK Rebel Austin, LLC ("Tenant") and associated Guaranty
       dated June 5, 2015.**

Dear Tenant and Guarantor, The One Group Hospitality, Inc.:

       Any capitalized term not defined herein shall have the meaning ascribed thereto in the
Lease.

       Tenant owes Rent and other charges in the amount of **$39,321.78** (the "Delinquent
Amount"). The Delinquent Amount includes Rent, Tax, CAM, Insurance and Late Fees. These
amounts indicate only what is currently due and owing as of today, and additional charges are
incurred every day this matter is ignored.

       Tenant **must** remit payment of the Delinquent Amount to Landlord, at the address specified
below, within five (5) days hereof pursuant to Section 22.1 of the Lease.

                        WC 3rd & Trinity, LP
                        815-A Brazos Street #1100
                        Austin, TX 78701

STK Rebel Austin, LLC
The One Group Hospitality, Inc.
The Giannuzzi Group, LLP

October 10, 2016
Page 2

Tenant's failure to make such payment constitutes an Event of Default under the Lease, and Landlord hereby reserves all of its rights and remedies thereunder and under applicable law, including without limitation the right to terminate the Lease and/or retake possession of the Demised Premises. This Notice of Default does not constitute a waiver of any default under the Lease or a waiver of any of Landlord's rights to pursue any and all remedies available under the Lease or at law or in equity. If Landlord does not receive the Delinquent Amount within the time period prescribed, Landlord will exercise all applicable rights under the Lease.

If I do not receive a response from you within five (5) days, Landlord will exercise all applicable legal remedies, including the filing of a suit for the Delinquent Amount and other charges. I urge to you to contact me immediately at 512-328-9800 to discuss this matter and to make appropriate arrangements.

We look forward to hearing from you and resolving the above referenced issues.

Sincerely,

Caron Peace | Property Administrator
cpeace@iwcregroup.com

cc:    Anil Bhagat, Vice President, Property Management
       Maryann Norwood, Corporate Counsel

       Tenant File

# Exhibit D

**From:** Rosalie Keszler [mailto:rkeszler@wccapitalgroup.com]
**Sent:** Friday, December 16, 2016 2:02 PM
**To:** Jonathan Segal <js@togrp.com>; Sonia Low <SoniaLow@togrp.com>
**Cc:** Nate Paul <npaul@wccapitalgroup.com>; Sheena Paul <SPaul@wccapitalgroup.com>; Anil
Bhagat (WCRE) <abhagat@wcregroup.com>; Maryann Norwood <mnorwood@wccapitalgroup.com>
**Subject:** RE: 3rd & Trinity: STK Rebel Austin LLC

Mr. Segal, please respond to the email below.

Best,

Rosalie G. Keszler, CCIM | Vice President, Retail Leasing
World Class Capital Group LLC
401 Congress Avenue, 33rd Floor | Austin, Texas 78701
D 512-615-0976 | T 512-327-3300 | F 512.322.9238 | M 512.808.8781
rkeszler@wccapitalgroup.com | www.wccapitalgroup.com

**From:** Rosalie Keszler
**Sent:** Thursday, December 15, 2016 3:53 PM
**To:** 'js@togrp.com'; 'SoniaLow@togrp.com'

**Cc:** Nate Paul; Sheena Paul; Anil Bhagat (WCRE); Maryann Norwood
**Subject:** 3rd & Trinity: STK Rebel Austin LLC

Mr. Segal,

We have yet to receive a response from you or anyone from your team regarding the information received on the roof top deck structure. In addition STK continues to be delinquent on rent in the amount of $117,965.34, which does not include all penalties and fees.

Please advise immediately on the above.

Best,
Rosalie

Rosalie G. Keszler, CCIM | Vice President, Retail Leasing
World Class Capital Group LLC
401 Congress Avenue, 33rd Floor | Austin, Texas 78701
D 512-615-0976 | T 512-327-3300 | F 512.322.9238 | M 512.808.8781
rkeszler@wccapitalgroup.com | www.wccapitalgroup.com

The information contained in this e-mail is strictly confidential and for the intended use of the addressee only and may also be privileged or otherwise protected by other legal rules. Any disclosure, use or copying of the information by anyone other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and delete this message from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender does not accept liability for any errors or omissions in the contents of this message or for any damage sustained as a result of software viruses and advise that you carry out your own virus checks before opening any attachment. This email contains the views of the author and should not be interpreted as the views of World Class Capital Group or its affiliates.

# THE LAWYER REFERRAL SERVICE OF CENTRAL TEXAS

*A Non-Profit Corporation*

## IF YOU NEED A LAWYER AND DON'T KNOW ONE, THE LAWYER REFERRAL SERVICE CAN HELP

### 512-472-8303
**866-303-8303 (toll free)**
**www.AustinLRS.com**

Weekdays 8:00 am to 4:30 pm
$20.00 for first half hour attorney consultation
(free consultations for personal injury, malpractice, worker's compensation, bankruptcy, and social security disability)

This service is certified as a lawyer referral service as required by the State of Texas under Chapter 952, Occupations Code. Certificate No. 9303

## SI USTED NECESITA EL CONSEJO DE UN ABOGADO Y NO CONOCE A NINGUNO PUEDE LLAMAR A LA REFERENCIA DE ABOGADOS

### 512-472-8303
**866-303-8303 (llame gratis)**
**www.AustinLRS.com**

Abierto de lunes a viernes de 8:00 am–4:30 pm
$20.00 por la primera media hora de consulta con un abogado
(la consulta es gratis si se trata de daño personal, negligencia, indemnización al trabajador, bancarrota o por incapacidad del Seguro Social)

This service is certified as a lawyer referral service as required by the State of Texas under Chapter 952, Occupations Code. Certificate No. 9303