**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **WC 3rd & TRINITY, LP** | § | |
| | § | |
| **V.** | § | **NO. 1:17-CV-688-LY** |
| | § | |
| **STK REBEL AUSTIN, LLC, et al.** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **WORLD CLASS CAPITAL GROUP,** | § | |
| **LLC, et al.** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:     THE HONORABLE LEE YEAKEL
         UNITED STATES DISTRICT JUDGE

Before this Court are WC Group's Motion for Summary Judgment (Dkt. No. 39), STK's

Response (Dkt. No. 47), and WC Group's Reply (Dkt. No. 48); and STK's Motion for Partial

Summary Judgment (Dkt. No. 50), WC Group's Response (Dkt. No. 53), and STK's Reply (Dkt. No.

54). The District Court referred the above-motions to the undersigned Magistrate Judge for Report

and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72 and

Rule 1(c) of Appendix C of the Local Rules.

## I. GENERAL BACKGROUND

WC 3rd and Trinity, LP (WC Trinity) brought this suit against STK Rebel Austin, LLC

(STK) and its parent corporation, The One Group Hospitality, Inc. for breach of a lease and guaranty.

STK and The One Group then counterclaimed against WC 3rd and Trinity, and filed third-party

claims against WC Trinity's parent corporation World Class Capital Group and owners Natin Paul

and Sheena Paul (collectively WC Group). In its counter and third-party claims, STK asserts causes

of action for fraudulent inducement, fraud by nondisclosure, and negligent misrepresentation, along

with two claims for breach of contract and a claim for declaratory judgment. WC Trinity and WC Group now move for summary judgment in their favor on the affirmative breach of contract claim, and also seek a summary judgment rejecting all of the counterclaims and third-party claims. STK and The One Group have filed a cross-motion for summary judgment.

This suit arises from a contract between WC Trinity and STK, in which STK entered into a lease for a property owned by WC Trinity. The lease was for an initial period of ten years, with the prospect of extending the lease for two additional five-year periods (the Lease). The subject of the Lease, the "Demised Premises," were defined as:

> The building located at 305 E. 3rd St., Austin, Texas 78701, which, contains approximately 6,690 square feet of rentable area on the ground floor, in addition to an approximately 4,304 square foot rooftop area (**"Rooftop Patio"**) in an approximately 19,244 gross square foot building containing approximately 15,210 square feet of rentable area (**"Building"**) on a portion of the tract of land as more particularly described in **Exhibit "A"**.

(Dkt. No. 39, Exhibit 2-A). The One Group owns and operates a number of high end steak houses, and planned to open an "STK Rebel" restaurant in the leased premises. The parties signed the Lease on June 5, 2015, with a commencement date of July 1, 2015. The One Group Hospitality separately signed a guaranty agreement, in which it guaranteed payment and performance of STK's payment obligations under the Lease. The parties negotiated the lease over a number of months.

Pursuant to the Lease, STK was to pay a "Minimum Guaranteed Rental" beginning on the "Rent Commencement Date." The Rent Commencement Date was to begin "[t]he earlier of (i) the date upon which [STK] commences business operations at the Demised Premises and opens to the general public (the **"Opening Date"**), and (ii) March 1, 2016, subject to extension as provided for in Section 28.18." *Id.* Section 28.18 allowed for an extension of the Rent Commencement Date in

the case of: "(i) any Force Majeure Event or (ii) any Remediation Work, in any such case [that] causes, the Tenant's Work not to be completed or cause[s] Tenant to not open for business to the public on or before the Rent Commencement Date." *Id*. Absent these circumstances, STK was to begin paying the Minimum Guaranteed Rental Payments in monthly installments by the first day of the calendar month following the Rent Commencement Date. The Minimum Guaranteed Rental for the first 36 months of the Lease was $27,840.00 per month, with "an additional sum of $1,546.66 per month during each of Month 1 through 36," and $2,997.70 in a "Common Area Maintenance Charge" (CAM). *Id*. Further, STK was to pay a proportion of the taxes and insurance on the property.

WC Trinity alleges in its Complaint that STK committed a breach of contract when, after paying rent for several months, it failed to deliver its rent payments as they became due, beginning in the Fall of 2016. WC Trinity also alleges that STK did not use commercially reasonable best efforts pursuant to the Lease to open the restaurant. STK, on the other hand, argues that there was no breach of contract because WC Trinity did not deliver the property—specifically the rooftop patio—up to code as was required by the Lease, and WC Trinity's breach excused STK's performance. Furthermore, STK—which views the rooftop patio as essential to its "STK concept" or branding—argues that before the Lease was signed, WC Group made several representations to STK about the rooftop patio which turned out to be false, and agreed to help resolve the issues related to the rooftop after the Lease was signed.

Though STK began making its payments in March 2016—following the Rent Commencement Date— it failed to make its October 1, 2016 rent payment, and has not made any

payments since that date. WC Group seeks $1,088,155.45 in unpaid rent and fees up to the date of June 6, 2018. It also seeks attorneys fees and costs.

## II. LEGAL STANDARD

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required

to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

Determining whether a contract is ambiguous, and interpreting an unambiguous contract, are questions of law. *Interstate Contracting Corp. v. City of Dall., Tex.*, 407 F.3d 708, 712 (5th Cir. 2005); *Reilly v. Rangers Mgmt, Inc.*, 727 S.W.2d 527, 529 (Tex. 1987). The court's job in interpreting a written contract is to carry out the parties' stated intentions. *Reilly,* 727 S.W.2d at 529. Thus, in construing a contract, the court must give language its plain grammatical meaning unless it definitely appears that the intention of the parties would be defeated by doing so. *Id.* When a contract's meaning is disputed, the court's primary objective is to ascertain and give effect to the parties' intent as expressed by their language; objective manifestations of intent control, not what either party alleges they intended to say. *URI, Inc. v. Kleberg Cnty*, 543 S.W.3d 755, 763 (Tex. 2018). The Texas Supreme Court has stated that courts should "presume parties intend what the words of their contract say" and interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise.

> [W]ords must be construed in the context in which they are used. Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass "the circumstances present when the contract was entered." This is so because words are "the skin of a living thought," and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

*Id.* The Texas Supreme Court has also stated that if a court can give a clear and definite legal meaning to a contract, it is not ambiguous as a matter of law. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010). Courts should not find ambiguity simply because the parties disagree over a contract's meaning. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014). The primary concern in contract interpretation is to ascertain the true intentions of the parties as expressed in the instrument; courts should consider the entire writing to harmonize and effectuate all provisions such that none are rendered meaningless. *Id.*

## III. ANALYSIS

Each side has filed a summary judgment motion. The motion filed by the WC Group entities requests that the Court grant summary judgment on WC Trinity's breach of contract claim against STK and on its breach of the guaranty claim against The One Group Hospitality, Inc. It also asks that the Court grant summary judgment on all of the counterclaims against WC Trinity, as well as the third-party claims against World Class Capital Group and Natin and Sheena Paul. For its part, STK's motion seeks partial summary judgment on its fourth claim for relief (against WC Trinity for breach of contract), and against WC Trinity on its breach of contract and breach of guaranty claims against STK and The One Group, respectively.[1]

---

[1]In their briefs the parties make arguments not addressed here (e.g., WC Trinity alleges STK breached its contract not just by non-payment of rent, but also by not using commercially reasonable best efforts to open for business). In light of the recommendations made herein, the Court has not reached arguments, like this one, that are unnecessary to the resolution of the case. Further, STK and The One Group argued in their response that discovery had not closed, and thus consideration of the motion for summary judgment was premature. Because the discovery deadline in this case was December 7, 2018, and that date passed nearly two months ago—meaning all parties have had an opportunity to submit any evidence they wish—the Court need not address this argument.

## A.    WC Group's Motion for Summary Judgment

As noted, WC Group asks that the Court dismiss all of STK's counterclaims and third-party claims, and also requests summary judgment in its own favor on its claims against STK and The One Group for breach of the Lease and the guaranty.  The Court will start with the counter and third-party claims.

### 1.    STK's Fraud-based Counterclaims and Third-Party Claims

Each of these claims—fraudulent inducement, fraudulent concealment, and negligent misrepresentation—contain an element of justifiable reliance.[2]  Justifiable reliance "usually presents a question of fact," but as the Texas Supreme Court held last year, "the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified."  *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018).   In *JPMorgan*

---

[2]The elements of a fraudulent inducement claim are: (1) a material representation (2) that was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the representation was made with the intent that it should be acted upon by the party, (5) the party relied on it, and (6) he thereby suffered injury. *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 369 (Tex. App.–Houston [14th Dist.] 2016).

The elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover them, (5) the defendant was deliberately silent, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclsoure, (8) the plaintiff was injured as a result of acting without that knowledge. *Horizon Shipbuilding, Inc. V. Blyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.–Houston [14th Dist.] 2010).

The elements of a negligent misrepresentation claim are: (1) defendant made a representation to plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) the defendant provided false information for the guidance of others; (3) the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the representation; and (5) the misrepresentation proximately caused the plaintiff injury. *Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. App.–El Paso 2013).

*Chase*, a lessee under an oil and gas lease filed suit against a lessor and the lessor's representative for fraudulent inducement and negligent misrepresentation arising out of the execution of a lease when the lessor had already leased the property to a third party. The court held that the plaintiff could not maintain a claim of justifiable reliance within the context of numerous "red flags," the plaintiff's sophistication within the oil-and-gas industry, and the direct contradiction between the alleged representation and the letter of intent. The Court stated:

> Orca, composed of experienced and knowledgeable businesspeople, negotiated an arm's-length transaction and then placed millions of dollars in jeopardy–all while operating under circumstances that similarly situated parties would have regarded as imminently risky. Orca needed to protect its own interests through the exercise of ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances. Its failure to do so precludes its claim of justifiable reliance as a matter of law.

*JPMorgan Chase*, 546 S.W.3d at 660. In a 2010 case, where investors claimed to have justifiably relied on representations when purchasing bonds, the Texas Court also held that the investors' reliance was not justified because before the acquisition, the investors' senior portfolio manager—who was "an experienced bond investor" with a finance degree and an MBA—learned the corporation was financially at risk. *Grant Thornton, LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).

The Texas Supreme Court has also addressed the concept of "direct contradiction" in the context of justifiable reliance. The Court reiterated in *JPMorgan Chase* that, as Texas courts have "repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *JPMorgan Chase*, 546 S.W.3d at 658 (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*. 453 S.W.3d 419, 424 (Tex. 2015)).

8

> [A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests. . . . Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. . . . If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute. . . . [A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril. . . .

*Id.* (quoting *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858-59 (Tex. App.– Houston [14th Dist.] 2003)).

The Fifth Circuit's cases applying Texas law have similarly rejected fraud claims where the reliance was not justified. In a recent case, the court stated that a company's own investigation of the facts may negate "any reasonable reliance upon the supposed misrepresentations." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 475 (5th Cir. 2018). The Circuit has held that "no reasonable jury could find that [plaintiff] justifiably relied on [the defendants'] alleged misrepresentation" when "its own investigation of the facts negated any reasonable reliance upon the supposed misrepresentations." *Highland Crusader Offfshore Partners LP v. LifeCare Holdings, Inc.*, 377 Fed.Appx 422, 428 (5th Cir. 2010). And in a 2003 case, the Fifth Circuit analyzed the justifiable-reliance element by stating:

> Lewis, an individual with both a business background and familiarity with retirement accounts, should have viewed this series of events as a red flag warranting further investigation of the tax consequences of the loan transaction. Viewing the circumstances in their entirety, including Lewis's access to professional accountants, the amount of money involved in the transaction, and the ambiguous nature of [the defendant's] "assurance," Lewis' decision to enter into the transaction without undertaking additional investigation into its tax consequences was not justifiable.

*Lewis v. Bank of Am. N.A.*, 343 F.3d 540, 547 (5th Cir. 2003).

Here, all three of STK's fraud-based claims rely on the same alleged misrepresentation: "the rooftop area of the Premises was compliant with all codes and regulations for STK's intended use of the rooftop area of the Premises." (*E.g.* Dkt. No. 19 at 8, ¶ 37). To support this assertion, STK points to the claim that Natin Paul emailed STK "a rendering of the property as it could look as an STK-branded restaurant, including the rooftop area," and also emailed "a CAD file of the property which included the rooftop area." (Dkt. No. 47 at 14 (relying on Segal declaration)).

Applying the law regarding justifiable reliance to the undisputed facts, STK's claims fail as a matter of law. First, STK is clearly a sophisticated party that not only has operated in the hospitality industry for some time, but has previously negotiated similar contracts. One Group "admits that it has designed and currently operates restaurants in many locations and countries" (Dkt. No. 47 at 5) and "admit[s] that Plaintiff's general business description of One, as well as the general business concept of STK, including the number of restaurants, is generally accurate." (Dkt. 14 at 2). In addition to STK's sophistication in the hospitality industry generally and operation of restaurants more specifically, the parties also hired commercial real estate companies "to aid in the lease negotiation and implementation process." (Dkt. No. 19 at 3). Therefore, as in *JPMorganChase*, the parties, and STK in particular, were coming to this business transaction with a heightened and deep expertise.

Second, as the court stated in *JPMorgan*, reliance on a misrepresentation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. The alleged misrepresentation here was that "the rooftop area of the Premises was compliant with all codes and regulations for STK's intended use of the rooftop area of the Premises," Dkt. No. 19 at 8 ¶ 37, and this was based on renderings and CAD files that WC

Group sent to STK. There are at least two clauses in the lease that directly contradict this. First, the "AS-IS" clause stated that "the Demised Premises is being leased "AS IS", with Tenant accepting all defects, if any, and (ii) Landlord makes no warranty of any kind, express or implied, with respect to the Demised Premises (without limitation, Landlord makes no warranty as to the habitability, fitness or suitability of the Demised Premises for a particular purpose)." (Dkt. No. 39, Exhibit 2-A at ¶ 3.1). And in at least two places the Lease specifically excluded reliance on any renderings or brochures. Paragraph 28.13 stated:

> This Lease contains the entire agreement between the parties, and no rights are created in favor of either party other than as specified or expressly contemplated in this Lease. *No brochure, rendering, information, or correspondence shall be deemed to be a part of this agreement unless specifically incorporated herein by reference.* In addition, no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification, or termination is sought.

Dkt. No. 39, Exhibit 2-A (emphasis added). Further, paragraph 28.14 states:

> LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION OR PROMISE OF THE OTHER, OR OF THE AGENT OR COOPERATING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THE LEASE.

Dkt. No. 39, Exhibit 2-A. These provisions contradict the allegation that STK was relying on a representation that the rooftop area complied with all relevant codes for STK's intended use.

The Lease's description of STK's intended use of the premises, in conjunction with WC Trinity's agreement on the condition in which it would deliver the premises, is also inconsistent with the representation that the rooftop area was compliant with relevant codes for STK's intended use. The Lease has very detailed terms on STK's intended use, and WC Group's obligations regarding the premises' code compliance for that use. As set out in detail in the next section (addressing the

breach of contract claim) STK's statement of how it intended to use the premises does not even contain the word "rooftop," and is silent regarding how it planned to use the rooftop. And the only representation WC Trinity made was that the premises as a whole were in compliance with code and would permit STK to carry out its"STK Concept"—again, with no mention of the rooftop. These detailed statements are also inconsistent with the supposed representation that the rooftop met all code requirements needed to permit it to be used as a restaurant or bar.

Finally, as both parties admit, the Lease contained a 60-day contingency period that expired on August, 3, 2015. (Dkt. No. 47 at 5). The contingency period was designed for STK to be able to terminate the Lease before the end of the contingency period if it chose to do so. STK notes that during this period it "diligently undertook steps to design, plan and implement its restaurant on the Premises." (Dkt. No. 19 at 5). This 60-day contingency period, combined with the sophistication of STK, is precisely the sort of provision that under the law bars a claim of justifiable reliance. Notwithstanding the right to walk away from the lease for any reason (or no reason) during this 60-day period, and notwithstanding the alleged importance of the rooftop to STK's plans, STK did not use that time to investigate the rooftop's load capacity. Instead, it waited until nearly a year later to obtain a structural engineering report—in May 2016—and only then asserted that there was a problem with the rooftop. And this does not even account for the many months of pre-execution time that STK had to inspect the premises, and its acknowledgment in the Lease that "it has been given the opportunity to inspect the Demised Premises and to have qualified experts inspect the Demised Premises prior to the execution of this Lease." (Dkt. No. 39, Exhibit 2-A). In short, the facts are undisputed that STK had ample opportunity to investigate the structural integrity of the rooftop both before *and* after it signed the lease, and to otherwise protect its interests regarding its

plans for the rooftop, and it failed to do so. This is very much like the situation in *JPMorgan Chase* where

> experienced and knowledgeable businesspeople, negotiated an arm's-length transaction and then placed millions of dollars in jeopardy–all while operating under circumstances that similarly situated parties would have regarded as imminently risky. [STK] needed to protect its own interests through the exercise of ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances. Its failure to do so precludes its claim of justifiable reliance as a matter of law.

546 S.W.3d at 660. Given that justifiable reliance is an element of fraudulent inducement, fraudulent concealment, and negligent misrepresentation, WC Trinity and the WCGroup parties are entitled to summary judgment on each of these counter and third-party claims.

## 2. STK's Breach of Contract Counterclaim Against WC Trinity - Lease

STK's breach of contract claim under the Lease is primarily defensive. It contends that WC Trinity failed to deliver the premises as it was obligated to, in breach of the Lease. It further contends that the Lease and the guaranty are thereby voided by this breach. The essential elements of a breach of contract claim under Texas law are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.–Houston [1st Dist.] 2001). This claim depends on element (3)—whether WC Trinity delivered the premises to STK in the condition required by the Lease.

The parties' central dispute turns on Section 3.1 of the Lease, which states in part:

> This Section 3.1 is subject to any contrary requirements under applicable law; however, in this regard Tenant acknowledges that it has been given the opportunity to inspect the Demised Premises and to have qualified experts inspect the Demised Premises prior to the execution of this Lease. *Notwithstanding the foregoing, Landlord covenants, agrees, represents and warrants to deliver the Demised*

> *Premises to Tenant . . . (b) in compliance with all local codes and Regulations (as defined below) with respect to the Permitted Use.*

(Dkt. No. 39, Exhibit 2-A) (emphasis added).  The parties agree that the Demised Premises include the entire building—the interior space *and* the rooftop area (referred in the lease as the "Rooftop Patio").  (Dkt. No. 19 at 7; Dkt. No. 39 at 3).  WC Trinity argues that it delivered, and STK took possession of, the Demised Premises as required by the Lease on June 5, 2015.  STK contends, however, that WC Trinity failed to deliver the premises to STK in compliance with all applicable codes and regulations for STK's "***intended use of the rooftop area as a fully functional restaurant, bar, and lounge***."  (Dkt. No. 19 at 3-4) (emphasis added).  Said differently, STK's argument is that WC Trinity was required to deliver *the rooftop area* in a condition that allowed STK to operate a restaurant, bar or lounge *on the rooftop* in compliance with all local codes and regulations.  It contends that because relevant regulations required that, if used as a restaurant, bar, or lounge, the rooftop area had to be able to hold a load of at least 100 pounds per square foot, and because the rooftop, as delivered, could not hold that load, WC Trinity did not deliver the Demised Premises—the rooftop—"in compliance with all local codes and Regulations."

This argument depends further on the definition of "Permitted Use," because the pertinent language of Section 3.1 only obligated WC Trinity to deliver the premises in compliance with relevant codes "with respect to the Permitted Use."  "Permitted Use" is defined by the Lease as follows:

> **Permitted Use**: Restaurant, Bar and/or Lounge operating as an STK Rebel.  Landlord understands acknowledges and agrees that (i) Demised Premises will operate in a manner substantially similar to the "STK Rebel" steakhouse restaurants operated by Tenant's affiliates, and (ii) such concept involves a number of elements uncharacteristic among traditional steakhouse restaurants, including without limitation, the following: (a) playing of loud pre-recorded music and using a "disc

jockey" who may be accompanied by live instrument performances, subject to compliance with all local noise ordinances; (b) playing pre-recorded ambient background music; (c) installing and operating one or more private dining rooms in the Demised Premises; and (d) using the Demised Premises (or any portion thereof) for private parties (collectively, the "**STK Concept**"). . . . Tenant acknowledges that the above specification of a "Permitted Use" means only that Landlord has no objection to the specified use and, except as otherwise expressly set forth in this Lease, does not include any representation or warranty by Landlord as to whether or not such specified use complies with applicable laws and/or requires special governmental permits.

(Dkt. No. 39, Exhibit 2-A). STK argues that this clause required WC Trinity to deliver the premises—including the rooftop area—in a condition that would allow STK to operate as described. And because the rooftop as delivered could not be used as described in the Permitted Use clause, WC Trinity breached the Lease.

STK is reading much more into these clauses than is there. STK does not argue (nor could it) that the Demised Premises could not be operated as described in the "Permitted Use" clause. In fact, the undisputed evidence is that it could do so. Rather, it contends only the rooftop *alone* could not operate as a restaurant, bar, and/or lounge. But nothing in the Lease required that. As a sophisticated party, STK knew that, if it wanted assurance that it would be able to use the rooftop patio in any particular manner, then it needed to include in the Lease language explicitly stating how it intended to use *the rooftop*, and requiring WC Trinity to warrant that it was delivering the rooftop in a condition that would permit that specific use. There simply isn't any language like that in the Lease. In fact, the word "rooftop" is nowhere to be found in the Permitted Use clause. Despite the alleged importance of the rooftop to STK's plans, the clause doesn't say a word about how STK intends to use the rooftop, but instead focuses on the "STK Concept"—with its use of DJs and loud music—and documents that WC Trinity has "no objection" to STK carrying out that concept in the

premises. When taken in conjunction with the definition of "Permitted Use," the plain language of Section 3.1 only obligated WC Group to deliver *all* of the Demised Premises—not some limited portion—in a condition that, if STK operated it according to the Permitted Use, the space as delivered would allow for that use under all relevant codes. The facts are undisputed that WC Trinity complied with this obligation, and WC Trinity is entitled to summary judgment on STK's breach of contract claim under the Lease.

### 3. STK's Breach of Contract Claim Against WC Trinity - Emails

WC Trinity and the WC Group in their summary judgment motion requested judgment on the Fifth Counterclaim, in which STK contends that in October 2016 Nate Paul, on behalf of WC Trinity, and Jonathan Segal, on behalf of STK and One Group, entered into an agreement whereby WC Trinity would aid STK in updating its building permit seeking to render the rooftop complaint with the applicable building codes and regulations, and whereby WC Trinity would bear the costs of that work. This contract supposedly arose out of a single email sent by Segal to Paul, purporting to confirm the contents of a phone call. Dkt. No. 47-1 at 25-26. The summary judgment motion on this claim is a "no evidence" motion, as it simply states that STK does not have any evidence to prove this claim. Dkt. No. 39 at 12. Under Rule 56, this shifted the burden to STK to demonstrate the existence of at least some facts to support the claim that would allow it to get to a jury. *Celotex*, 477 U.S. 317, 322 (1987); *Sangi v. Fairbanks Cap. Corp.*, 219 Fed. App'x 359, 2007 WL 625012 (5th Cir. 2007).

STK has wholly failed to do so. In fact, STK doesn't even address this breach of contract claim in its response. That alone dooms the claim. And while the email at issue is attached to the response to the motion, that email is far from enough to create a fact question on the claim. The

simplest reason for this is the last sentence of the email. After summarizing what he understood the phone call's contents to be, Segal finished with "In order to move forward I would greatly lyrics [sic] appreciate it if you would confirm the above as our joint understanding of the meeting." Dkt. No. 47-1 at 26. There is no other document STK points to on this claim, so STK's summary judgment evidence does not even show that Paul agreed with Segal's summary of the call, much less that he did so in such a manner that would have created an enforceable contract. Since there is no proof of a valid contract, there can be no breach of contract. Thus, STK has not met its burden, and summary judgment as to its fifth claim for relief is appropriate.

### 4. STK's Declaratory Judgment Counterclaim Against WC Trinity

Finally, WC Group argues that STK's sixth counterclaim for relief, seeking a declaratory judgment, should be dismissed. The Court agrees. STK seeks a determination from the Court that no rent is due and payable under the Lease. "[A] motion for declaratory judgement that merely restates a party's defenses is insufficient unless the party can prove that there are issues of greater ramification to be resolved." *Zytax, Inc. v. Green Plains Renewable Energy, Inc.*, No. H-09-2582, 2010 WL 2219179, at *7 (S.D. Tex. May, 28, 2010); *Hanson Aggregates, Inc. v. Roberts & Schaefer Co.*, No. 3:05-CV-1883-P, 2006 WL 2285575, at *3 (N.D. Tex. Aug. 9, 2006). Here, STK's request for declaratory judgment is resolved in other parts of the present motion, namely WC Group's claims, and thus, summary judgment as to this claim is warranted as well.

### 5. WC Group's Breach of Contract Claim

Next, the Court turns to WC Trinity's breach of contract claim. Again, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of

the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d at 351*; Compass Bank v. Sunbelt Multimedia Co.*, 2014 WL 6087777, at *5 (S.D. Tex. Nov. 13, 2014).

a. **Liability for breach - Lease**

WC Group contends that it is entitled to summary judgment that STK breached its rent payment obligations under the lease, and also that The One Group breached it contract guaranteeing STK's payment obligations. The only defensive argument the Defendants make (other than those already disposed of above), is a force majeure argument. STK argues that WC Group did not conclusively establish the Rent Commencement Date was ever triggered. The relevant section of the Lease states:

> **Rent Commencement Date:** The earlier of (i) the date upon which Tenant commences business operations at the Demised Premises and opens to the general public (the "Opening Date"), and (ii) March 1, 2016, subject to extension as provided for in Section 28.18.

(Dkt. No. 39 at Exhibit 2-A). The parties agree that STK never commenced business operations on the premises. Absent, some other provision, section 1.1 therefore provided that the Rent Commencement Date was March 1, 2016. STK contends that Section 28.18, which is referenced in this clause, provides that the Rent Commencement Date is extended when a "Force Majeure Event" causes the Tenant not to open for business. (Dkt. No. 39 at Exhibit 2-A). STK contends that an applicable force majeure event occurred, in the form of it being unable to open for business because the rooftop's structural support did not comply with local building codes and regulations, and because of WC Trinity's refusal to cure that defect. There are a host of problems with this argument.

First, Section 28.18, the clause allowing for the extension of the Rent Commencement Date, is inconsistent with STK's argument. That section does not contemplate that rent will start and stop once the Rent Commencement Date is triggered. Rather, the Force Majeure language allows for the possibility that *before* the Rent Commencement Date kicks in, it can be extended if a force majeure event occurs. Here, the undisputed evidence shows that STK began paying rent on March 8, 2016 (a week after the contractual date of March 1, 2016), and continued making payments until September 2, 2016. (Dkt. No. 39 at 26-27). The extension clause provides that if "any Force Majeure Event . . . causes the Tenant's work not be completed or cause[s] Tenant to not open for business *on or before* the Rent Commencement Date, then the Rent Commencement Date shall be extended by one day for each such day of delay." Once STK commenced paying rent, the plain language of the Lease did not provide for any "extension" of the Rent Commencement Date, and said nothing about allowing STK *to stop paying rent*, which is what occurred.

A more fundamental problem with this argument is that the state of the rooftop simply does not qualify as a "force majeure" event. The Lease at Section 28.6 defines a Force Majeure Event as

> . . . strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party.

(Dkt. No. 39 at Exhibit 2-A). In determining whether a condition of force majeure has occurred, courts "look to the language that the parties specifically bargained for in the contract to determine the parties' intent concerning whether the event complained of excuses performance." *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 n.5 (5th Cir. 1990); *Anadarko Petroleum Corp. v. Nobel Drilling (U.S.) LLC.*, 2012 WL 13040279, at *16 (S.D. Tex. May 3, 2012). Force majeure clauses derive from the notion that parties to a contract should be relieved of their contractual duties when

19

performance is prevented by an event wholly beyond their control, such as an act of God.  *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales*, 729 F.2d 1530, 1542 (5th Cir. 1984); *Red River Res. Inc. v. Wickford, Inc.*, 443 B.R. 74, 79 (E.D. Tex. 2010).  A party relying on a force majeure clause bears the burden of proving that the event was beyond its control and without its fault or negligence.  30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77:31 (4th ed. 1990 & Supp. 2004).

STK's force majeure claim borders on the frivolous.  The entirety of its argument is contained in this sentence:

> STK Group's inability to open the restaurant for business due to the rooftop's structural support failing to comply with local building codes and regulations, and WC Group's refusal to cure that defect, constitutes a Force Majeure Event under the broad definition of Section 28.6.

Dkt. No. 47 at 17.  STK fails to cite to any summary judgment evidence to support this claim.  Thus, there is no evidence whatsoever that STK made any efforts to open for business without using the rooftop, or that doing so was impossible.  Further, the evidence in the record rebuts any claim of impossibility, as all that it shows is that STK did not want to pay for the rooftop improvements needed to allow the rooftop to be used as a restaurant or bar.  Thus, it was not the regulations or codes that were the impediment, but rather STK's reluctance to spend the money needed.  This is not a force majeure event.  Finally, as WC Trinity points out, Texas law requires that an event of force majeure be something that the party asserting it could not have anticipated or controlled.  *Roland Oil Co. v. R.R. Comm'n of Tex.*, 2015 WL 870232, at *5 (Tex. App.-Austin Feb. 27, 2015).  As already discussed, the status of the roof and its ability to be used as STK intended was something

very much within the control and anticipation of STK—if STK required that the roof be in any particular condition to open for business, it could have negotiated for that in the Lease.

As this is the sole defense STK offers to the breach of contract claim, and the undisputed evidence demonstrates that the Rent Commencement Date was March 1, 2016, and further that STK did not pay any rent after September 2016, WC Group is entitled to summary judgment on its breach of contract claim against STK.

### b.    Liability for breach - Guaranty

As noted at the outset, The One Group Hospitality guaranteed all of STK's obligations under the Lease. WC Group therefore also seeks summary judgment against One Group on its guaranty. To recover on a guaranty, a plaintiff must show: (1) the existence and ownership of the guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the guarantor's failure or refusal to perform the promise. *Lee v. Martin Marietta Materials Sw., Ltd*., 141 S.W.3d 719, 720-21 (Tex. App.–San Antonio 2004). Here, there is no disagreement between the parties that they executed a guaranty contract; One Group admits that it executed a guaranty contract on June 5, 2015 (Dkt. No. 19 at 5; Dkt. No. 47 at 5). WC Group has shown the terms of the underlying contract and the occurrence of the condition upon which liability is based (Dkt. No. 39, Exhibit 2-B). Here, the relevant portion of the Guaranty states:

> Guarantor hereby covenants that if Tenant shall default in the payment or performance of any of the Obligations, Guarantor shall pay the amount due to Landlord as and when the same become due under the Lease. Guarantor further covenants to pay to Landlord on demand by Landlord all reasonable, out-of-pocket costs and expenses that may arise in enforcing this Limited Lease Guaranty (this "**Guaranty**") or damages in consequence of any default by Tenant of the Obligations (other than any acceleration of rent beyond Month 36 of the Lease Term), including without limitation, reasonable attorneys' fees (the "**Enforcement Costs**" together with the "**Obligations**", the "**Guaranteed Obligations**").

(Dkt. No. 39, Exhibit 2-A). As already found, STK failed to pay rent under the Lease as due, and thus has "default[ed] in the payment or performance of any of the Obligations" of the Lease. Further, the evidence shows that The One Group has failed to pay the rent that STK defaulted in paying. (Dkt. No. 39, Exhibit 1-A).

The sole defensive argument One Group and STK raise is that WC Group cannot seek recovery under the Guaranty because WC Trinity failed to deliver the property as required by the Lease. (Dkt. No. 47 at 14). However, as the preceding discussion shows, WC Trinity met its Lease obligations with regard to the delivery of the premises. As the evidence before the Court shows both the existence of the guaranty contract and the occurrence of the condition upon which liability is based, the Court looks to see whether the guarantor failed to perform its promise. There is no genuine issue of fact on this point. The One Group has not made a single payment under the Guaranty. Therefore, WC Group is entitled to summary judgement on this claim as well.

### c. Damages

With regard to damages, WC Group submits the affidavit of Barbara Lee and the Lease Ledger to show the amount of rent that is due and unpaid. (Dkt. No. 39, Exhibit 1, Exhibit 1-A). STK disputes the calculations and states that they include improper amounts, such as tenant allowances that were never provided and other offsets such as the security deposit and good fath rent payments that WC Group received. (Dkt. No. 47 at 18). STK also argues that it suffered costs and expenses in building out the property in question and WC Group's calculations do not take these into account. (Dkt. No. 47, Declaration of Linda Siluk). In short, there are fact issues as to the precise amount of damages WC Group is entitled to, and summary judgment on this issue is inappropriate.

## C.    Attorney's Fees

Finally, WC Group seeks summary judgment for its attorney's fees under Paragraph 22.6 of

the Lease, which states:

> If on account of any breach or default by Tenant in its obligations hereunder,
> Landlord shall employ an attorney to represent, enforce or defend any Landlord's
> rights or remedies hereunder, Tenant agrees to pay any reasonable, out-of-pocket
> attorney's fees incurred by Landlord in connection therewith.

(Dkt. No. 39, Exhibit 2-A).  The relevant portion of the Guaranty states:

> Guarantor hereby covenants that if Tenant shall default in the payment or
> performance of any of the Obligations, Guarantor shall pay the amount due to
> Landlord as and when the same become due under the Lease.  Guarantor further
> covenants to pay to Landlord on demand by Landlord all reasonable, out-of-pocket
> costs and expenses that may arise in enforcing this Limited Lease Guaranty (this
> **"Guaranty")** or damages in consequent of any default by Tenant of the Obligations
> (other than any acceleration of rent beyond Month 36 of the Lease Term), including
> without limitation, reasonable attorneys' fees (the "**Enforcement Costs**", together
> with the "**Obligations**", the "**Guaranteed Obligations**")).

(Dk. No. 39, Exhibit 2-A).   Based on a plain reading of the Lease and the Guaranty, and given the

Court's finding that STK and The One Group breached their contracts, WC Group is entitled to its

attorney's fees against STK under the lease and the One Group in its role as Guarantor, should this

Court's other recommendations be adopted by the district judge.  It is premature to address the issue

in any more detail at this time, however, as the federal rules and this Court's Local Rules provide

for attorney's fees to be addressed after judgment.  FED. R. CIV. P. 54(d)(2)(B)(i); Local Rule CV-

7(j).  Accordingly, should the district court adopt the recommendation that WC Trinity be granted

summary judgment as to liability on the breach of contract claim, then it would also be appropriate

to grant judgment as to WC Trinty's entitlement to attorney's fees, with the amount of those fees to

be determined in accordance with Rule 54 and Local Rule CV-7(j).

## IV. RECOMMENDATION

Consistent with the discussion above, the undersigned **RECOMMENDS** that STK's Motion for Partial Summary Judgment (Dkt. No. 50) be **DENIED**.

It is **FURTHER RECOMMENDED** that WC Group's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED IN PART and DENIED IN PART** as follow:

(1)     summary judgment be entered that STK and The One Group take nothing on any of their counterclaims and third-party claims,

(2)     summary judgment be entered in favor of WC 3rd and Trinity, LP and against both STK and The One Group for breach of contract under the Lease and Guaranty, but as to liability only,

(3)     summary judgment be entered in favor of WC 3rd and Trinity against both STK and The One Group as to liability for WC Trinity's and WC Group's attorney's fees, and

(4)     that summary judgment be **DENIED** with respect to the amount of damages and attorney's fees on the claims against STK and The One Group.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon

grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150–53, 106 S. Ct. 466, 472–74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 1st day of February, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE